UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| ALPS PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>                              Plaintiff,<br><br>    v.<br><br>GREGORY P. CAVAGNARO, ESQ.;<br>LAW OFFICE OF GREGORY P.<br>CAVAGNARO; and<br>UMPQUA BANK,<br><br>                              Defendants. | NO. 2:24-cv-00472<br><br>**COMPLAINT** |

Plaintiff ALPS Property & Casualty Insurance Company ("ALPS"), pursuant to 28 U.S.C. §§ 2201(a) and 2202 and Federal Rules of Civil Procedure 8(a) and 57, for its complaint against Defendants Gregory P. Cavagnaro, Esq. ("Cavagnaro"), Law Office of Gregory P. Cavagnaro ("Cavagnaro Firm" and together with Cavagnaro, "Cavagnaro Defendants"), and Umpqua Bank ("Umpqua Bank" and together with the Cavagnaro Defendants, "Defendants"), alleges as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      ALPS is an insurance company and corporation organized under the laws of the State of Montana with its principal place of business in the State of Montana; ALPS is a citizen of the State of Montana.

COMPLAINT - 1

2. Cavagnaro is an attorney licensed to practice in the State of Washington and, upon information and belief, domiciled in and a citizen of the State of Washington.

3. The Cavagnaro Firm is, upon information and belief, a sole proprietorship with its principal place of business in Bellevue, Washington. Cavagnaro is, upon information and belief, the sole owner, member, or partner of the Cavagnaro Firm. The Cavagnaro Firm is, upon information and belief, a citizen of the State of Washington.

4. Umpqua Bank is, upon information and belief, an Oregon state-chartered bank; Umpqua Bank is, upon information and belief, domiciled in and a citizen of the State of Oregon.

5. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between ALPS and Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims for relief occurred in this district.

## GENERAL ALLEGATIONS

### I. Introduction

7. In this insurance coverage action, ALPS seeks a judgment declaring (a) Lawyers Professional Liability Insurance Policy No. ALPS28842-1 issued by ALPS to the Cavagnaro Firm for the policy period October 25, 2022 to October 25, 2023 ("2022-2023 Policy") and (b) Lawyers Professional Liability Insurance Policy No. ALPS28842-2 issued by ALPS to the Cavagnaro Firm for the policy period October 25, 2023 to October 25, 2024 ("2023-2024 Policy" and together with the 2022-2023 Policy, "Policies") do not afford coverage to the Cavagnaro Defendants with respect to the claim ("Claim") by Umpqua Bank against the Cavagnaro Defendants, as articulated in the suit styled *Umpqua Bank v. Cavagnaro*, No. 24-2-00682-6 SEA (Sup. Ct. King Cty., Wash.) ("Suit"). A true and correct copy of the 2022-2023 Policy is attached as Exhibit A; a true and correct copy of the 2023-2024 Policy is attached as Exhibit B.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

8.     The Claim arises from the Cavagnaro Defendants' alleged loss of trust account funds from a counterfeit check scheme ("Counterfeit Check Scheme") involving a fraudulent client and the Cavagnaro Defendants' transfer of funds from the Cavagnaro Defendants' trust account with Umpqua Bank to a criminal actor.

9.     As described more fully below, with respect to the Counterfeit Check Scheme, the Cavagnaro Defendants responded to an inquiry from a criminal actor purporting to be a potential client; received a counterfeit check and wire instructions from the criminal actor or an associate of the criminal actor; deposited the counterfeit check in the Cavagnaro Defendants' trust account with Umpqua Bank, which at the time had approximately $1500 in the account; directed Umpqua Bank to wire transfer approximately $255,000 from the Cavagnaro Defendants' trust account to a Third Federal Savings & Loan Bank account in Florida; and subsequently discovered the check was counterfeit and the funds were lost to the criminal actor.  Although Umpqua Bank subsequently recovered approximately $105,000 of the lost funds, there remains a negative balance of nearly $150,000 in the Cavagnaro Defendants' trust account with Umpqua Bank—funds which Umpqua Bank presently seeks from the Cavagnaro Defendants in the Suit.

10.     The Claim, as articulated in the Suit, is outside the coverage afforded by the Policies because:

(a)     the Claim arises from or in connection with loss, conversion, misappropriation, wrongful disbursement, or negligent supervision by any person of trust account funds or property, or funds or property of any other person, held or controlled by the Cavagnaro Defendants, which is excluded from coverage (Exhibit A, Exclusions § 3.H; Exhibit B, Exclusions § 3.H);

(b)     the Claim seeks the return or reimbursement of funds held or controlled by the Cavagnaro Defendants, which is excluded from coverage (Exhibit A, Exclusions § 3.I; Exhibit B, Exclusions § 3.I);

(c)     the Claim does not arise from or in connection with an act, error, or omission by the Cavagnaro Defendants in the performance of "Professional Services", which are defined by the Policies, in relevant part, as services or activities as an attorney on behalf of clients in an attorney-client relationship; the Claim, rather, arises from or in connection with: (i) obligations or services assumed by or performed under various financial agreements with Umpqua Bank, which are not contracts to provide "Professional Services" as defined by the

COMPLAINT - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Policies, and (ii) holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party, which are not "Professional Services" as defined by the Policies (Exhibit A, Insuring Agreements § 1.A.1, Definitions §§ 2.BB, 2.Z; Exhibit B, Insuring Agreements § 1.A.1, Definitions §§ 2.BB, 2.Z); and

(d)   the Claim—by which Umpqua Bank seeks reimbursement for approximately $150,000 ultimately lost from the Cavagnaro Defendants' trust account in the Counterfeit Check Scheme—does not seek "Damages" under the Policies, which provide "Damages" do not include (i) "[r]estitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses . . . received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured", and (ii) "[i]njury or damage to, destruction of, loss of, or loss of use of any funds or property" (Exhibit A, Definitions § 2.H; Exhibit B, Definitions § 2.H).

11.    Additionally, with respect to the 2023-2024 Policy, the Claim is outside the coverage because it was not first made and reported during the policy period for the 2023-2024 Policy.  The Cavagnaro Defendants first provided ALPS with notice of circumstances from which the Claim could arise during the policy period for the 2022-2023 Policy.  Although Umpqua Bank filed the Suit during the policy period for the 2023-2024 Policy, because the Cavagnaro Defendants first provided notice of a potential claim arising from the Counterfeit Check Scheme during the policy period for the 2022-2023 Policy, the Claim is deemed made and reported under the 2022-2023 Policy.  The Claim is outside the coverage afforded by the 2023-2024 Policy because the Claim was made and reported under the 2022-2023 Policy and was first reported to ALPS prior to the October 25, 2023 effective date of the 2023-2024 Policy.

## II.  Background

### A.  Counterfeit Check Scheme

12.    On July 23, 2023, upon information and belief, the Cavagnaro Firm received a request through the Cavagnaro Firm's website ("July 23, 2023 Request") to provide legal assistance to an individual who identified himself as Raymond Alan Hopkins ("Hopkins").  A true and correct copy of the July 23, 2023 Request is attached as Exhibit C.

COMPLAINT - 4

13.     In Hopkins's July 23, 2023 Request to the Cavagnaro Firm, he requested assistance recovering funds loaned to a business associate.  (Exhibit C).

14.     By email correspondence to Hopkins dated July 25, 2023 ("July 25, 2023 Correspondence"), upon information and belief, Cavagnaro offered to discuss Hopkins's request for legal assistance.  A true and correct copy of the July 25, 2023 Correspondence is attached as Exhibit D.

15.     By email correspondence dated July 26, 2023, upon information and belief, Hopkins provided the Cavagnaro Defendants with a copy of the "loan agreement" between Hopkins and his alleged former business associate, whom Hopkins identified as William A. Johnson ("Johnson").  (Exhibit D).

16.     On July 28, 2023, upon information and belief, Hopkins executed an engagement agreement ("Engagement Agreement") with the Cavagnaro Firm and provided the executed agreement to the Cavagnaro Firm.

17.     By email correspondence dated July 29, 2023 ("July 29, 2023 Correspondence"), upon information and belief, Johnson notified the Cavagnaro Defendants he intended to repay the loan from Hopkins and would "send out a payment shortly."  A true and correct copy of the July 29, 2023 Correspondence is attached as Exhibit E.

18.     By email correspondence to Cavagnaro dated August 3, 2023 ("August 3, 2023 Correspondence"), upon information and belief, Johnson proposed a payment plan to repay the loan to Hopkins on or before September 15, 2023.  A true and correct copy of the August 3, 2023 Correspondence is attached as Exhibit F.

19.     On August 3, 2023, upon information and belief, the Cavagnaro Defendants received a Scotiabank check made payable to the Cavagnaro Firm in the amount of $258,500.00 ("Check").  A true and correct copy of the Check and correspondence to the Cavagnaro Defendants enclosed with the Check, redacted pursuant to LCR 5.2(a)(4), is attached as Exhibit G.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

20.     Umpqua Bank alleges, on August 3, 2023, the Cavagnaro Defendants deposited the Check into the Cavagnaro Defendants' IOLTA trust account with Umpqua Bank. (January 10, 2024 Complaint in the Suit ("Complaint") ¶ 17.   A true and correct copy of the Complaint is attached as Exhibit H.).

21.     Umpqua Bank further alleges the Cavagnaro Defendants' trust account "had a balance of $1,443.12" as of July 31, 2023, prior to the Cavagnaro Defendants' deposit of the Check into the Cavagnaro Defendants' trust account with Umpqua Bank.  (Exhibit H ¶ 16).

22.     By email correspondence dated August 10, 2023 ("August 10, 2023 Wire Instruction Correspondence"), upon information and belief, the Cavagnaro Defendants received wire instructions from Hopkins, which requested the Cavagnaro Defendants wire the amount of the Check to a Third Federal Savings & Loan Bank ("Third Federal Bank") account in Florida owned by "Fariyal R. ALI".   A true and correct copy of the August 10, 2023 Wire Instruction Correspondence, redacted pursuant to LCR 5.2(a)(4), is attached as Exhibit I.

23.     On August 11, 2023, upon information and belief, the Cavagnaro Defendants complied with the wire instructions Hopkins provided and directed Umpqua Bank to wire transfer $254,750.00—$258,500.00, less the Cavagnaro Defendants' $3,750.00 retainer—to the Third Federal Bank account owned by "Fariyal R. ALI".  (*See* Exhibit H ¶ 18).  Umpqua Bank alleges it "initiated the wire transfer to Third Federal Bank in accordance with [the Cavagnaro Defendants'] instructions."  (*Id*. ¶ 19).

24.     By email correspondence dated August 14, 2023 ("August 14, 2023 Correspondence"), ALPS understands Johnson notified the Cavagnaro Defendants he intended to submit a second payment to the Cavagnaro Defendants.   A true and correct copy of the August 14, 2023 Correspondence is attached as Exhibit J.

COMPLAINT - 6

**B.  Discovery of Funds Lost in Counterfeit Check Scheme and Recovery Efforts**

25.    Umpqua Bank alleges, on or around August 14, 2023, it "received from Canadian Imperial Bank of Commerce ("Canadian Imperial") a notification of chargeback (incoming return) explaining that the Check had been returned as a counterfeit item."  (Exhibit H ¶ 20).

26.    Umpqua Bank further alleges: it "issued a wire recall and sought to recover any remaining [f]unds transferred to Third Federal Bank"; "[b]ased on the returned Check, Umpqua Bank charged the [Cavagnaro Defendants' trust account] a Deposit Return Item Chargeback of $258,515.00 on August 14, 2023"; "[b]ecause there were insufficient funds in the [Cavagnaro Defendants' trust account] to cover the returned Check, the account was overdrawn"; and "[a]s of August 31, 2023, the balance of the [Cavagnaro Defendants' trust account] was $(-)253,321.88." (Exhibit H ¶¶ 20-22).

27.    On or around August 15, 2023, upon information and belief, the Cavagnaro Defendants reviewed the Cavagnaro Firm's trust account balance online and discovered Umpqua Bank was reporting a negative balance of $253,321.88.  ALPS further understands the Cavagnaro Defendants discussed the matter with a Regional Branch Manager of Umpqua Bank on August 15, 2023 and subsequently reported the Counterfeit Check Scheme to the Bellevue, Washington Police Department.

28.    On or around August 17, 2023, upon information and belief, Cavagnaro received a telephone call from a representative of Umpqua Bank, during which Umpqua Bank advised the Cavagnaro Defendants the Check was a fraudulent and forged instrument, Umpqua Bank was investigating the matter, and the Cavagnaro Firm's trust account with Umpqua Bank would remain closed.

29.    The Cavagnaro Defendants, upon information and belief, contacted the FBI and a private investigator in an attempt to recover information regarding the Counterfeit Check Scheme and the wire of $254,750.00, which was misappropriated by unknown parties.  The private

COMPLAINT - 7

investigator, upon information and belief, prepared a report and the Cavagnaro Defendants provided the investigator's report to Umpqua Bank and the Bellevue Police Department.

30.     On or around August 22, 2023, upon information and belief, the Cavagnaro Defendants received a notice from Umpqua Bank dated August 14, 2023 ("August 14, 2023 Notice") providing the Cavagnaro Defendants with a copy of the returned Check, which Umpqua Bank identified as a counterfeit item.  A true and correct copy of the August 14, 2023 Notice, redacted pursuant to LCR 5.2(a)(4), is attached as Exhibit K.

31.     On or around September 14, 2023, upon information and belief, Cavagnaro received a telephone call from a representative of Umpqua Bank and he reported Third Federal Bank recovered $104,988.85 from the recipient account, "Fariyal R ALI", which Umpqua Bank will credit to the Cavagnaro Firm's negative trust account balance, leaving a negative trust account balance of (-$148,333.03).

32.     Umpqua Bank alleges, on September 14, 2023, it "credited the $104,988.95 payment from Third Federal Bank to" the Cavagnaro Defendants' trust account and, as of September 30, 2023, "the balance of the [Cavagnaro Defendants' trust account] was" negative $148,333.18.  (Exhibit H ¶¶ 23-24).

## C. The Claim

### 1. Pre-Suit Demands

33.     By correspondence to the Cavagnaro Defendants dated September 14, 2023 ("September 14, 2023 Umpqua Bank Correspondence"), Umpqua Bank advised the Cavagnaro Defendants: the Cavagnaro Firm's trust account "has been overdrawn for 30 or more consecutive days" and is "overdrawn by ($253,321.88)"; "[i]f the balance remains overdrawn for 55 days, this letter will serve as 'the final demand for payment' of the overdraft amount and any fees"; if the trust "account is overdrawn for 55 consecutive days, it will be closed" and the "total balance owing, including fees, will be charged off"; and "[t]his action may be reported to ChexSystems and

COMPLAINT - 8

collection proceedings pursued."  A true and correct copy of the September 14, 2023 Umpqua Bank Correspondence is attached as Exhibit L.

34.    Umpqua Bank alleges, by correspondence to the Cavagnaro Defendants dated October 4, 2023, it demanded the Cavagnaro Defendants "immediately address the overdrawn balance and return the [Cavagnaro Defendants' trust account] balance to zero."  (Exhibit H ¶ 27).

35.    Umpqua Bank further alleges: by correspondence to the Cavagnaro Defendants dated October 30, 2023, Umpqua Bank demanded the Cavagnaro Defendants "cure the total overdrawn balance on the [Cavagnaro Defendants' trust account] within ten (10) days"; the Cavagnaro Defendants "failed to cure or otherwise pay the total overdrawn balance on the" Cavagnaro Defendants' trust account; Umpqua Bank "closed" the Cavagnaro Defendants' trust account with Umpqua Bank on November 14, 2023; and "[a]s of November 14, 2023, the [Cavagnaro Defendants' trust account] has a balance of $(-)148,333.18."  (Exhibit H ¶¶ 28-30).

2. The Suit

36.    On January 10, 2024, Umpqua Bank filed the Complaint against the Cavagnaro Defendants in the Suit.  (Exhibit H).

37.    In the Suit, Umpqua Bank alleges one cause of action—breach of contract—against the Cavagnaro Defendants arising from the Counterfeit Check Scheme and the Cavagnaro Defendants' transfer of funds from the Cavagnaro Defendants' trust account with Umpqua Bank to a criminal actor.

38.    In Umpqua Bank's only cause of action, for breach of contract, Umpqua Bank alleges the management and administrative oversight of the Cavagnaro Defendants' IOLTA trust account with Umpqua Bank are governed by certain agreements (collectively, "Agreement") Cavagnaro executed when the Cavagnaro Defendants opened the trust account with Umpqua Bank's predecessor, Columbia Bank, on February 20, 2002.  (Exhibit H ¶¶ 5-15, 26, 33-37).

39.    Umpqua Bank further alleges: the Cavagnaro Defendants' trust account with Umpqua Bank "had insufficient funds to cover the returned Check, resulting in an overdraft on

COMPLAINT - 9

the" Cavagnaro Defendants' trust account; "[a]s of November 14, 2023, the [Cavagnaro Defendants' trust account] has an overdrawn balance of $(-)148,333.18"; the Cavagnaro Defendants have "failed to repay the overdrawn balance on the" Cavagnaro Defendants' trust account; "[u]nder the terms of the Agreement, Umpqua Bank is entitled to recover from [the Cavagnaro Defendants] the overdrawn balance of the" Cavagnaro Defendants' trust account; and "[u]nder the terms of the Agreement, Umpqua Bank is entitled to a monetary judgment against [the Cavagnaro Defendants] in the principal amount of $148,333.18" and is further "entitled to recover its attorneys' fees and costs from" the Cavagnaro Defendants.  (Exhibit H ¶¶ 26, 32-38).

40.     In Umpqua Bank's Prayer for Relief in the Complaint, Umpqua Bank seeks a "judgment in favor of Umpqua Bank and against [the Cavagnaro Defendants] in the total amount of $148,333.18", interest on the judgment, and "an "award of attorneys' fees and costs . . . as allowed by the Agreement and as allowed by law."  (Exhibit H, Prayer for Relief).

### III.  The Policies

**A.  2022-2023 Policy**

41.     ALPS issued the 2022-2023 Policy to the Cavagnaro Firm for the policy period October 25, 2022 to October 25, 2023.  (Exhibit A, Declarations Items 1 and 4).  The 2022-2023 Policy provides limits of liability of $1,000,000 each claim and $2,000,000 in aggregate. (*Id*., Declarations Item 5).

42.     Cavagnaro is listed as the sole individual attorney insured under the 2022-2023 Policy.  (Exhibit A, Declarations Item 3).

43.     The 2022-2023 Policy provides legal professional liability insurance on a claims made and reported basis.  (Exhibit A, Insuring Agreements § 1.A).

44.     The 2022-2023 Policy provides:

This is a '*CLAIMS MADE AND REPORTED*' insurance Policy.  Therefore, as a condition precedent to the Company's obligation to defend or indemnify the Insured under this Policy, the Insured must immediately report any Claim to the Company during the Policy Period or during any applicable Extended Reporting Period.  No coverage exists under this Policy for a Claim which is first made against the Insured or first reported to the Company before or after

COMPLAINT - 10

the Policy Period or any applicable Extended Reporting Period.  If the Insured receives notice of a Claim, or becomes aware of a Wrongful Act that could reasonably be expected to be the basis of a Claim, then the Insured must, as a condition precedent to the Company's obligation to defend or indemnify any Insured, immediately deliver a written notice directly to the Company via email, facsimile, or mail[.]

(Exhibit A, at 1) (emphasis in original).

45.     The 2022-2023 Policy's insuring agreement states, in relevant part:

A.     COVERAGE

Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD, provided that all of the following conditions are satisfied:

1.     The Claim arises from a Wrongful Act that occurred on or after the Retroactive Coverage Date set forth in Item 2 of the Declarations;

2.     At the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim;

3.     Notice of the Claim or the Wrongful Act was not given nor required to be given to any other insurer prior to the Effective Date; and

4.     The Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured.

B.     DEFENSE AND CLAIM EXPENSES

1.     For any Claim seeking the recovery of Damages from the Insured and otherwise covered under this Policy, the Company shall have the right and the duty to defend such Claim even if any or all of the allegations of the Claim are groundless, false or fraudulent[.]  . . .

2.     The Company shall pay Claim Expenses in accordance with the terms of this Policy.  The Company shall not have a duty to defend or to pay such expenses as to any Claim not covered under this Policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim,

COMPLAINT - 11

1

2

3

4

5

including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims.  The right to reimbursement of Claims Expenses will only apply to the costs the Company has incurred after the Company notifies the Insured in writing that coverage might not exist under the Policy and that the Company is reserving the Company's right to terminate the defense or the payment of Claims Expenses and to seek reimbursement for Claims Expenses.

(Exhibit A, Insuring Agreements §§ 1.A-1.B & Washington Amendatory Endorsement) (emphasis in original).

6

7

8

9

46.    "Claim" is defined in the 2022-2023 Policy as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the Insured."  (Exhibit A, Definitions § 2.C).

10

11

12

13

14

47.    "Wrongful Act" is defined in the 2022-2023 Policy as "an actual or alleged: (1) [a]ct, error, or omission by the Insured in the performance of Professional Services; and (2) [a] Personal Injury resulting from the Professional Services of the Insured."  (Exhibit A, Definitions § 2.BB).

15

16

17

18

48.    "Professional Services" are defined in the 2022-2023 Policy as "services or activities . . . rendered solely to others as . . . [a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]" (Exhibit A, Definitions § 2.Z.1).

19

20

49.    The 2022-2023 Policy provides "Professional Services does _not_ mean _nor_ include any:

> 11.    Obligations or services assumed by or performed under any contract other than one to provide Professional Services; [or] . . .
>
> 13.    Holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party.

21

22

23

24

(Exhibit A, Definitions §§ 2.Z.11, 2.Z.13) (emphasis in original).

25

26

COMPLAINT - 12

50.   "Damages" is defined in the 2022-2023 Policy as any "[m]onetary award by way of judgment or final arbitration, or any settlement"; the 2022-2023 Policy specifically excludes from the definition of "Damages":

> 3.   Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorneys' fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same are levied or imposed in a separate matter or proceeding; . . .

> 6.   Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured; [and] . . .

> 8.   Injury or damage to, destruction of, loss of, or loss of use of any funds or property[.]

(Exhibit A, Definitions § 2.H.)

51.   "Claim Expenses" are defined in the 2022-2023 Policy as:

> 1.   Fees charged by any attorney(s) designated by [ALPS] to defend a Claim or otherwise represent an Insured; [and]

> 2.   All other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim (including a suit or proceeding arising in connection therewith), if incurred by [ALPS], or if incurred by the Insured with the prior written consent of [ALPS][.]

(Exhibit A, Definitions §§ D.1-D.2).

52.   The 2022-2023 Policy does not apply to "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]" (Exhibit A, Exclusions § 3.H) (emphasis in original).

53.   The 2022-2023 Policy does not apply to "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny dispute over fees or costs, or any Claim that seeks, whether

COMPLAINT - 13

directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an Insured[.]"  (Exhibit A, Exclusions § 3.I) (emphasis in original).

54.     The 2022-2023 Policy provides:

SECTION 6 – GENERAL CONDITIONS

* * *

B.     INSURED'S   OBLIGATIONS   UPON   NOTICE   OF   CLAIM   OR POTENTIAL CLAIM

1.     When an Insured becomes aware of a Wrongful Act that could reasonably be expected to be the basis of a Claim, but no Claim arising therefrom has yet been made, then as a condition precedent to the Company's obligation to defend or indemnify the Insured under this Policy, the Insured shall immediately give written notice to the Company.  Such notice shall include the fullest information obtainable concerning the potential Claim.  The Insured must deliver written notice to the Company in accordance with the CLAIMS MADE AND REPORTED POLICY paragraph set forth on page 1 of this Policy.

2.     If, during the Policy Period or any Extended Reporting Period, the Company is given written notice of a potential Claim pursuant to Section 6.B.1, and a Claim arising from or in connection with the same Wrongful Act is subsequently made against an Insured no later than six years after the end of the Insured's last Policy Period or any applicable Extended Reporting Period, then any such Claim shall be deemed to have been first reported during the Policy Period or Extended Reporting Period in which the potential Claim was reported.

(Exhibit A, General Conditions §§ 6.B.1, 6.B.2).

**B.  2023-2024 Policy**

55.     ALPS issued the 2023-2024 Policy to the Cavagnaro Firm for the policy period October 25, 2023 to October 25, 2024.  (Exhibit B, Declarations Items 1 and 4).  The 2023-2024 Policy provides limits of liability of $1,000,000 each claim and $2,000,000 in aggregate. (*Id*., Declarations Item 5).

56.     Cavagnaro is listed as the sole individual attorney insured under the 2023-2024 Policy.  (Exhibit B, Declarations Item 3).

COMPLAINT - 14

57.     The 2023-2024 Policy provides legal professional liability insurance on a claims made and reported basis.  (Exhibit B, Insuring Agreements § 1.A).

58.     The 2023-2024 Policy provides:

> This is a '*CLAIMS MADE AND REPORTED*' insurance Policy.  Therefore, as a condition precedent to the Company's obligation to defend or indemnify the Insured under this Policy, the Insured must immediately report any Claim to the Company during the Policy Period or during any applicable Extended Reporting Period.  No coverage exists under this Policy for a Claim which is first made against the Insured or first reported to the Company before or after the Policy Period or any applicable Extended Reporting Period.  If the Insured receives notice of a Claim, or becomes aware of a Wrongful Act that could reasonably be expected to be the basis of a Claim, then the Insured must, as a condition precedent to the Company's obligation to defend or indemnify any Insured, immediately deliver a written notice directly to the Company via email, facsimile, or mail[.]

(Exhibit B, at 1) (emphasis in original).

59.     The 2023-2024 Policy's insuring agreement states, in relevant part:

A.   COVERAGE

Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD, provided that all of the following conditions are satisfied:

1.   The Claim arises from a Wrongful Act that occurred on or after the Retroactive Coverage Date set forth in Item 2 of the Declarations;

2.   At the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim;

3.   Notice of the Claim or the Wrongful Act was not given nor required to be given to any other insurer prior to the Effective Date; and

4.   The Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

B.   DEFENSE AND CLAIM EXPENSES

    1.    For any Claim seeking the recovery of Damages from the Insured and otherwise covered under this Policy, the Company shall have the right and the duty to defend such Claim even if any or all of the allegations of the Claim are groundless, false or fraudulent[.] . . .

    2.    The Company shall pay Claim Expenses in accordance with the terms of this Policy.  The Company shall not have a duty to defend or to pay such expenses as to any Claim not covered under this Policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims.  The right to reimbursement of Claims Expenses will only apply to the costs the Company has incurred after the Company notifies the Insured in writing that coverage might not exist under the Policy and that the Company is reserving the Company's right to terminate the defense or the payment of Claims Expenses and to seek reimbursement for Claims Expenses.

(Exhibit B, Insuring Agreements §§ 1.A-1.B & Washington Amendatory Endorsement) (emphasis in original).

60.   "Claim" is defined in the 2023-2024 Policy as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the Insured."  (Exhibit B, Definitions § 2.C).

61.   "Wrongful Act" is defined in the 2023-2024 Policy as "an actual or alleged: (1) [a]ct, error, or omission by the Insured in the performance of Professional Services; and (2) [a] Personal Injury resulting from the Professional Services of the Insured."   (Exhibit B, Definitions § 2.BB).

62.   "Professional Services" are defined in the 2023-2024 Policy as "services or activities . . . rendered solely to others as . . . [a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]"  (Exhibit B, Definitions § 2.Z.1).

COMPLAINT - 16

63.     The 2023-2024 Policy provides "Professional Services does *not* mean <u>nor</u> include any:

> 11.     Obligations or services assumed by or performed under any contract other than one to provide Professional Services; [or] . . .
>
> 13.     Holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party.

(Exhibit B, Definitions §§ 2.Z.11, 2.Z.13) (emphasis in original).

64.     "Damages" is defined in the 2023-2024 Policy as any "[m]onetary award by way of judgment or final arbitration, or any settlement"; the 2023-2024 Policy specifically excludes from the definition of "Damages":

> 3.     Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorneys' fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same are levied or imposed in a separate matter or proceeding; . . .
>
> 6.     Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured; [and] . . .
>
> 8.     Injury or damage to, destruction of, loss of, or loss of use of any funds or property[.]

(Exhibit B, Definitions § 2.H)

65.     The 2023-2024 Policy does not apply to "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny Wrongful Act that occurred prior to the [October 25, 2023] Effective Date of this Policy, if:"

> Prior to the [October 25, 2023] Effective Date of the Policy, any Insured gave or should have given to any insurer, notice of a Claim or potential Claim arising from or in connection with the Wrongful Act, or from any Wrongful Act that is connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the Claim or potential Claim.

(Exhibit B, Exclusions § 3.E.3) (emphasis in original).

COMPLAINT - 17

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

66.     The 2023-2024 Policy does not apply to "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]"  (Exhibit B, Exclusions § 3.H) (emphasis in original).

67.     The 2023-2024 Policy does not apply to "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny dispute over fees or costs, or any Claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an Insured[.]"  (Exhibit B, Exclusions § 3.I) (emphasis in original).

68.     The 2023-2024 Policy provides:

SECTION 6 – GENERAL CONDITIONS

*  *  *

B.      INSURED'S OBLIGATIONS UPON NOTICE OF CLAIM OR POTENTIAL CLAIM

1.      When an Insured becomes aware of a Wrongful Act that could reasonably be expected to be the basis of a Claim, but no Claim arising therefrom has yet been made, then as a condition precedent to the Company's obligation to defend or indemnify the Insured under this Policy, the Insured shall immediately give written notice to the Company.  Such notice shall include the fullest information obtainable concerning the potential Claim.  The Insured must deliver written notice to the Company in accordance with the CLAIMS MADE AND REPORTED POLICY paragraph set forth on page 1 of this Policy.

2.      If, during the Policy Period or any Extended Reporting Period, the Company is given written notice of a potential Claim pursuant to Section 6.B.1, and a Claim arising from or in connection with the same Wrongful Act is subsequently made against an Insured no later than six years after the end of the Insured's last Policy Period or any applicable Extended Reporting Period, then any such Claim shall be deemed to have been first reported during the Policy Period or Extended Reporting Period in which the potential Claim was reported.

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1   (Exhibit B, General Conditions §§ 6.B.1, 6.B.2).

2   **C.  Notice to ALPS and Claim-Related Communications**

3         69.    By email correspondence dated October 4, 2023 ("October 2023 Notice
4   Correspondence"), during the policy period for the 2022-2023 Policy, the Cavagnaro Defendants
5   first provided ALPS with notice of circumstances from which a claim could arise concerning the
6   Counterfeit Check Scheme ("Potential Claim").

7         70.    By correspondence dated October 16, 2023 ("October 2023 Correspondence"),
8   ALPS provided its position regarding coverage under the 2022-2023 Policy for the Cavagnaro
9   Defendants with respect to the Potential Claim and the Counterfeit Check Scheme.

10        71.    On January 10, 2024, Umpqua Bank filed the Complaint in the Suit against the
11   Cavagnaro Defendants.  (Exhibit H).

12        72.    By communications dated March 1, 2024 and March 4, 2024 (together,
13   "March 2024 Correspondence"), the Cavagnaro Defendants provided ALPS with notice of the Suit
14   and a copy of the Complaint.

15        73.    By correspondence to the Cavagnaro Defendants dated March 12, 2024
16   ("March 12, 2024 Correspondence"), ALPS supplemented the October 2023 Correspondence and
17   provided ALPS's position regarding coverage under the Policies for the Insureds with respect to
18   the Claim, as presently articulated in the Suit.  In the March 12, 2024 Correspondence, ALPS
19   denied coverage for the Claim under the 2023-2024 Policy and agreed to provide the Cavagnaro
20   Defendants with a defense against the Claim under the 2022-2023 Policy, subject to its terms and
21   ALPS's reservation of rights, including, but not limited to, its right to reimbursement of Claim
22   Expenses paid by ALPS in defending the Claim.

23

24

25

26

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

## FIRST CAUSE OF ACTION

**(For a Declaration the 2022-2023 Policy Does Not Afford Coverage to the Cavagnaro Defendants for the Claim – Against All Defendants)**

74.     ALPS incorporates and realleges paragraphs 1 through 73 as if fully set forth herein.

### *Exclusions*

75.     The 2022-2023 Policy does not afford coverage for the Claim, as articulated in the Suit, to the extent any exclusions in the 2022-2023 Policy apply to exclude coverage.  (Exhibit A, Exclusions § 3).

76.     The 2022-2023 Policy excludes coverage for "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]"  (Exhibit A, Exclusions § 3.H) (emphasis in original).

77.     The Claim arises from or in connection with the loss of trust account funds in the Counterfeit Check Scheme.  (Exhibit H).  The Cavagnaro Defendants held the lost funds in the Cavagnaro Firm's trust account and controlled the disposition of the funds.  (*Id*. ¶¶ 17-19).

78.     The alleged fraudulent theft of funds, upon information and belief, occurred after the Cavagnaro Defendants received wire instructions from a criminal actor posing as a client and provided those instructions to Umpqua Bank, the Cavagnaro Defendants' bank.  (Exhibit H ¶¶ 17-19; Exhibit I).  Umpqua Bank alleges it completed the wire transfer of funds pursuant to the instructions the Cavagnaro Defendants provided, which resulted in the loss—after Third Federal Bank's recovery of $104,988.85—of approximately $150,000.  (Exhibit H ¶¶ 17-25).

79.     The Claim, as articulated in the Suit, is outside the coverage afforded by the 2022-2023 Policy because it arises entirely from or in connection with loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any

COMPLAINT - 20

person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an insured in any capacity or under any authority.  (Exhibit A, Exclusions § 3.H).

80.     The 2022-2023 Policy excludes coverage for "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny dispute over fees or costs, or any Claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an Insured[.]"  (Exhibit A, Exclusions § 3.I) (emphasis in original).

81.     The Claim arises from or in connection with the loss of trust account funds in the Counterfeit Check Scheme and Umpqua Bank's subsequent efforts—as presently articulated in the Suit—to recover the lost funds from the Cavagnaro Defendants.  (Exhibit H).

82.     On or around August 3, 2023, upon information and belief, the Cavagnaro Defendants received the counterfeit Check and deposited it in the Cavagnaro Firm's trust account with Umpqua Bank.  (Exhibit F; Exhibit G; Exhibit H ¶ 17).  The Cavagnaro Defendants held all funds in the Cavagnaro Firm's trust account and controlled the disposition of the funds. (Exhibit H ¶¶ 17-19).

83.     On or around August 11, 2023, the Cavagnaro Defendants conveyed wire instructions to Umpqua Bank to transfer $254,750.00 (the amount of the Check, less the Cavagnaro Defendants' retainer fee) from the Cavagnaro Defendants' trust account, which transfer Umpqua Bank performed, resulting in the loss—after Third Federal Bank's recovery of $104,988.85—of approximately $150,000 to a criminal actor or actors.  (Exhibit H ¶¶ 17-25; Exhibit I).

84.     In the Suit, Umpqua Bank alleges: the Cavagnaro Defendants' trust account with Umpqua Bank "had insufficient funds to cover the returned Check, resulting in an overdraft on the" Cavagnaro Defendants' trust account; "[a]s of November 14, 2023, the [Cavagnaro Defendants' trust account] has an overdrawn balance of $(-)148,333.18"; the Cavagnaro Defendants have "failed to repay the overdrawn balance on the" Cavagnaro Defendants' trust

COMPLAINT - 21

account; "Umpqua Bank is entitled to recover from [the Cavagnaro Defendants] the overdrawn balance of the" Cavagnaro Defendants' trust account; and "Umpqua Bank is entitled to a monetary judgment against [the Cavagnaro Defendants] in the principal amount of $148,333.18[.]" (Exhibit H ¶¶ 26, 32-38).  In Umpqua Bank's Prayer for Relief, Umpqua Bank seeks a "judgment in favor of Umpqua Bank and against [the Cavagnaro Defendants] in the total amount of $148,333.18[.]" (*Id.*, Prayer for Relief).

85.     The Claim, as articulated in the Suit, is outside the coverage afforded by the 2022-2023 Policy because it seeks, directly or indirectly, the return or reimbursement of funds or property held or controlled at any time by an insured in any capacity or under any authority. (Exhibit A, Exclusions § 3.I).

### *Professional Services*

86.     The 2022-2023 Policy does not afford coverage for the Claim, as articulated in the Suit, to the extent the Claim does not arise from an act, error, or omission by the Cavagnaro Defendants in the performance of Professional Services, as defined by the 2022-2023 Policy.

87.     Under the 2022-2023 Policy, "Professional Services" are defined as "services or activities . . . rendered solely to others as . . . [a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]" (Exhibit A, Definitions § 2.Z.1).

88.     The 2022-2023 Policy provides "Professional Services does *not* mean nor include any:

> 11.     Obligations or services assumed by or performed under any contract other than one to provide Professional Services; [or] . . .
>
> 13.     Holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party.

(Exhibit A, Definitions §§ 2.Z.11, 2.Z.13) (emphasis in original).

89.     First, "Hopkins" and "Johnson", upon information and belief, were merely names or identities created or subsumed for purposes of perpetrating the Counterfeit Check Scheme and

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

neither had a genuine commercial or legal existence.  Because "Hopkins" was not an actual client, the Cavagnaro Defendants did not establish an attorney-client relationship with "Hopkins", and any act, error, or omission by the Cavagnaro Defendants related to the Counterfeit Check Scheme was not in the performance of Professional Services.

90.     Second, Umpqua Bank's only cause of action against the Cavagnaro Defendants in the Complaint is breach of contract, and the contract Umpqua Bank alleges the Cavagnaro Defendants breached is the Agreement that Cavagnaro executed when the Cavagnaro Firm opened its trust account with Umpqua Bank's predecessor.  (Exhibit H ¶¶ 5-15, 26, 32-38).  Umpqua Bank alleges the Agreement governs the banking policies and procedures applicable to the Cavagnaro Firm's trust account and regulates administrative matters concerning, *e.g.*, overdraft fees, insufficient account funds, and the return of a forged or altered check.  (*Id*. ¶¶ 5-15).  The Agreement is not a contract to provide Professional Services, as defined by the 2022-2023 Policy, and Umpqua Bank does not allege the Insureds provided Umpqua Bank with any Professional Services in connection with the Agreement or the Counterfeit Check Scheme.

91.     Third, any acts, errors, or omissions by the Cavagnaro Defendants concerning the Counterfeit Check Scheme related only to the disbursement and handling of funds, which are not Professional Services.

92.     The Claim does not arise from or in connection with services or activities as an attorney on behalf of clients in an attorney-client relationship; rather, the Claim arises from or in connection with: (a) obligations or services assumed by or performed under the Agreement with Umpqua Bank, which is not a contract to provide Professional Services as defined by the 2022-2023 Policy, or (b) holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party, which are not Professional Services as defined by the 2022-2023 Policy.  (Exhibit A, Insuring Agreements § 1.A.1 & Definitions §§ 2BB, 2.Z.1, 2.Z.11, and 2.Z.13; Exhibit H; Exhibit K; Exhibit L).

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

93.     The 2022-2023 Policy does not afford coverage for the Claim—as articulated in the Suit—because the Claim does not arise from or in connection with an actual or alleged act, error, or omission in Professional Services, and accordingly does not arise from a Wrongful Act. (Exhibit A, Insuring Agreements § 1.A.1 & Definitions §§ 2BB, 2.Z.1, 2.Z.11, and 2.Z.13; Exhibit H; Exhibit K; Exhibit L).

### *Damages*

94.     The 2022-2023 Policy does not afford coverage for the Claim, as articulated in the Suit, to the extent the relief requested does not constitute "Damages" as defined in the 2022-2023 Policy.  (Exhibit A, Insuring Agreements § 1.A & Definitions § 2.H).

95.     The 2022-2023 Policy specifically excludes from the definition of "Damages", in relevant part:

> 3.     Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorneys' fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same are levied or imposed in a separate matter or proceeding; . . .

> 6.     Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured; [and] . . .

> 8.     Injury or damage to, destruction of, loss of, or loss of use of any funds or property[.]

(Exhibit A, Definitions § 2.H).

96.     In the Suit, Umpqua Bank seeks a "judgment in favor of Umpqua Bank and against [the Cavagnaro Defendants] in the total amount of $148,333.18", interest on the judgment, and "an award of attorneys' fees and costs . . . as allowed by the Agreement and as allowed by law." (Exhibit H, Prayer for Relief).

97.     The Claim concerns the loss of funds controlled by the Cavagnaro Defendants. (Exhibit H).

COMPLAINT - 24

98.     Umpqua Bank's demand for $148,333.18, the amount of funds ultimately lost from the Cavagnaro Defendants' trust account in the Counterfeit Check Scheme, is excluded from the definition of "Damages", and outside the coverage afforded by the 2022-2023 Policy, because Umpqua Bank necessarily seeks (a) "[r]estitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses . . . received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured", and (b) relief for "[i]njury or damage to, destruction of, loss of, or loss of use of any funds or property[.]"  (Exhibit A, Definitions §§ 2.H.6, 2.H.8).

99.     Umpqua Bank's demand for attorneys' fees and costs incident to the Suit, as allowed by law and the Agreement, and interest on the judgment are excluded from the definition of "Damages", and outside the coverage afforded by the 2022-2023 Policy, because such amounts are "[p]unitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom[.]"  (Exhibit A, Definitions § 2.H.3).

100.    An actual controversy exists between ALPS and Defendants regarding whether the 2022-2023 Policy affords coverage for the Claim, as articulated in the Suit.

101.    Because the Claim is outside the coverage afforded by the 2022-2023 Policy, ALPS is entitled to a declaratory judgment in its favor, pursuant to 28 U.S.C. § 2201, declaring the 2022-2023 Policy does not afford coverage for the Claim and ALPS has no duty to defend or indemnify the Cavagnaro Defendants under the 2022-2023 Policy with respect to the Claim.

**SECOND CAUSE OF ACTION**

**(For a Declaration the 2023-2024 Policy Does Not Afford Coverage to the Cavagnaro Defendants for the Claim – Against All Defendants)**

102.    ALPS incorporates and realleges paragraphs 1 through 101 as if fully set forth herein.

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

*Claims Made and Reported*

103.    The 2023-2024 Policy "is a 'CLAIMS MADE AND REPORTED' insurance Policy", which means coverage under the 2023-2024 Policy is limited to claims first made and reported to ALPS during the policy period of October 25, 2023 to October 25, 2024. (Exhibit B, at 1, Insuring Agreements § 1.A, and Declarations Item 4).

104.    The 2023-2024 Policy does not afford coverage for the Claim to the extent the Claim was not made and reported to ALPS during the October 25, 2023 to October 25, 2024 policy period for the 2023-2024 Policy.

105.    The Insuring Agreements of the Policies limit coverage to claims "FIRST MADE AGAINST THE INSURED AND FIRST REPORTED IN WRITING TO THE COMPANY DURING THE POLICY PERIOD, provided that all of the following conditions are satisfied:"

1.    The Claim arises from a Wrongful Act that occurred on or after the Retroactive Coverage Date set forth in Item 2 of the Declarations;

2.    At the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim;

3.    Notice of the Claim or the Wrongful Act was not given nor required to be given to any other insurer prior to the Effective Date; and

4.    The Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured.

(Exhibit A, Insuring Agreements § 1.A.1; Exhibit B, Insuring Agreements § 1.A.1) (emphasis in original).

106.    "Claim" is defined in the Policies as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the Insured."   (Exhibit A, Definitions § 2.C; Exhibit B, Definitions § 2.C).

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

107.    The Policies provide:

SECTION 6 – GENERAL CONDITIONS

* * *

B.    INSURED'S OBLIGATIONS UPON NOTICE OF CLAIM OR POTENTIAL CLAIM

1.    When an Insured becomes aware of a Wrongful Act that could reasonably be expected to be the basis of a Claim, but no Claim arising therefrom has yet been made, then as a condition precedent to the Company's obligation to defend or indemnify the Insured under this Policy, the Insured shall immediately give written notice to the Company. Such notice shall include the fullest information obtainable concerning the potential Claim. The Insured must deliver written notice to the Company in accordance with the CLAIMS MADE AND REPORTED POLICY paragraph set forth on page 1 of this Policy.

2.    If, during the Policy Period or any Extended Reporting Period, the Company is given written notice of a potential Claim pursuant to Section 6.B.1, and a Claim arising from or in connection with the same Wrongful Act is subsequently made against an Insured no later than six years after the end of the Insured's last Policy Period or any applicable Extended Reporting Period, then any such Claim shall be deemed to have been first reported during the Policy Period or Extended Reporting Period in which the potential Claim was reported.

(Exhibit A, General Conditions §§ 6.B.1, 6.B.2; Exhibit B, General Conditions §§ 6.B.1, 6.B.2).

108.    The Policies define "Wrongful Act" to mean "an actual or alleged: (1) [a]ct, error, or omission by the Insured in the performance of Professional Services; and (2) [a] Personal Injury resulting from the Professional Services of the Insured."   (Exhibit A, Definitions § 2.BB; Exhibit B, Definitions § 2.BB).

109.    Under the Policies, "Professional Services" are defined, in relevant part, as "services or activities performed for and on behalf of the Named Insured or a Predecessor Law Firm and rendered solely to others as . . . an Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]"   (Exhibit A, Definitions § 2.Z.1; Exhibit B, Definitions § 2.Z.1).

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

110.    By email correspondence from the Cavagnaro Defendants dated October 4, 2023, during the policy period of the 2022-2023 Policy, the Cavagnaro Defendants first provided ALPS with notice of the Potential Claim—*i.e.*, circumstances from which a claim could arise concerning the Cavagnaro Defendants' acts, errors, or omissions with respect to the Counterfeit Check Scheme.

111.    On January 10, 2024, Umpqua Bank filed the Complaint against the Cavagnaro Defendants in the Suit.  (Exhibit H).

112.    Although the Cavagnaro Defendants provided ALPS with notice of the Suit and a copy of the Complaint via the March 2024 Correspondence, during the policy period for the 2023-2024 Policy, because the Suit arises from or in connection with the same acts, errors, or omissions—*i.e.*, the Cavagnaro Defendants' acts, errors, or omissions in connection with the Counterfeit Check Scheme—reported to ALPS in the October 2023 Notice Correspondence, the Claim is deemed made and reported under the 2022-2023 Policy.  (Exhibit A, General Conditions §§ 6.B.1, 6.B.2; Exhibit B, General Conditions §§ 6.B.1, 6.B.2).

113.    The Claim is outside the coverage afforded by the 2023-2024 Policy because the Claim was made and reported under the 2022-2023 Policy and was first reported to ALPS prior to the October 25, 2023 effective date of the 2023-2024 Policy.

### *Exclusions*

114.    The 2023-2024 Policy does not afford coverage for the Claim, as articulated in the Suit, to the extent any exclusions in the 2023-2024 Policy apply to exclude coverage.  (Exhibit B, Exclusions § 3).

115.    The 2023-2024 Policy does not apply to any claim arising from or in connection with "[a]ny Wrongful Act that occurred prior to the [October 25, 2023] Effective Date of this Policy, if:"

> Prior to the [October 25, 2023] Effective Date of the Policy, any Insured gave or should have given to any insurer, notice of a Claim or potential Claim arising from or in connection with the Wrongful Act, or from any Wrongful Act that is connected temporally, logically or causally, by any common fact,

> circumstance, situation, transaction, event, advice or decision to the Claim or potential Claim.

(Exhibit B, Exclusions § 3.E.3).

116.    The Claim arises from acts, errors, or omissions by the Cavagnaro Defendants prior to October 25, 2023 in connection with the Counterfeit Check Scheme.  (Exhibit H ¶¶ 16-27).

117.    By correspondence dated October 4, 2023—prior to the October 25, 2023 effective date of the 2023-2024 Policy—the Cavagnaro Defendants first provided ALPS with notice of the Potential Claim, *i.e.*, circumstances from which a claim could arise concerning the Cavagnaro Defendants' acts, errors, or omissions with respect to the Counterfeit Check Scheme.

118.    The 2023-2024 Policy does not provide coverage to the Cavagnaro Defendants with respect to the Claim, as presently articulated in the Suit, because the Suit arises from or in connection with the same acts, errors, or omissions—*i.e.*, the Cavagnaro Defendants' acts, errors, or omissions in connection with the Counterfeit Check Scheme—reported to ALPS in the October 2023 Notice Correspondence, prior to the October 25, 2023 effective date of the 2023-2024 Policy.  (Exhibit B, Exclusions § 3.E.3).

119.    The 2023-2024 Policy excludes coverage for "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an Insured in any capacity or under any authority, including any loss or reduction in value of such funds or property[.]"  (Exhibit B, Exclusions § 3.H) (emphasis in original).

120.    The Claim arises from or in connection with the loss of trust account funds in the Counterfeit Check Scheme.  (Exhibit H).  The Cavagnaro Defendants held the lost funds in the Cavagnaro Firm's trust account and controlled the disposition of the funds.  (*Id.* ¶¶ 17-19).

121.    The alleged fraudulent theft of funds, upon information and belief, occurred after the Cavagnaro Defendants received wire instructions from a criminal actor posing as a client and

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

provided those instructions to Umpqua Bank, the Cavagnaro Defendants' bank.  (Exhibit H ¶¶ 17-19; Exhibit I).  Umpqua Bank alleges it completed the wire transfer of funds pursuant to the instructions the Cavagnaro Defendants provided, which resulted in the loss—after Third Federal Bank's recovery of $104,988.85—of approximately $150,000.  (Exhibit H ¶¶ 17-25).

122.    The Claim, as articulated in the Suit, is outside the coverage afforded by the 2023-2024 Policy because it arises entirely from or in connection with loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an insured in any capacity or under any authority.  (Exhibit B, Exclusions § 3.H).

123.    The 2023-2024 Policy excludes coverage for "ANY CLAIM ARISING FROM OR IN CONNECTION WITH . . . [a]ny dispute over fees or costs, or any Claim that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an Insured[.]"  (Exhibit B, Exclusions § 3.I) (emphasis in original).

124.    The Claim arises from or in connection with the loss of trust account funds in the Counterfeit Check Scheme and Umpqua Bank's subsequent efforts—as presently articulated in the Suit—to recover the lost funds from the Cavagnaro Defendants.  (Exhibit H).

125.    On or around August 3, 2023, upon information and belief, the Cavagnaro Defendants received the counterfeit Check and deposited it in the Cavagnaro Firm's trust account with Umpqua Bank.  (Exhibit F; Exhibit G; Exhibit H ¶ 17).  The Cavagnaro Defendants held all funds in the Cavagnaro Firm's trust account and controlled the disposition of the funds. (Exhibit H ¶¶ 17-19).

126.    On or around August 11, 2023, the Cavagnaro Defendants conveyed wire instructions to Umpqua Bank to transfer $254,750.00 (the amount of the Check, less the Cavagnaro Defendants' retainer fee) from the Cavagnaro Defendants' trust account, which transfer Umpqua

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Bank performed, resulting in the loss—after Third Federal Bank's recovery of $104,988.85—of approximately $150,000 to a criminal actor or actors.  (Exhibit H ¶¶ 17-25; Exhibit I).

127.    In the Suit, Umpqua Bank alleges: the Cavagnaro Defendants' trust account with Umpqua Bank "had insufficient funds to cover the returned Check, resulting in an overdraft on the" Cavagnaro Defendants' trust account; "[a]s of November 14, 2023, the [Cavagnaro Defendants' trust account] has an overdrawn balance of $(-)148,333.18"; the Cavagnaro Defendants have "failed to repay the overdrawn balance on the" Cavagnaro Defendants' trust account; "Umpqua Bank is entitled to recover from [the Cavagnaro Defendants] the overdrawn balance of the" Cavagnaro Defendants' trust account; and "Umpqua Bank is entitled to a monetary judgment against [the Cavagnaro Defendants] in the principal amount of $148,333.18[.]" (Exhibit H ¶¶ 26, 32-38).  In Umpqua Bank's Prayer for Relief, Umpqua Bank seeks a "judgment in favor of Umpqua Bank and against [the Cavagnaro Defendants] in the total amount of $148,333.18[.]"  (*Id*., Prayer for Relief).

128.    The Claim, as articulated in the Suit, is outside the coverage afforded by the 2023-2024 Policy because it seeks, directly or indirectly, the return or reimbursement of funds or property held or controlled at any time by an insured in any capacity or under any authority. (Exhibit B, Exclusions § 3.I).

### *Professional Services*

129.    The 2023-2024 Policy does not afford coverage for the Claim, as articulated in the Suit, to the extent the Claim does not arise from an act, error, or omission by the Cavagnaro Defendants in the performance of Professional Services, as defined by the 2023-2024 Policy.

130.    Under the 2023-2024 Policy, "Professional Services" are defined as "services or activities . . . rendered solely to others as . . . [a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]"  (Exhibit B, Definitions § 2.Z.1).

COMPLAINT - 31

131.    The 2023-2024 Policy provides "Professional Services does *not* mean <u>nor</u> include any:

> 11.    Obligations or services assumed by or performed under any contract other than one to provide Professional Services; [or] . . .
>
> 13.    Holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party.

(Exhibit B, Definitions §§ 2.Z.11, 2.Z.13) (emphasis in original).

132.    First, "Hopkins" and "Johnson", upon information and belief, were merely names or identities created or subsumed for purposes of perpetrating the Counterfeit Check Scheme and neither had a genuine commercial or legal existence.  Because "Hopkins" was not an actual client, the Cavagnaro Defendants did not establish an attorney-client relationship with "Hopkins", and any act, error, or omission by the Cavagnaro Defendants related to the Counterfeit Check Scheme was not in the performance of Professional Services.

133.    Second, Umpqua Bank's only cause of action against the Cavagnaro Defendants in the Complaint is breach of contract, and the contract Umpqua Bank alleges the Cavagnaro Defendants breached is the Agreement that Cavagnaro executed when the Cavagnaro Firm opened its trust account with Umpqua Bank's predecessor.  (Exhibit H ¶¶ 5-15, 26, 32-38).  Umpqua Bank alleges the Agreement governs the banking policies and procedures applicable to the Cavagnaro Firm's trust account and regulates administrative matters concerning, *e.g.*, overdraft fees, insufficient account funds, and the return of a forged or altered check.  (*Id*. ¶¶ 5-15).  The Agreement is not a contract to provide Professional Services, as defined by the 2022-2023 Policy, and Umpqua Bank does not allege the Insureds provided Umpqua Bank with any Professional Services in connection with the Agreement or the Counterfeit Check Scheme.

134.    Third, any acts, errors, or omissions by the Cavagnaro Defendants concerning the Counterfeit Check Scheme related only to the disbursement and handling of funds, which are not Professional Services.

COMPLAINT - 32

135.    The Claim does not arise from or in connection with services or activities as an attorney on behalf of clients in an attorney-client relationship; rather, the Claim arises from or in connection with: (a) obligations or services assumed by or performed under the Agreement with Umpqua Bank, which is not a contract to provide Professional Services as defined by the 2023-2024 Policy, or (b) holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the Insured, or of any client, trust, estate, person, or any other third party, which are not Professional Services as defined by the 2023-2024 Policy.  (Exhibit B, Insuring Agreements § 1.A.1 & Definitions §§ 2BB, 2.Z.1, 2.Z.11, and 2.Z.13; Exhibit H; Exhibit K; Exhibit L).

136.    The 2023-2024 Policy does not afford coverage for the Claim because the Claim does not arise from or in connection with an actual or alleged act, error, or omission in Professional Services, and accordingly does not arise from a Wrongful Act.  (Exhibit B, Insuring Agreements § 1.A.1 & Definitions §§ 2BB, 2.Z.1, 2.Z.11, and 2.Z.13; Exhibit H; Exhibit K; Exhibit L).

### *Damages*

137.    The 2023-2024 Policy does not afford coverage for the Claim, as articulated in the Suit, to the extent the relief requested does not constitute "Damages" as defined in the 2023-2024 Policy.  (Exhibit B, Insuring Agreements § 1.A & Definitions § 2.H).

138.    The 2023-2024 Policy specifically excludes from the definition of "Damages", in relevant part:

> 3.    Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorneys' fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same are levied or imposed in a separate matter or proceeding; . . .

> 6.    Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured; [and] . . .

COMPLAINT - 33

8.      Injury or damage to, destruction of, loss of, or loss of use of any funds or property[.]

(Exhibit B, Definitions § 2.H).

139.    In the Suit, Umpqua Bank seeks a "judgment in favor of Umpqua Bank and against [the Cavagnaro Defendants] in the total amount of $148,333.18", interest on the judgment, and "an "award of attorneys' fees and costs . . . as allowed by the Agreement and as allowed by law." (Exhibit H, Prayer for Relief).

140.    The Claim concerns the loss of funds controlled by the Cavagnaro Defendants. (Exhibit H).

141.    Umpqua Bank's demand for $148,333.18, the amount of funds ultimately lost from the Cavagnaro Defendants' trust account in the Counterfeit Check Scheme, is excluded from the definition of "Damages", and outside the coverage afforded by the 2023-2024 Policy, because Umpqua Bank necessarily seeks (a) "[r]estitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses . . . received by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured", and (b) relief for "[i]njury or damage to, destruction of, loss of, or loss of use of any funds or property[.]"  (Exhibit B, Definitions §§ 2.H.6, 2.H.8).

142.    Umpqua Bank's demand for attorneys' fees and costs incident to the Suit, as allowed by law and the Agreement, and interest on the judgment are excluded from the definition of "Damages", and outside the coverage afforded by the 2023-2024 Policy, because such amounts are "[p]unitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom[.]"  (Exhibit B, Definitions § 2.H.3).

143.    An actual controversy exists between ALPS and Defendants regarding whether the 2023-2024 Policy affords coverage for the Claim, as articulated in the Suit.

COMPLAINT - 34

144.     Because the Claim is outside the coverage afforded by the 2023-2024 Policy, ALPS is entitled to a declaratory judgment in its favor, pursuant to 28 U.S.C. § 2201, declaring the 2023-2024 Policy does not afford coverage for the Claim and ALPS has no duty to defend or indemnify the Cavagnaro Defendants under the 2023-2024 Policy with respect to the Claim.

### THIRD CAUSE OF ACTION

**(Reimbursement of Defense Expenses – Against the Cavagnaro Defendants)**

145.     ALPS incorporates and realleges paragraphs 1 through 144 as if fully set forth herein.

146.     The 2022-2023 Policy states ALPS has no duty to defend or pay Claim Expenses for "any Claim not covered" and has "the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims."  (Exhibit A, Insuring Agreements § 1.B.2 & Washington Amendatory Endorsement).

147.     The 2022-2023 Policy provides: "[t]he right to reimbursement of Claims Expenses will only apply to the costs [ALPS] has incurred after [ALPS] notifies the Insured in writing that coverage might not exist under the Policy and that [ALPS] is reserving [ALPS]'s right to terminate the defense or the payment of Claims Expenses and to seek reimbursement for Claims Expenses." (Exhibit A, Insuring Agreements § 1.B.2 & Washington Amendatory Endorsement).

148.     The 2022-2023 Policy defines "Claim Expenses" to mean, in relevant part, "[f]ees charged by any attorney(s) designated" by ALPS "to defend a Claim or otherwise represent an Insured;" and "[a]ll other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim (including a suit or proceeding arising in connection therewith), if incurred by [ALPS][.]"  (Exhibit A, Definitions §§ D.1-D.2).

149.     By correspondence to the Cavagnaro Defendants dated March 12, 2024, ALPS provided its position regarding coverage under the Policies for the Insureds with respect to the

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Claim—as presently articulated in the Suit—and reserved ALPS's right, *inter alia*, to seek reimbursement of Claim Expenses paid with respect to the defense against the Claim from the Cavagnaro Defendants, or any insured, under the 2022-2023 Policy.

150.    ALPS is providing the Cavagnaro Defendants with a defense against the Claim under the 2022-2023 Policy subject to a complete reservation of rights, including the right to seek recovery from the Cavagnaro Defendants or any insured under the 2022-2023 Policy of all amounts paid by ALPS in defense of non-covered aspects of the Claim.

151.    For the reasons described above in Paragraphs 74 through 99, the Claim—as articulated in the Suit—is outside the coverage afforded by the 2022-2023 Policy.

152.    ALPS is entitled to judgment in its favor and against the Cavagnaro Defendants for the amount of attorneys' fees and costs paid to defend Cavagnaro Defendants with respect to the Claim because the Claim is not covered under the 2022-2023 Policy.

## PRAYER FOR RELIEF

WHEREFORE, ALPS prays that judgment be entered in its favor and against Defendants as follows:

1.    Declaring the 2022-2023 Policy does not afford coverage to the Cavagnaro Defendants with respect to the Claim, as articulated in the Suit, and ALPS has no duty to defend or indemnify the Cavagnaro Defendants under the 2022-2023 Policy with respect to the Claim;

2.    Declaring the 2023-2024 Policy does not afford coverage to the Cavagnaro Defendants with respect to the Claim, as articulated in the Suit, and ALPS has no duty to defend or indemnify the Cavagnaro Defendants under the 2023-2024 Policy with respect to the Claim;

3.    Awarding damages in favor of ALPS and against the Cavagnaro Defendants in the amount of the attorneys' fees and costs paid to defend Cavagnaro Defendants under the 2022-2023 Policy with respect to the Claim; and

4.    Awarding ALPS such additional relief as shall be deemed appropriate in the circumstances, together with its costs and expenses.

Byrnes ◆ Keller ◆ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

DATED this 9th day of April, 2024.

BYRNES KELLER CROMWELL LLP

By /s/ Joshua B. Selig
    Joshua B. Selig WSBA #39628
    1000 Second Avenue, 38th Floor
    Seattle, Washington 98104
    Telephone: (206) 622-2000
    Email:  jselig@byrneskeller.com

KUTAK ROCK LLP

By /s/ Brooke H. McCarthy
    Brooke H. McCarthy (*pro hac vice* forthcoming)

By /s/ Kevn D. Hartzell
    Kevin D. Hartzell (*pro hac vice* forthcoming)
    1650 Farnam Street
    Omaha, NE 68102-2186
    Telephone: (402) 346-6000
    Email:  brooke.mcmarthy@kutakrock.com
        kevin.hartzell@kutakrock.com
    *Attorneys for Plaintiff*

# Exhibit A

## 2022-2023 Policy

 **ALPS**

**Lawyers Professional Liability Insurance Policy**

| HOME OFFICE ADDRESS: | PHONE: | MAILING ADDRESS: |
|---|---|---|
| 111 N. Higgins, Suite 600 | (800) 367-2577 | PO Box 9169 |
| Missoula, MT  59802 | | Missoula, MT  59807-9169 |

### POLICY DECLARATIONS

NOTICE: THE POLICY IS A CLAIMS MADE AND REPORTED POLICY. NO COVERAGE EXISTS UNDER THE POLICY FOR A CLAIM WHICH IS FIRST MADE AGAINST THE INSURED OR FIRST REPORTED TO THE COMPANY BEFORE OR AFTER THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD.  PLEASE READ THE ENTIRE POLICY CAREFULLY.

POLICY NUMBER:                    ALPS28842- 1

Item 1 – Named Insured:      Law Office of Gregory P. Cavagnaro
         Address:      2135 112th Avenue N.E.
                  Bellevue, WA 98004

Item 2 – Retroactive Coverage Date: 10/25/2021

Item 3 – Name of Each Insured Attorney:

        Cavagnaro, Gregory P.

Item 4 – Policy Period:

        Effective Date and Time:   10/25/2022      at 12:01 AM at the address stated in Item 1.
        Expiration Date and Time: 10/25/2023      at 12:01 AM at the address stated in Item 1.

Item 5 – Limit of Liability:      $ 1,000,000        Each Claim*
                        $ 2,000,000        Aggregate

Item 6 – Deductible:        $ 5,000          Each Claim*

Item 7 – Annual Premium:      ▮▮▮▮▮

Item 8 – Endorsements attached at inception of the policy form Preferred (01-21):

Signature Page                        WA Amendatory                  Excluded Entity(s)

* Important Notice:  All Claims that arise out of or in connection with the same Professional Services or Interrelated Wrongful Acts, whenever made and without regard to the number of Claims, claimants, or implicated Insureds, shall be treated as a single Claim.

All current and previously submitted application forms delivered to the Company are made a part of the Policy. The Named Insured may obtain a copy of all application forms by submitting a written request to the Company.

Countersigned by: _____          Date:      <u>October 25, 2022</u>
                Authorized Representative



**Lawyers Professional Liability Insurance Policy**

---

Named Insured:   Law Office of Gregory P. Cavagnaro

Policy No:        ALPS28842- 1
Effective Date:   10/25/2022

### SIGNATURE PAGE

IN WITNESS WHEREOF, ALPS Property & Casualty Insurance Company has caused this **Policy** to be executed and attested, but this **Policy** shall not be valid unless countersigned by a duly authorized representative of ALPS Property & Casualty Insurance Company.

[_____]                    [_____,

[David A. Bell, President]                             [Bradley D. Dantic, Secretary]



**Lawyers Professional Liability Insurance Policy Endorsement**

**EXCLUDED ENTITY ENDORSEMENT**

In consideration of the premium paid, it is understood and agreed that the **Policy** is amended as follows:

SECTION 3 -- EXCLUSIONS

The following EXCLUSIONS are added to SECTION 3 - EXCLUSIONS to read in their entirety as follows:

THIS **POLICY** DOES NOT APPLY TO ANY actual or potential **Claim** arising from a **Wrongful Act** in connection with **Professional Services** rendered or that should have been rendered by the **Insured** in regard to the **Insured's** relationship with or **Professional Services** rendered for and on behalf of, or rendered to, each EXCLUDED ENTITY identified below.

FURTHER, THIS **POLICY** DOES NOT APPLY TO any actual or alleged facts, events, circumstances, transactions or matters relating to the EXCLUDED ENTITY described below, or derived from the same or substantially similar facts, events, circumstances, transactions or matters related to the EXCLUDED ENTITY described below.

EXCLUDED ENTITY:
Century Law Firm

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



**Lawyers Professional Liability Insurance Policy Endorsement**

<u>**WASHINGTON AMENDATORY ENDORSEMENT**</u>

This Endorsement shall apply to and form a part of your **Policy** issued by ALPS Property & Casualty Insurance Company (the "**Company**").  The effective date of this endorsement is the **Effective Date** of your **Policy**.

In consideration of the premium paid, it is understood and agreed that the **Policy** is amended as follows:

SECTION 1 - INSURING AGREEMENTS

The following sentence is added at the end of Section 1.B.2. of the **Policy**:

> The right to reimbursement of **Claims Expenses** will only apply to the costs the **Company** has incurred after the **Company** notifies the **Insured** in writing that coverage might not exist under the Policy and that the **Company** is reserving the **Company's** right to terminate the defense or the payment of **Claims Expenses** and to seek reimbursement for **Claims Expenses**.

Section 1.B.4. of the **Policy** is deleted in its entirety and replaced to read in its entirety as follows:

> 4. Where an **Insured** has a right or obligation to arbitrate a **Claim**, or receives a demand to arbitrate a **Claim**, neither the **Company** nor the **Insured** may elect arbitration without the mutual consent of both the **Company** and the **Insured.**

SECTION 6 - GENERAL CONDITIONS

The Section entitled "SUBROGATION" set forth in Section 6 of the **Policy** is deleted in its entirety and replaced to read in its entirety as follows:

> 1. To the extent of any payment under this **Policy**, the **Company** shall be subrogated to the **Insured's** rights of recovery against any person or organization after the **Insured** has been fully compensated under this **Policy**, and the **Insured** shall execute and deliver all instruments and papers and do whatever else may be necessary for the **Company** to secure such rights.

> 2. Any amount recovered after payment under this **Policy** shall be apportioned first to the **Insured** as indicated in the paragraph above and thereafter, in the inverse order of payment to the extent of actual payment. The expenses of all such recovery proceedings shall be apportioned in the same ratio as the recoveries.

The Section entitled "CANCELLATION" set forth in Section 6 of the **Policy** is deleted in its entirety and replaced to read in its entirety as follows:

CANCELLATION

> 1. This **Policy** may be cancelled by the **Named Insured** stated in the **Declarations** either by mailing or delivering written notice to the **Company** stating when the cancellation is to become effective. In the event the **Named Insured** cancels the **Policy**, the **Company** shall be entitled to retain the customary "short rate" portion of the premium. Except as otherwise provided, the **Named Insured** may cancel this **Policy** by notifying the **Company** or the insurance producer in one of the following ways:

> > (a) Written notice by mail, fax, or e-mail;

> > (b) Surrender of the **Policy** or binder; or

> > (c) Verbal notice.

2.  Upon receipt of such notice, the **Company** will cancel this **Policy** or any binder issued as evidence of coverage, effective on the later of the following:

    (a)    The date on which notice is received or the **Policy** or binder is surrendered; or

    (b)    The date of cancellation required by the **Named Insured**.

If the **Named Insured** provides verbal notice of cancellation to the **Company**, the **Named Insured** must also provide written confirmation of cancellation to the **Company**. The effective date of cancellation shall be the date of cancellation verbally requested by the **Named Insured**.

3.  This **Policy** may be cancelled by the **Company** by delivering or mailing to the **Named Insured**, and any other person shown by the **Policy** to have an interest in any loss which may occur thereunder, at the principal address shown in the **Declarations**, written notice of cancellation, stating the reason for cancellation at least ten (10) days before the effective date of cancellation for nonpayment of premium and forty-five (45) days before the effective date of cancellation for all other reasons. A copy of the notice shall be provided within five (5) working days to the agent on the account or to the broker of record for the **Named Insured**. The effective date of cancellation shall become the end of the **Policy Period**. Delivery of such notice shall be equivalent to mailing. Proof of mailing shall be considered sufficient proof of notice.

4.  In the event the **Company** cancels this **Policy** for any reason, it will compute earned premium on a *pro rata* basis. The **Company** may make any resultant premium adjustments at the time cancellation is effective, or as soon thereafter as is practicable. However, the payment or tender of unearned premium is not a condition of or a prerequisite to cancellation of the **Policy**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



**PREFERRED**
Lawyers Professional Liability Insurance Policy

| PLEASE READ THE ENTIRE POLICY CAREFULLY |
| --- |

## CLAIMS MADE AND REPORTED POLICY

This is a "*CLAIMS MADE AND REPORTED*" insurance **Policy**.  Therefore, as a condition precedent to the **Company**'s obligation to defend or indemnify the **Insured** under this **Policy**, the **Insured** must immediately report any **Claim** to the **Company** in writing during the **Policy Period** or during any applicable **Extended Reporting Period**.  No coverage exists under this **Policy** for a **Claim** which is first made against the **Insured** or first reported to the **Company** before or after the **Policy Period** or any applicable **Extended Reporting Period**.  If the **Insured** receives notice of a **Claim**, or becomes aware of a **Wrongful Act** that could reasonably be expected to be the basis of a **Claim**, then the **Insured** must, as a condition precedent to the **Company**'s obligation to defend or indemnify any **Insured**, immediately deliver a written notice directly to the **Company** via email, facsimile, or mail at any of the following:

| NOTICE OF CLAIM | |
| --- | --- |
| Email: | Claims@alpsinsurance.com |
| Facsimile: | 406-728-7416 |
| Mail Address: | ALPS |
| | 111 N. Higgins, Ste. 600 |
| | P.O. Box 9169 |
| | Missoula, MT  59807-9169 |

If you deliver written notice of a **Claim** or circumstances which may give rise to a **Claim** to the **Company** via email at Claims@alpsinsurance.com you must then receive an email from the **Company** acknowledging receipt of the notice before the notice is considered to have been received.  If you do not receive an acknowledging email from the **Company** by the end of the next business day after delivering a written notice to the **Company** via email, then please contact the **Company** at 406-728-3113 for further assistance.

## CLAIM EXPENSE ALLOWANCE

This **Policy** provides a **Claim Expense Allowance**.  The **Company**'s payment of any **Claim Expenses** will first be applied against and reduce the **Claim Expense Allowance**.  Any **Claim Expenses** paid by the **Company** will not be applied against or reduce the **Limit of Liability** until after the **Claim Expense Allowance** has been exhausted, at which time any additional **Claim Expenses** paid by the **Company** will be applied against and reduce the **Limit of Liability** available to pay **Damages**.

## SEPARATE AND DISTINCT POLICY AND LIMIT OF LIABILITY

This **Policy** is a separate insuring agreement and distinct from any other insurance policy the **Company** may issue to you.  Each insurance policy the **Company** issues to you should be considered to be a separate and independent insuring agreement with its own separate terms, conditions and definitions.  No coverage is afforded under this **Policy** for any **Claim** that is otherwise covered under any other insurance policy the **Company** issues to you.  The limits of liability provided by each separate insurance policy the **Company** issues to you shall not be added together with the limits of liability of any other insurance policy the **Company** issues to you.

## THIS POLICY DOES NOT RENEW

This **Policy** expires on the **Expiration Date** and time specified in the **Policy Declarations**.  There is no right to a renewal of this **Policy**.  If the **Insured** wishes to maintain insurance coverage with the **Company** following the **Expiration Date** of this **Policy**, the **Insured** must timely submit a fully completed application to the **Company** prior to the **Expiration Date** so that the **Company** may review the complete underwriting information and determine whether or not the **Insured** qualifies for continued coverage under a new policy, and if so, on what terms.



**PREFERRED Lawyers Professional Liability Insurance Policy**

ALPS Property & Casualty Insurance Company (herein called "the **Company**"), agrees with the **Named Insured**, in consideration of the payment of the premium, and in reliance upon all applications, documents and information that the **Named Insured** has submitted for this **Policy** and any prior policies, as follows:

## SECTION 1 – INSURING AGREEMENTS

A.   COVERAGE

Subject to the **Limit of Liability**, exclusions, conditions and other terms of this **Policy**, the **Company** agrees to pay on behalf of the **Insured** all sums (in excess of the **Deductible** amount) that the **Insured** becomes legally obligated to pay as **Damages**, arising from or in connection with A **CLAIM** FIRST MADE AGAINST THE **INSURED** AND FIRST REPORTED IN WRITING TO THE **COMPANY** DURING THE **POLICY PERIOD**, provided that all of the following conditions are satisfied:

1.   The **Claim** arises from a **Wrongful Act** that occurred on or after the **Retroactive Coverage Date** set forth in Item 2 of the **Declarations**;

2.   At the **Effective Date** of this **Policy**, no **Insured** knew or reasonably should have known or foreseen that the **Wrongful Act** might be the basis of a **Claim**;

3.   Notice of the **Claim** or the **Wrongful Act** was not given nor required to be given to any other insurer prior to the **Effective Date**; and

4.   The **Claim** is not otherwise covered under any other insurance policy that the **Company** has issued to the **Named Insured**.

B.   DEFENSE AND CLAIM EXPENSES

1.   For any **Claim** seeking the recovery of **Damages** from the **Insured** and otherwise covered under this **Policy**, the **Company** shall have the right and the duty to defend such **Claim** even if any or all of the allegations of the **Claim** are groundless, false or fraudulent, but shall have no obligation to appoint legal counsel to defend a **Claim** that is not the subject of a pending civil action, arbitration, or similar proceeding seeking the recovery of **Damages**. The **Company** shall have the right to appoint legal counsel in the **Company**'s sole discretion after consultation with an **Insured** when practicable; consultation with any one **Insured** being sufficient. The **Company** shall have no duty to defend any **Claim** that does not seek the recovery of **Damages** from the **Insured**.

2.   The **Company** shall pay **Claim Expenses** in accordance with the terms of this **Policy**. The **Company** shall not have a duty to defend or to pay such expenses as to any **Claim** not covered under this **Policy**, and shall have the right to seek reimbursement from any **Insured**, who shall promptly provide such reimbursement, for any amount paid by the **Company** in defending any such non-covered **Claim**, including any amount paid in defending a non-covered **Claim** that is asserted together with one or more covered **Claims**.

3.   The **Company** may make such investigations as it deems appropriate.

4.   Where an **Insured** has a right or obligation to arbitrate a **Claim**, or receives a demand for arbitration, the **Company** shall have sole discretion as to whether to seek, agree to or reject arbitration.

5.   In the event a **Claim** covered under this **Policy** is made against an **Insured**, and in the same matter a **Claim** is also made against a non-attorney who referred to the **Insured** the matter from which the **Claim** arises, the **Company** shall provide the same defense to the referring party as to the **Insured**, but only for so long as the **Insured** remains liable to pay **Damages** arising from or in connection with the **Claim** against the **Insured**, and, provided, however, that such referring party shall accept the same legal counsel to defend the **Claim** as the **Company** appoints to represent the **Insured**. The **Company** shall have no other obligation to the referring party, including any obligation to pay any **Damages** or other **Claim Expenses** on the referring party's behalf. Any **Claim Expenses** associated with the defense of the referring party shall be subject to the **Deductible**, and shall be included within, and shall not increase, the **Claim Expense Allowance** and the **Limit of Liability**.

C.   SETTLEMENT AND CONSENT TO SETTLE

The **Company** will not admit liability of any **Insured** or settle a **Claim** without the written consent of any **Insured**, which consent shall not be unreasonably withheld.

 **PREFERRED Lawyers Professional Liability Insurance Policy**

D.    SUPPLEMENTARY PAYMENTS FOR DISCIPLINARY PROCEEDINGS

If an **Attorney** identified in Item 3 of the **Declarations**, at a time when the **Attorney** is an employee of the **Named Insured**, first receives notice during the **Policy Period** of a proceeding brought against the **Attorney** before a state licensing board, peer review committee or disciplinary agency or official to investigate allegations of professional misconduct by the **Attorney** concerning a **Wrongful Act** by the **Attorney** that would otherwise fall within the coverage of this **Policy**, then, except as provided in Section 1.D.6., the **Company** shall reimburse the **Named Insured** for attorneys' fees and expenses incurred by the **Named Insured** in relation to such proceeding, subject to the following conditions:

1.    The **Attorney** must be an employee of the **Named Insured** at the time the **Attorney** first receives notice of the proceeding;

2.    The **Attorney** must immediately deliver written notice of the proceeding to the **Company** during the **Policy Period**;

3.    The **Company** shall have the right to appoint legal counsel in the **Company**'s sole discretion after consultation with the **Attorney** that is the subject of the proceeding;

4.    The maximum reimbursement amount for any one **Attorney** involved in such proceeding shall be $25,000 without regard to the number of such proceedings involving the **Attorney** during the **Policy Period**;

5.    The maximum reimbursement amount shall be $75,000 per **Policy Period** and **Extended Reporting Period**, if applicable, without regard to the number of such proceedings or the number of **Attorneys** listed in Item 3 of the **Declarations**; and

6.    The **Company** will not reimburse the **Named Insured** for any attorney's fees and expenses incurred by the **Named Insured** in relation to such proceedings if the **Attorney** is disbarred in conjunction with such proceedings.

E.    EXHAUSTION OF LIMIT OF LIABILITY AND TENDER OF REMAINING LIMIT OF LIABILITY

The **Company**'s duty to defend shall be fully satisfied, and the **Company** shall not be obligated to continue to defend any **Claim** or pay any **Claim Expenses**, nor be obligated to pay any **Damages**, or interest thereon, after:

1.    The applicable **Limit of Liability** has been exhausted by payments of **Damages** and/or **Claim Expenses**; or

2.    The **Company** has deposited an amount equal to the applicable **Limit of Liability**, minus any **Damages** paid on the **Claim** and any **Claim Expenses** paid on the **Claim** and chargeable against the **Limit of Liability**, with a court of competent jurisdiction, to be disbursed by the court's order.

In either such case, the **Company** shall have the right to withdraw from further defense of the **Claim** by tendering control of the defense to the **Insured**. The **Insured** agrees, as a condition to the issuance of this **Policy**, to accept such tender.

F.    POLICY TERRITORY

This **Policy** applies to any **Wrongful Act** occurring anywhere in the world, provided that a **Claim** otherwise covered by this **Policy** is made within the United States of America, its territories or possessions, or Canada.

## SECTION 2 – DEFINITIONS

As used in this **Policy**, including the **Declarations**:

A.    **Attorney** means an individual attorney who is properly licensed to practice law or a professional business entity of which said individual attorney who is properly licensed to practice law is the sole owner and employee; provided, however, that with respect to the **Professional Services** which are the subject of a **Claim**, the individual attorney must have been properly licensed at the time the **Professional Services** were or should have been rendered within the jurisdiction in which the **Professional Services** were or should have been rendered.

B.    **Bodily Injury** means any injury to the body, any sickness or disease, or any death. **Bodily Injury** also includes any mental, psychological, or emotional injury, anguish, tension, distress, pain, suffering, shock or death, regardless of whether or not such condition arises from any injury to the body, from any sickness or disease, or from any death.



C.   **Claim** means a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the **Insured**.

**Claim** does *not* mean *nor* include any demand, service or proceeding arising from or in connection with any actual or alleged:

1.   Discrimination by an **Insured** including, but not necessarily limited to, discrimination based on race, color, creed, age, sex, gender, nationality, marital status or sexual orientation;

2.   Sexual harassment or misconduct by an **Insured**;

3.   Employment-related matter involving an **Insured** as an employer;

4.   Security breach, unauthorized access, unauthorized use or misuse of any **Computer Systems**;

5.   Theft, unauthorized use or misuse of any login information, access information or identification, or personally identifiable information including, but not necessarily limited to, any password, username, social security number or other code or identifier intended for use in accessing any **Computer Systems**, account, website or the internet;

6.   Infection, damage or loss of use of any **Computer Systems** due to the transmission of or failure to prevent the transmission of any malware, ransomware or malicious code;

7.   Notice or written demand arising from or in connection with any disciplinary, investigatory or other proceeding before a state licensing board, peer review committee or governmental regulatory body involving an **Insured Attorney**;

8.   Nuclear reaction, radiation or contamination, or any pollution, contamination or condition of any real or personal property, regardless of cause;

9.   Advertising or marketing services or activities; or

10.  **Bodily Injury** of any person.

D.   **Claim Expenses** means:

1.   Fees charged by any attorney(s) designated by the **Company** to defend a **Claim** or otherwise represent an **Insured**;

2.   All other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a **Claim** (including a suit or proceeding arising in connection therewith), if incurred by the **Company**, or if incurred by the **Insured** with the prior written consent of the **Company**; and

3.   Any supplementary payments incurred or reimbursed by the **Company** under Section 1.D.

**Claim Expenses** does *not* mean *nor* include:

4.   Salaries or other compensation of regular employees or officials of the **Company** or the **Named Insured**; or

5.   Premiums for any supersedeas, appeal, attachment or other similar bond and the **Company** shall have no obligation to apply for, furnish or issue such bond.

E.   **Claim Expense Allowance** means, with respect to **Claims** first made and first reported during the **Policy Period**, an amount equal to one half of the "Each **Claim**" Limit of Liability listed in Item 5 of the **Declarations**, or $500,000, whichever is less, and includes the amount of any applicable **Deductible** and any supplementary payments incurred or reimbursed by the **Company** under Section 1.D.  The **Claim Expense Allowance** is described further in Section 4.B.

**Claim Expense Allowance** means, with respect to **Claims** first made and first reported during any applicable **Extended Reporting Period**, the applicable **Claim Expense Allowance** further described in Section 5.J.

F.   **Computer Systems** means computers, information systems, servers, hardware, software, and associated input and output devices, data storage devices, networking equipment, back up facilities and any other associated or connected electronic devices, including mobile devices.

G.   **Contract Attorney** means a non-employee **Attorney** who is or was rendering services for and on behalf of the **Named Insured**, but solely for a **Claim** arising from or in connection with the provision of **Professional Services** by the **Named**



**PREFERRED Lawyers Professional Liability Insurance Policy**

**Insured** or **Predecessor Law Firm**, solely to the extent no other insurance or extension of insurance applies, and solely to the extent said **Contract Attorney**'s services satisfy the following conditions:

1.   The services must be rendered to a client of the **Named Insured** in conjunction with the **Named Insured's** rendering of **Professional Services** to such client; and

2.   The non-employee **Attorney** must be identified as an **Attorney** in Item 3 of the **Declarations**.

H.   **Damages** means any:

1.   Monetary award by way of judgment or final arbitration, or any settlement; and

2.   Civil liability which may be imposed upon an **Insured** under § 813(a) of the federal Fair Debt Collection Practices Act (codified at 15 U.S.C. § 1692k(a)), as may hereafter be amended from time to time.

**Damages** does _not_ mean _nor_ include any:

3.   Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same were levied or imposed in a separate matter or proceeding;

4.   Awards deemed uninsurable by law;

5.   Injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

6.   Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an **Insured**, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an **Insured**;

7.   Judgment, award, verdict, decision or order that includes, as a measure, element or portion of the damages or award set forth therein, any amount the basis of which was determined by reference to the amount of fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an **Insured**.

8.   Injury or damage to, destruction of, loss of, or loss of use of any funds or property; or

9.   Pollution, contamination, or erosion of any property.

I.   **Declarations** means the Policy Declarations attaching to this **Policy** for the current **Policy Period** listed in Item 4 of the Policy Declarations.

J.   **Deductible** means the **Deductible** amount for "Each **Claim**" stated in Item 6 of the **Declarations**.  The **Deductible** is described further in Section 4.A.

K.   **Effective Date** means 12:01 a.m., at the address stated in Item 1 of the **Declarations**, on the **Effective Date** listed in Item 4 of the **Declarations**.

L.   **Exempt Organization** means an **Organization** exempt from taxation within the meaning of the following enumerated sections of 501(c) of the United States Internal Revenue Code:  501(c)(3), 501(c)(4), 501(c)(6), 501(c)(7), 501(c)(8) and 501(c)(10).

M.   **Expiration Date** means 12:01 a.m., at the address stated in Item 1 of the **Declarations**, on the **Expiration Date** listed in Item 4 of the **Declarations**.

N.   **Extended Reporting Period Endorsement** means an endorsement issued by the **Company** providing for an **Extended Reporting Period** as described in Section 5 for reporting of a **Claim** that: (a) would otherwise be covered by this **Policy**; (b) arises from a **Wrongful Act** that occurred after the **Retroactive Coverage Date** and before the end of the **Policy Period**; and (c) is first made, and first reported to the **Company**, after the end of the **Policy Period** and during the **Extended Reporting Period**.

O.   **Extended Reporting Period** means the period of time set forth in an automatic 60-day extended reporting period identified in Section 5.A. or the period of time set forth in an **Extended Reporting Period Endorsement** that the **Company** may issue after expiration or cancellation of the **Policy Period** as described in Section 5.

P.   **Formal Mediation** means a voluntary alternative dispute resolution ("ADR") process agreed to by the **Company** and the **Insured** and engaged in without a court order or judicial rule, by which: (i) a qualified professional mediator is



chosen by the parties to the **Claim** with agreement by the **Company**; (ii) a specific date, time and duration is established for the ADR process; and (iii) the mediator meets with and intercedes between the parties during the ADR process in an attempt to fully and finally resolve the **Claim**.

Q.  **Insured** means the **Named Insured** listed in Item 1 of the **Declarations** and each of the following, but solely for **Claims** arising from **Professional Services** performed for and on behalf of the **Named Insured** or a **Predecessor Law Firm**:

1.  An **Attorney** who is, at the time a **Claim** is first made, or who was, at the **Effective Date** of the **Policy**, a principal, partner, shareholder, member or other owner or employee of the **Named Insured**, and who is or was identified in Item 3 of the **Declarations**, provided that the requirements of this **Policy** concerning amendment of Item 3 of the **Declarations** have been complied with, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim**;

2.  An **Attorney** who was, before the **Effective Date** of the **Policy**, a principal, partner, shareholder, member or other owner or employee of the **Named Insured** or a **Predecessor Law Firm**, provided that information requested on the application concerning such person has been provided to the **Company**, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim**;

3.  An **Attorney** acting as "of counsel" under formal contract with the **Named Insured** or a **Predecessor Law Firm**, and who is identified in Item 3 of the **Declarations**, provided that information requested on the application concerning such person has been provided and that the requirements of this **Policy** concerning amendment of Item 3 have been complied with, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim;**

4.  A non-**Attorney** who is or was an employee of the **Named Insured** or a **Predecessor Law Firm**, solely for **Claims** arising from or in connection with actions within the scope of such person's duties as an employee of the **Named Insured** or a **Predecessor Law Firm**, and arising from or in connection with the rendering of **Professional Services** for and on behalf of the **Named Insured** or a **Predecessor Law Firm**, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim**;

5.  The heirs, executors, administrators, assigns and legal representatives of an **Insured**, in the event of the **Insured's** death, incapacity or bankruptcy;

6.  A **Contract Attorney** who is, at the time a **Claim** is first made, or who was, at the **Effective Date** of this **Policy**, a **Contract Attorney** of the **Named Insured**, and who is or was identified in Item 3 of the **Declarations**;

7.  Any **Predecessor Law Firm** listed as an additional **Insured** on an endorsement issued by the **Company** and identified in Item 8 of the **Declarations**; and

8.  The spouse or legally recognized domestic partner of an **Insured**, but solely with respect to a **Claim** asserted against such **Insured** that is otherwise covered under this **Policy**; provided, however, that such spouse or legally recognized domestic partner shall accept the same legal counsel to defend the **Claim** as the **Company** appoints to represent the **Insured**, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim**.

R.  **Interrelated Wrongful Acts** means **Wrongful Act**s that are temporally, logically or causally related, including all **Wrongful Act**s that have as a common nexus any fact, circumstance, situation, transaction, event, advice or decision, and all **Wrongful Act**s that are the same, related or continuous acts, regardless of whether the **Claim** or **Claims** alleging such **Wrongful Act**s involve the same, different or multiple claimants, **Insured**s, or causes of action.

S.  **Limit of Liability** means, with respect to **Claims** first made and first reported during the **Policy Period**, the "Each **Claim**" **Limit of Liability** and the "Aggregate" **Limit of Liability,** as applicable and as listed in Item 5 of the **Declarations**.  The **Limit of Liability** with respect to **Claims** first made and first reported during the **Policy Period** includes the amount of any applicable **Deductible** and is described in Section 4.C.

**Limit of Liability** means, with respect to **Claims** first made and first reported during any **Extended Reported Period**, the applicable **Limit of Liability** further described in Section 5.J.

T.  **Named Insured** means the law firm or individual **Attorney** listed as the **Named Insured** in Item 1 of the **Declarations**.

U.  **Organization** means any corporation, partnership, limited partnership, limited liability partnership or limited liability company; association; charitable entity, enterprise or organization; health or welfare benefit plan, program, fund or trust; pension, profit-sharing, 401(k) or other retirement benefit plan, program, fund or trust; mutual fund or



investment trust; or any other business entity, enterprise or organization of any kind or nature whatsoever. **Organization** does not include a decedent's estate or a trust (other than an investment trust).

V.   **Personal Injury** means an injury other than a **Bodily Injury** that results from:

1.   False arrest, detention or imprisonment;

2.   Wrongful entry or eviction or other invasion of private occupancy;

3.   Malicious prosecution;

4.   Publication or utterance of libel, slander or other defamatory or disparaging material; and

5.   Invasion of privacy, or publication or utterance in violation of an individual's right of privacy.

W.   **Policy** means this Lawyers Professional Liability Insurance Policy that the **Company** has issued to the **Named Insured**, including all endorsements attaching hereto, and including all current and previous application forms any **Insured** has delivered to the **Company**.

X.   **Policy Period** means the period of time between the **Effective Date** listed in Item 4 of the **Declarations** and the earlier to occur of (a) the **Expiration Date** listed in Item 4 of the **Declarations**, or (b) the date this **Policy** is otherwise terminated or cancelled prior to the **Expiration Date**.  **Policy Period** does not mean nor include any **Extended Reporting Period** provided pursuant to Section 5.

Y.   **Predecessor Law Firm** means any sole proprietorship or legally recognized business entity previously engaged in the private practice of law that: (i) has undergone dissolution; (ii) has been disclosed to the **Company** in the **Named Insured's** application for lawyers professional liability insurance; and (iii) is listed as an additional **Insured** on an endorsement issued by the **Company** and identified in Item 8 of the **Declarations**.

Z.   **Professional Services** means services or activities performed for and on behalf of the **Named Insured** or a **Predecessor Law Firm** and rendered solely to others as:

1.   An **Attorney** in an attorney-client relationship on behalf of one or more clients applying the **Attorney's** specialized education, knowledge, skill, labor, experience and/or training, including pro bono services;

2.   A mediator, arbitrator, or other facilitator in a dispute resolution process;

3.   An administrator, conservator, guardian, executor, personal representative, trustee or other fiduciary, so long as the **Insured**:  (i) is not a beneficiary of such estate, trust or other fiduciary relationship; and (ii) is not receiving compensation other than fees for such services paid directly from such estate or trust or for services in conjunction with such fiduciary capacity;

4.   An **Attorney** in researching or certifying title to real estate, including services as a title insurance agent acting on behalf of a title insurance company;

5.   A director, officer or member of any professional legal association, legal bar association, or paralegal or legal assistant association, including its governing board or any of its committees;

6.   An author or presenter of legal research papers, legal materials and legal seminars, including matters relating to the ethical and professional conduct of an **Attorney**, but only if such services or activities are performed without compensation or royalties, or the amount of compensation or royalties per publication, presentation or seminar does not exceed $30,000;

7.   A court-appointed child and family investigator in a domestic relations matter, or other similar position or role so long as the **Insured** is acting pursuant to a court order;

8.   A government affairs advisor or lobbyist; and

9.   A notary public.

**Professional Services** does *not* mean *nor* include any:

10.   Services rendered or activities engaged in prior to the **Retroactive Coverage Date**;

11.   Obligations or services assumed by or performed under any contract other than one to provide **Professional Services**;



12. Rendering of investment advice in any context or in any capacity including, but not limited to, advice concerning securities, real property, commodities, futures contracts or franchises;

13. Holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the **Insured**, or of any client, trust, estate, person, or any other third party;

14. Advertising or marketing services or activities;

15. Services as a broker, dealer, business manager, accountant, or real estate broker or agent; or

16. Services as an expert witness.

AA. **Retroactive Coverage Date** means the date for the **Named Insured** as listed in Item 2 of the **Declarations** and, if applicable, the date for any **Predecessor Law Firm** as listed in an additional **Insured** endorsement issued by the **Company** and identified in Item 8 of the **Declarations**.  The effect of the **Retroactive Coverage Date** is described in Section 1.A.1. and Section 5.

BB. **Wrongful Act** means an actual or alleged**:**

1. Act, error, or omission by the **Insured** in the performance of **Professional Services**; and

2. A **Personal Injury** resulting from the **Professional Services** of the **Insured**.

**Wrongful Act** does not mean nor include an act, error, or omission resulting in **Bodily Injury**.

---

## SECTION 3 – EXCLUSIONS

THIS **POLICY** DOES NOT APPLY TO ANY **CLAIM** ARISING FROM OR IN CONNECTION WITH:

A. Any dishonest, fraudulent, criminal, malicious, or intentionally harmful **Wrongful Act** committed by, at the direction of, or with the consent of an **Insured**, subject to Section 6.A. ("innocent insured coverage");

B. Any trust or estate of which an **Insured** is an heir, devisee, beneficiary or distributee of such trust or estate;

C. Any **Professional Services** that were rendered or should have been rendered to or in connection with any **Organization** (including the ownership, maintenance or care of any property in connection with any such **Organization**) of which, at the time such **Professional Services** were or should have been rendered:

1. An **Insured** was an officer, director, employee or other fiduciary;

2. An **Insured** was a partner, shareholder, member or other owner; provided, however, that this provision does not apply if, at the time such **Professional Services** were or should have been rendered, no **Insured** (or group of **Insureds** collectively) owned, possessed or controlled a total voting interest or beneficial interest of more than ten percent (10%) of such **Organization**; or

3. An **Insured** served in any capacity to directly or indirectly control, operate or manage such **Organization**.

This exclusion shall not apply to any **Claim** arising from or in connection with (i) an **Insured's** position as an officer or director of an **Exempt Organization**, but only to the extent the **Insured** is not indemnified by the **Exempt Organization**, and only to the extent no other insurance applies, or (ii) any **Professional Services** that were or should have been rendered to an **Organization** listed on an endorsement identified in Item 8 of the **Declarations**;

D. Notary certification or attestation of an instrument without first determining from personal knowledge or satisfactory evidence or proof of the identity of the individual, that the individual signing the instrument has the identity claimed and has executed the instrument knowingly and willingly for the purposes intended;

E. Any **Wrongful Act** that occurred prior to the **Effective Date** of this **Policy**, if:

1. The **Wrongful Act** occurred in the course of services or activities performed for a firm other than the **Named Insured**, and there is another policy of professional liability insurance that provides coverage for the **Claim**, regardless of the amount, if any, of the available limits of liability of the other policy, and regardless of whether or not the deductible provisions or limits of liability of the other policy are different from those of this **Policy**;



2.   There is an earlier-incepting policy of professional liability insurance that provides coverage for the **Claim**, or would have provided coverage for the **Claim** if the **Insured's** obligations under that policy had been complied with, regardless of the amount, if any, of the available limits of liability of the prior policy, and regardless of whether or not the deductible provisions or limits of liability of the prior policy are different from those of this **Policy**; or

3.   Prior to the **Effective Date** of this **Policy**, any **Insured** gave or should have given to any insurer, notice of a **Claim** or potential **Claim** arising from or in connection with the **Wrongful Act**, or from any **Wrongful Act** that is connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the **Claim** or potential **Claim**.

F.   An **Insured's** activities as an elected public official, employee or representative of a governmental body, subdivision, or agency thereof ("public entity"), unless such **Insured** is deemed to be a public official, employee or representative solely by reason of rendering **Professional Services** to such public entity;

G.   An **Insured's** activities or capacity as a fiduciary under the Employee Retirement Income Security Act of 1974, as amended, or any regulation or order issued pursuant thereto, or under any other similar state or local law;

H.   Any loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an **Insured** in any capacity or under any authority, including any loss or reduction in value of such funds or property;

I.   Any dispute over fees or costs, or any **Claim** that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an **Insured**;

J.   Any defect in title to real estate that was not disclosed in public records and that any **Insured** knew about when a title insurance policy was issued;

K.   Breach of any underwriting authority granted any **Insured** by a title insurance company or its authorized representative;

L.   Any liability agreed to or assumed by an **Insured** under an agreement where the **Insured** has agreed to indemnify for or share or participate in any loss payment or expense due or payable under a title insurance policy;

M.   Any **Claim** that is otherwise covered under any other insurance policy that the **Company** has issued to the **Named Insured**; or

N.   Any **Wrongful Act** committed by any **Attorney** with whom any **Insured** shares common office space or office facilities, but which said **Attorney** is not identified as an **Insured Attorney** in Item 3 of the Declarations.

THIS **POLICY** DOES NOT APPLY TO ANY **CLAIM** MADE BY:

O.   An employer against an **Insured** who is or was an employee of the employer;

P.   An **Insured**;

Q.   A family member or other relative of an **Insured**; or

R.   Anyone who is or was a partner, officer, director, owner, stockholder or employee of any **Insured**.

---

**SECTION 4 – DEDUCTIBLE, CLAIM EXPENSE ALLOWANCE, LIMIT OF LIABILITY, AND MULTIPLE CLAIMS**

A.   DEDUCTIBLE

1.   For each and every **Claim** covered by this **Policy**, the **Named Insured** shall pay all **Claim Expenses** and **Damages** up to the **Deductible** for each and every covered **Claim**.  The **Named Insured's** payment of all **Claim Expenses** and **Damages** up to the **Deductible** for each and every covered **Claim** is a condition precedent to the **Company's** obligation to pay any **Claim Expenses** or **Damages** for each and every covered **Claim**.  Each **Insured** shall be jointly and severally liable for such **Claim Expenses** and **Damages** in the event the **Named Insured** fails to make any required payment.

2.   The **Company** shall not have any obligation to pay **Claim Expenses** or **Damages** until after the **Deductible** is exhausted.  If the **Company** pays any amount within the **Deductible**, the **Named Insured** and each **Insured** shall



**PREFERRED Lawyers Professional Liability Insurance Policy**

be jointly and severally liable to the **Company** for any and all such amounts paid by the **Company** and, on demand, shall promptly reimburse such amounts to the **Company**.

3.   The maximum aggregate **Deductible** amount payable by the **Named Insured** for all **Claims** first made and reported during a **Policy Period**, without regard to the number of **Claims** or claimants, or the number of **Insureds**, shall be twice the "Each **Claim**" **Deductible** amount listed in Item 6 of the **Declarations**.

4.   If a **Claim** is resolved through **Formal Mediation**, the **Deductible** payable by the **Named Insured** for that **Claim** will be reduced by an amount equal to the lesser of: (i) fifty percent (50%) of the **Deductible**; or (ii) $25,000.

B.   CLAIM EXPENSE ALLOWANCE

1.   This **Policy** provides a **Claim Expense Allowance**.  The **Company**'s payment of any **Claim Expenses** will first be applied against and reduce the **Claim Expense Allowance**.  Subject to Section 4.B.2., the **Claim Expense Allowance** shall be the maximum aggregate amount the **Company** shall be obligated to pay for **Claim Expenses** for all **Claims** first made and reported during a **Policy Period**, without regard to the number of **Claims** or claimants, or the number of **Insureds**.

2.   In the event payment by the **Named Insured** or the **Company** (or both) of **Claim Expenses** exhausts the remaining available **Claim Expense Allowance** under this **Policy**, any further payment of **Claim Expenses** shall be applied against and reduce the remaining available **Limit of Liability**, described in Section 4.C.  The **Company** shall have no further obligation to pay **Claim Expenses** once any **Limit of Liability** is reached.

3.   The **Claim Expense Allowance** includes the **Deductible**, and to the extent any **Insured** is required during the **Policy Period** to pay **Claim Expenses** as part of a **Deductible**, the remaining available **Claim Expense Allowance** for the **Policy Period** shall be reduced by the amount of such payments by the **Insured**.

4.   If the **Company** issues an **Extended Reporting Period Endorsement**, the **Claim Expense Allowance** applicable during the **Extended Reporting Period** is described in Section 5.J.

C.   LIMIT OF LIABILITY

1.   Subject to Section 4.B.2. and subject always to the remaining available "Aggregate" **Limit of Liability** in the event more than one **Claim** is first made and first reported during the **Policy Period,** the "Each **Claim**" **Limit of Liability** listed in Item 5 of the **Declarations** shall be the maximum amount the **Company** shall pay for each **Claim** first made and first reported during a **Policy Period**, without regard to the number of claimants or number of **Insureds**.  The **Limit of Liability** includes the **Deductible**, and to the extent any **Insured** is required during the **Policy Period** to pay **Damages** as part of a **Deductible**, the remaining available **Limit of Liability** for the **Claim** shall be reduced by the amount of such payments by the **Insured**.

2.   The "Aggregate" **Limit of Liability** listed in Item 5 of the **Declarations** shall be the maximum amount the **Company** shall pay for all **Claims** first made and first reported during a **Policy Period**, without regard to the number of **Claims** or claimants, or the number of **Insureds**.

3.   If the **Company** issues an **Extended Reporting Period Endorsement**, the **Limit of Liability** applicable during the **Extended Reporting Period** is described in Section 5.J.

4.   If the **Company** pays any amount in excess of the applicable **Limit of Liability**, or any other amount for which the **Company** has no obligation under this **Policy**, each **Insured** shall be jointly and severally liable to the **Company** for any and all such amounts and, on demand, shall promptly reimburse such amounts to the **Company**.

D.   MULTIPLE CLAIMS, CLAIMANTS, OR INSUREDS

Neither the making of one or more **Claims** against more than one **Insured**, nor the making of **Claims** by more than one claimant, shall operate to increase the Limit of Liability.  All **Claims** that arise out of or in connection with the same **Professional Services** or **Interrelated Wrongful Acts**, whenever made and without regard to the number of **Claims**, claimants, or implicated **Insureds**, shall be treated as a single **Claim**.  All such **Claims**, whenever made, shall be deemed first made at the time the earliest **Claim** arising out of such **Professional Services** or **Interrelated Wrongful Acts** was first made, and all such **Claims** shall be subject to the same "Each Claim" **Limit of Liability,** "Aggregate" **Limit of Liability**, and **Claim Expense Allowance.**



**PREFERRED Lawyers Professional Liability Insurance Policy**

E.      NON-CUMULATION OF LIMITS OF LIABILITY

If two or more policies of lawyers professional liability insurance issued by the **Company** would otherwise provide coverage to an **Insured** or multiple **Insureds** with respect to any **Claim**, the **Claim** shall be subject to, and the maximum amount the **Company** shall be obligated to pay is, the highest available **Limit of Liability** of one of such policies.  The **Limit of Liability** under this **Policy** shall be reduced, and may be exhausted, by payments under this **Policy** or payments under such other policies issued by the **Company**.

---

## SECTION 5 – EXTENDED REPORTING PERIOD

A.      AUTOMATIC 60-DAY EXTENDED REPORTING PERIOD

1.      If this **Policy** is cancelled or not renewed by the **Company** or **Named Insured** for any reason other than nonpayment of premium or **Deductible**, or for fraud or material misrepresentation in any application for lawyers professional liability insurance delivered to the **Company**, then the **Named Insured** shall have an automatic 60-day period to report a **Claim**, commencing immediately upon expiration or cancellation of the **Policy Period**, subject to the terms and conditions of Section 5.J. and Section 5.K.

2.      The automatic 60-day reporting period under this Section 5.A. shall immediately terminate if: (i) the **Company** issues an **Extended Reporting Period Endorsement** to the **Named Insured** at any time during such 60-day period; or (ii) the **Named Insured** binds coverage or otherwise becomes insured under another policy of lawyers professional liability insurance issued by any insurer.

B.      FREE EXTENDED REPORTING PERIOD FOR RETIRING SOLE PRACTITIONER

This Section 5.B. shall apply to any **Extended Reporting Period Endorsement** issued to an individual **Attorney** who is the only **Attorney** identified in Item 3 of the **Declarations**.

1.      Except as provided in Section 5.B.5., an **Attorney** practicing as a sole practitioner shall have the right, upon written request to the **Company** no later than thirty (30) days after expiration or cancellation of the **Policy Period**, to have the **Company** issue an **Extended Reporting Period Endorsement** of unlimited duration to the **Attorney** if the **Attorney** satisfies the following conditions:

(a)     The **Attorney** has been the only **Attorney** identified in Item 3 of the **Declarations** and the only **Attorney** continuously insured by the **Company** under this **Policy** or a predecessor to this **Policy** during the five-year period immediately preceding expiration or cancellation of the **Policy Period**; and

(b)     The **Attorney** has attained age 55 or older and retires from and permanently and completely ceases the practice of law and the rendering of **Professional Services** during the **Policy Period**.

2.      No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to the sole practitioner **Attorney** pursuant to Section 5.B.1.

3.      If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.B.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

4.      Any **Extended Reporting Period Endorsement** issued under this Section 5.B. shall be subject to the terms and conditions of Section 5.K.

5.      No **Extended Reporting Period Endorsement** shall be available to an **Attorney** under this Section 5.B. if the **Attorney** has been insured by the **Company** under the **Company**'s policy form ALPS-LPL-BASIC at any time during the five-year period immediately preceding expiration or cancellation of the **Policy Period**.

C.      FREE EXTENDED REPORTING PERIOD FOR ATTORNEY RETIRING FROM NAMED INSURED FIRM

This Section 5.C. shall apply to any **Extended Reporting Period Endorsement** issued to an individual **Attorney** if the **Named Insured** has more than one (1) **Attorney** identified in Item 3 of the **Declarations**.

1.      Except as provided in Section 5.C.5. and Section 5.C.6., an **Attorney** identified in Item 3 of the **Declarations** shall have the right, upon written request to the **Company** no later than thirty (30) days after expiration or cancellation of the **Policy Period**, to have the **Company** issue an **Extended Reporting Period Endorsement** of unlimited duration if the **Attorney** satisfies the following conditions:



(a) The **Attorney** has been identified in Item 3 of the **Declarations** and continuously insured by the **Company** under this **Policy** and each predecessor policy to this **Policy** during the five-year period immediately preceding expiration or cancellation of the **Policy Period**; and

(b) The **Attorney** has attained age 55 or older and retires from and permanently and completely ceases the practice of law and the rendering of **Professional Services** during the **Policy Period**.

2. No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** pursuant to Section 5.C.1.

3. If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.C.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

4. Any **Extended Reporting Period Endorsement** issued pursuant to Section 5.C.1. shall be subject to the terms and conditions of Section 5.K.

5. No **Extended Reporting Period Endorsement** shall be available to an **Attorney** under this Section 5.C. if the **Attorney** has been insured by the **Company** under the **Company**'s policy form ALPS-LPL-BASIC at any time during the five-year period immediately preceding expiration or cancellation of the **Policy Period**.

6. No **Extended Reporting Period Endorsement** shall be available to an **Attorney** under this Section 5.C. if fifty percent (50%) or more of the **Attorneys** identified in Item 3 of the **Declarations** retire from and permanently and completely cease the practice of law and the rendering of **Professional Services** during the **Policy Period**.

D. FREE EXTENDED REPORTING PERIOD UPON DEATH

1. If an **Attorney** identified in Item 3 of the **Declarations** dies during the **Policy Period**, the executor, personal representative or other duly authorized administrator of the **Attorney**'s estate shall have the right to request that the **Company** issue an **Extended Reporting Period Endorsement** to the **Attorney**'s estate, subject to satisfaction of all of the following terms and conditions:

(a) The executor, personal representative or other duly authorized administrator of the **Attorney**'s estate shall deliver to the **Company** no later than thirty (30) days following expiration of the **Policy Period** or any applicable **Extended Reporting Period**: (i) a written request that the **Company** issue an **Extended Reporting Period Endorsement**; and (ii) written proof of the date and cause of death of the **Attorney**;

(b) No **Extended Reporting Period Endorsement** shall be available if suicide or abuse or misuse of any substance is the cause of the **Attorney**'s death; and

(c) The **Extended Reporting Period Endorsement** issued to the **Attorney**'s estate shall terminate upon the earlier of: (i) the informal or formal closing of the **Attorney**'s estate; or (ii) that date which is three (3) years following the date of death of the **Attorney**.

2. No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** pursuant to this Section 5.D.1.

3. If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.D.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

4. Any **Extended Reporting Period Endorsement** issued pursuant to Section 5.D.1. shall be subject to the terms and conditions of Section 5.K.

E. FREE EXTENDED REPORTING PERIOD UPON TOTAL AND PERMANENT DISABILITY

1. If an **Attorney** identified in Item 3 of the **Declarations** becomes totally and permanently disabled during the **Policy Period**, then the **Attorney** or the legal guardian acting on behalf of the **Attorney** shall have the right to request that the **Company** issue an **Extended Reporting Period Endorsement** of unlimited duration, subject to satisfaction of all of the following terms and conditions:

(a) The **Attorney** or such legal guardian shall deliver to the **Company** no later than thirty (30) days following expiration of the **Policy Period**: (i) a written request that the **Company** issue an **Extended Reporting Period Endorsement**; and (ii) a written certification from a licensed physician stating that the **Attorney** is totally and permanently disabled;



(b)    No **Extended Reporting Period Endorsement** shall be available if the **Attorney** is totally and permanently disabled arising from or in connection with abuse or misuse of any substance;

(c)    If the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** who is totally and permanently disabled, the **Extended Reporting Period** shall immediately terminate if the **Attorney** begins to render any **Professional Services** at any time after the **Company** issues the **Extended Reporting Period Endorsement**; and

(d)    Upon the **Company**'s request and at the **Company**'s sole expense, the **Attorney** must agree to submit to a medical examination by a licensed physician designated by the **Company**.

2.    Solely for purposes of this Section 5.E., including the written certification from a licensed physician as required under Section 5.E.1.(a), the phrase "totally and permanently disabled" shall mean:

(a)    Due to **Bodily Injury,** other than death, the **Attorney** is wholly and entirely prevented from rendering any **Professional Services**;

(b)    Such **Bodily Injury** has existed for no less than six (6) months prior to expiration of the **Policy Period**; and

(c)    Such **Bodily Injury** is reasonably expected to be continuous and permanent.

3.    No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** pursuant to Section 5.E.1.

4.    If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.E.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

5.    Any **Extended Reporting Period Endorsement** issued pursuant to Section 5.E.1. shall be subject to the terms and conditions of Section 5.K.

F.    FREE EXTENDED REPORTING PERIOD UPON ACTIVE MILITARY SERVICE

1.    If an **Attorney** listed in Item 3 of the **Declarations** is called to active duty as a member of the United States armed forces, then the **Attorney** shall have the right to request that the **Company** issue an **Extended Reporting Period Endorsement** of unlimited duration to the **Attorney**. The **Attorney** shall deliver to the **Company** no later than thirty (30) days after being called to active duty: (i) a written request for issuance of an **Extended Reporting Period Endorsement**; and (ii) written proof demonstrating that the **Attorney** has been called to active duty.

2.    No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** pursuant to this Section 5.F.1.

3.    If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.F.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

4.    Any **Extended Reporting Period Endorsement** issued pursuant to Section 5.F.1. shall be subject to the terms and conditions of Section 5.K.

G.    OPTIONAL EXTENDED REPORTING PERIOD FOR INDIVIDUAL ATTORNEY

1.    If an **Attorney** identified in Item 3 of the **Declarations** ceases to be a principal, partner, shareholder or other owner or employee of the **Named Insured** during the **Policy Period**, then the **Attorney** shall have the right, upon written request to the **Company** and upon payment of the additional premium specified in Section 5.I.2. no later than thirty (30) days after ceasing to be a principal, partner, shareholder or other owner or employee of the **Named Insured**, to have the **Company** issue an _Unlimited_ Extended Reporting Period Endorsement.

2.    If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to this Section 5.G., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

3.    Any **Extended Reporting Period Endorsement** issued pursuant to this Section 5.G. shall be subject to the terms and conditions of Section 5.K.

H.    OPTIONAL EXTENDED REPORTING PERIOD FOR NAMED INSURED

1.    If this **Policy** is cancelled or not renewed by the **Company** or **Named Insured** for any reason other than nonpayment of premium or **Deductible** or fraud or material misrepresentation in any application for lawyers professional liability insurance delivered to the **Company**, and except as otherwise provided herein, the **Named**



**Insured** shall have the right, upon written request to the **Company** and upon payment of the additional premium specified in Section 5.I. no later than thirty (30) days after expiration or cancellation of the **Policy Period**, to have the **Company** issue an **Extended Reporting Period Endorsement** of a duration as set forth in Section 5.I.1.

2. If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to this Section 5.H., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

3. Any **Extended Reporting Period Endorsement** issued under this Section 5.H. shall be subject to the terms and conditions of Section 5.K.

I.   PREMIUM FOR EXTENDED REPORTING PERIOD ENDORSEMENT

1. If the **Company** issues an **Extended Reporting Period Endorsement** to the **Named Insured** pursuant to Section 5.H.1., the premium for any **Extended Reporting Period Endorsement** shall be calculated based upon a percentage of the expiring premium of this **Policy** as applied to the duration of the **Extended Reporting Period** as follows:

| Duration of **Extended Reporting Period** | Percentage of Expiring Premium |
|---|---|
| 1 Year | 125% |
| 2 Years | 175% |
| 3 Years | 200% |
| 5 Years | 265% |
| Unlimited | 300% |

2. If the **Company** issues an **Extended Reporting Period Endorsement** to an individual **Attorney** pursuant to Section 5.G., the premium for any **Extended Reporting Period Endorsement** shall be calculated based upon the **Attorney**'s portion of the expiring premium of this **Policy** multiplied by the percentage applicable to an _Unlimited_ **Extended Reporting Period Endorsement** as set forth in Section 5.I.1.

3. Except as stated in Section 5.G., the premium for any **Extended Reporting Period Endorsement** must be paid no later than thirty (30) days after expiration or cancellation of the **Policy Period**.  If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.G., the premium for the **Extended Reporting Period Endorsement** must be paid no later than thirty (30) days after the individual **Attorney** ceases to be a principal, partner, shareholder or other owner or employee of the **Named Insured**.

J.   LIMIT OF LIABILITY AND CLAIM EXPENSE ALLOWANCE DURING EXTENDED REPORTING PERIOD

1. If the **Company** issues an **Extended Reporting Period Endorsement** to a sole practitioner **Attorney** pursuant to Section 5.B.1. or to the **Named Insured** pursuant to Section 5.H., the **Extended Reporting Period Endorsement** does _not_ create or establish a new or separate **Policy**, **Limit of Liability** or **Claim Expense Allowance** and will not increase or reinstate the **Limit of Liability** or the **Claim Expense Allowance** under this **Policy**.  Instead, the maximum amount the **Company** shall pay as **Claim Expenses** and **Damages** for all **Claims** first made and first reported to the **Company** during the **Extended Reporting Period** shall be the remaining **Limit of Liability** and the remaining **Claim Expense Allowance** under this **Policy** at the time of expiration or cancellation of the **Policy Period**.

2. Subject to the further limitation set forth in Section 5.J.4, if the **Company** issues an **Extended Reporting Period Endorsement** to an individual **Attorney** pursuant to Section 5.C., Section 5.D., Section 5.E., Section 5.F., or Section 5.G., the maximum amount the **Company** shall pay as **Claim Expenses** for all **Claims** first made against the **Attorney** and first reported to the **Company** during the **Extended Reporting Period** shall be the _lesser_ of:

   (a)   The remaining **Claim Expense Allowance** under this **Policy** at the time of expiration or cancellation of the **Policy Period**; or

   (b)   $125,000.

   The amount of such **Claim Expense Allowance** shall be determined without regard to the number of **Claims** or claimants.



**PREFERRED Lawyers Professional Liability Insurance Policy**

3. Subject to the further limitation set forth in Section 5.J.4., if the **Company** issues an **Extended Reporting Period Endorsement** to an individual **Attorney** pursuant to Section 5.C., Section 5.D., Section 5.E., Section 5.F., or Section 5.G., the maximum amount the **Company** shall pay as **Damages** for all **Claims** first made against the **Attorney** and first reported to the **Company** during the **Extended Reporting Period** shall be the _lesser_ of:

    (a) The remaining **Limit of Liability** under this **Policy** at the time of expiration or cancellation of the **Policy Period**; or

    (b) $500,000.

The maximum amount the **Company** shall pay as **Damages** during the **Extended Reporting Period** shall be determined without regard to the number of **Claims** or claimants.

4. If the **Company** has issued an **Extended Reporting Period Endorsement** to more than one former **Attorney** of the **Named Insured**, the "Each **Claim**" **Limit of Liability** listed in Item 5 of the **Declarations** shall be the maximum amount the **Company** shall pay for all **Claims** first made and first reported during any **Extended Reporting Period**, without regard to the number of **Claims** or claimants, or the number of **Attorneys** to whom the Company has issued an **Extended Reporting Period Endorsement**.

K. TERMS AND CONDITIONS OF EXTENDED REPORTING PERIOD ENDORSEMENT

1. If the **Company** issues any **Extended Reporting Period Endorsement** to an individual **Attorney** pursuant to Section 5.C., Section 5.D., Section 5.E., Section 5.F., or Section 5.G., the **Extended Reporting Period** shall become effective and shall commence only upon the latest to occur of the following:

    (a) The date the **Named Insured** no longer has available any other insurance that provides coverage to the **Attorney** for any **Claim** first made and first reported to the **Company** after the **Company** has issued the **Extended Reporting Period Endorsement**;

    (b) Expiration or cancellation of the **Policy Period**;

    (c) Expiration or cancellation of any renewal or successive renewal of this **Policy**; and

    (d) Expiration or cancellation of any **Extended Reporting Period Endorsement** issued to the **Named Insured**.

2. Any **Extended Reporting Period** and **Extended Reporting Period Endorsement** provided under Section 5 simply extends the reporting period to first report a **Claim** to the **Company** under this **Policy** that:

    (a) Is otherwise covered by this **Policy**;

    (b) Arises from a **Wrongful Act** that occurred after the **Retroactive Coverage Date** and before the end of the **Policy Period**; and

    (c) Is first made, and first reported to the **Company**, after the end of the **Policy Period** and during the **Extended Reporting Period**.

3. Any **Claim** reported to the **Company** during the **Extended Reporting Period** shall be treated as if reported during the **Policy Period**.

4. Immediately upon issuance of an **Extended Reporting Period Endorsement**, any premium paid for the **Extended Reporting Period Endorsement** shall be non-refundable and the **Extended Reporting Period Endorsement** shall not be cancellable, except as provided in Section 5.K.5.

5. No **Extended Reporting Period Endorsement** under this Section 5 shall be available to an **Attorney** or the **Named Insured** if:

    (a) The **Company** cancels this **Policy** or any other policy for failure to pay the premiums when due or for failure to pay any **Deductible** or other amount due to the **Company**;

    (b) The **Company** cancels or rescinds this **Policy** or any other policy for fraud or misrepresentation in any application or other submission to the **Company**;

    (c) Any **Insured** fails to comply with the terms and conditions of this **Policy** or any other policy, including any **Extended Reporting Period Endorsement** or any other endorsements; or



    (d)    Any **Insured's** license or right to practice law has been revoked, suspended, or surrendered after the commencement of any investigation or disciplinary proceeding by any regulatory authority.

6.    If the **Company** issues any **Extended Reporting Period Endorsement** under Section 5, it is understood that any such **Extended Reporting Period Endorsement** is not a new insurance policy, but instead an endorsement that simply extends the time period during which to report a **Claim** under this **Policy**. All other terms and conditions of this **Policy** shall apply to any **Extended Reporting Period** and any **Extended Reporting Period Endorsement**.

7.    An **Attorney** remains eligible for an **Extended Reporting Period Endorsement** under Sections 5.B. and 5.C. even if, upon permanently and completely ceasing the practice of law, the **Attorney** intends to or does render services solely within the context of a pro bono, volunteer service, access to justice, or access to legal services program sponsored by a national, state, or local agency or bar association; provided, however the **Extended Reporting Period Endorsement** provides no coverage under this **Policy** for such services.

## SECTION 6 – GENERAL CONDITIONS

A.    INNOCENT INSURED COVERAGE

1.    Whenever a **Claim** otherwise covered by this **Policy** would be excluded based solely upon Section 3.A. and no other applicable exclusion under this **Policy**, coverage will be afforded to any individual **Insured** who did not personally commit, or personally participate in committing or causing any such **Wrongful Act**, and who did not remain passive after learning of the **Wrongful Act**, provided that each such individual **Insured** shall have immediately notified the **Company** and complied with all obligations under this **Policy** once said **Insured** obtained knowledge of the **Wrongful Act**. Nothing in this section shall be interpreted to afford any coverage to a **Named Insured** that is an entity rather than an individual.

2.    No coverage will be afforded to any individual **Insured** under Section 6.A.1. if the **Claim** is otherwise excluded from coverage based upon any applicable exclusion from coverage under this **Policy** other than Section 3.A.

3.    The **Company's** obligation to provide coverage or make any payment of **Damages** or **Claim Expenses** under this Section 6.A. shall be in excess of any and all assets of any **Insured** who is not afforded coverage under this Section 6.A.

B.    INSURED'S OBLIGATIONS UPON NOTICE OF CLAIM OR POTENTIAL CLAIM

1.    When an **Insured** becomes aware of a **Wrongful Act** that could reasonably be expected to be the basis of a **Claim**, but no **Claim** arising therefrom has yet been made, then as a condition precedent to the **Company's** obligation to defend or indemnify the **Insured** under this **Policy**, the **Insured** shall immediately give written notice to the **Company**. Such notice shall include the fullest information obtainable concerning the potential **Claim**. The **Insured** must deliver written notice to the **Company** in accordance with the CLAIMS MADE AND REPORTED POLICY paragraph set forth on page 1 of this **Policy**.

2.    If, during the **Policy Period** or any **Extended Reporting Period**, the **Company** is given written notice of a potential **Claim** pursuant to Section 6.B.1, and a **Claim** arising from or in connection with the same **Wrongful Act** is subsequently made against an **Insured** no later than six years after the end of the **Insured's** last **Policy Period** or any applicable **Extended Reporting Period**, then any such **Claim** shall be deemed to have been first reported during the **Policy Period** or **Extended Reporting Period** in which the potential **Claim** was reported.

3.    When a **Claim** is made against an **Insured,** the **Insured** shall immediately forward to the **Company** every demand, notice, summons, or other process received by the **Insured** or the **Insured's** representative. The **Company** shall have no obligation hereunder with respect to a **Claim** unless and until so notified.

4.    In the event an **Insured** fails to give written notice to the **Company** of a **Claim**, prior to the end of the **Policy Period** in which the **Claim** is made, or in the event an **Insured** fails to give written notice to the **Company** of a potential **Claim**, as described in Section 6.B.1, prior to the end of the **Policy Period** in which the **Insured** first becomes aware of a **Wrongful Act**, then no coverage for any such **Claim** shall be afforded to the **Insured** under any future policy issued by the **Company**.



**PREFERRED Lawyers Professional Liability Insurance Policy**

C.   ASSISTANCE AND COOPERATION OF THE INSURED

1.   Each **Insured** shall cooperate with the **Company** in its investigation of any **Claim**, including, without limitation, by promptly complying with all requests for any **Insured** to submit to or provide any statements, including any sworn statements or statements under oath of any **Insured**, reports, documents, or other information, and by providing copies of all pertinent files upon request.

2.   Each **Insured** shall cooperate and assist, as requested, in the defense of any **Claim**, in making any settlements, and in enforcing any right of contribution or indemnity against any person.  If requested by the **Company**, such assistance may include, without limitation, attendance at hearings and trials and assistance in securing and giving evidence and in obtaining the attendance of witnesses.   Neither the **Insured** nor the **Insured's** legal representative shall impede the **Company's** investigation or defense of any **Claim**.  Neither the **Insured** nor the **Insured's** legal representative shall in any manner impair the right of the **Company** to make any settlement that the **Company** deems, in its discretion, to be reasonably necessary pursuant to any statutory or common law requirements concerning the fair or unfair claim settlement practices of insurers.

3.   Each **Insured** shall notify the **Company** of any demand to arbitrate a **Claim** against an **Insured**, and any right to demand arbitration of a **Claim**, and in the event the **Company** elects to proceed with arbitration, shall cooperate in any such proceeding.

4.   No **Insured** shall, without the **Company's** prior written consent, engage in or offer to engage in any of the following with respect to any **Claim** or potential **Claim**:  (a) make any payments; (b) admit any liability; (c) stipulate to the entry of a judgment against the **Insured**; (d) settle any **Claim**; (e) assume any obligation; (f) negotiate any tolling agreement; or (g) incur any expense. If an **Insured** engages in or offers to engage in any of the foregoing, the **Insured** shall do so at the **Insured's** own liability and expense, and such engagement, action or offer by the **Insured** shall be deemed to be a breach of the **Insured's** duty to cooperate with the **Company** with respect to such **Claim** or potential **Claim**.

D.   ACTION AGAINST COMPANY

No action shall lie against the **Company** unless and until the **Insured** has fully complied with all terms and conditions of this **Policy**, and unless and until the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** or by written agreement of the **Insured,** the claimant and the **Company**.  No person or **Organization** shall have the right under this **Policy** to join the **Company** as a party to any **Claim** against an **Insured**.

E.   OTHER INSURANCE

Except where coverage under this **Policy** is excluded under Section 3.E., the insurance provided under this **Policy** shall be excess over any other valid and collectible insurance, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is specifically written only as excess insurance over this **Policy**.

F.   SUBROGATION

1.   In the event of any payment under this **Policy**, the **Company** shall be subrogated to all the **Insured's** rights of recovery against any person or organization.  The **Insured** shall execute and deliver such instruments and papers as may be required by the **Company**, and shall do whatever else is necessary, to secure such rights.  The **Insured** shall at no time do anything to prejudice such rights.

2.   The **Company** shall not exercise any subrogation rights against another **Insured,** except with respect to any **Claim** arising from, involving, or in connection with any dishonest, fraudulent, criminal, malicious, or intentionally harmful **Wrongful Act** caused by such **Insured**.

3.   Any amounts recovered through subrogation shall be apportioned as follows: First, to the repayment of expenses incurred in enforcing subrogation; Second, to repayment of any loss and expense payments by the **Insured** in excess of any **Deductible**; Third, to any loss and expense payments by an excess carrier on behalf of the **Insured**; Fourth, to any loss and expense payments by any primary carrier, including the **Company**, on behalf of the **Insured**; and Last, to repayment of the **Insured's Deductible**.



**PREFERRED Lawyers Professional Liability Insurance Policy**

G.   CHANGES IN POLICY TERMS

Except where otherwise provided herein, no part of this **Policy** may be waived or changed, except by written endorsement issued to form a part of this **Policy** and signed by an authorized representative of the **Company**.  Neither notice to an agent nor knowledge possessed by an agent or by any other person shall effect any waiver or change in any part of this **Policy** or estop the **Company** from asserting any right under this **Policy**.

H.   FIRM CHANGES

1.   The **Named Insured** shall immediately notify the **Company** if, during the **Policy Period**, the **Named Insured** has: (a) any increase or decrease by more than 25 **Attorneys** or by more than 50% in the total number of **Attorneys** listed in Item 3 of the **Declarations**; or (b) any acquisition, dissolution or merger by or of the **Named Insured**. Upon receipt of such notice, the **Company** reserves the right, in its sole discretion, to re-evaluate the risk insured under this **Policy** and to take appropriate underwriting action.

2.   In all instances other than those described in the immediately preceding section, the **Named Insured** shall notify the **Company** within a commercially reasonable period of time if, during the **Policy Period**, the **Named Insured** seeks to add or delete an **Attorney** to or from the list of insured **Attorneys** in Item 3 of the **Declarations**.  Upon receipt of such notice, the **Company** reserves the right, in its sole discretion, to re-evaluate the risk insured under this **Policy** and to take appropriate underwriting action.

I.   ASSIGNMENT

No rights or interests hereunder of any **Insured** may be assigned.

J.   CANCELLATION

1.   The **Named Insured** may cancel this **Policy** at any time by surrendering this **Policy** to the **Company** (or an authorized representative of the **Company**), or by written notice to the **Company** stating the date on which the **Named Insured** proposes that the cancellation will be effective.  In the event the **Named Insured** cancels this **Policy**, the **Company** shall be entitled to retain the customary "short rate" portion of the premium.

2.   In the event the **Named Insured** has failed to pay when due a premium or **Deductible** under this **Policy**, or any other money owed to the **Company**, the **Company** may cancel this or any other policy by written notice of cancellation to the **Named Insured**.  The notice shall state the date on which the cancellation will be effective, which shall be no fewer than ten (10) days following the date of the notice.  Such notice shall be effective and conclusive as to all **Insureds** hereunder.  Proof of mailing shall be sufficient proof of notice and the effective date of cancellation stated in the notice shall become the end date of the **Policy Period**.

3.   For any reason other than nonpayment of premium or **Deductible** as set forth in Section 6.J.2, including but not limited to: (a) material misrepresentation; (b) substantial change in the risk assumed; or (c) substantial breach of contractual duties, conditions, statements or assurances, the **Company** may cancel this **Policy** by written notice of cancellation to the **Named Insured**.  The notice shall state the date on which the cancellation will be effective, which shall be no fewer than forty-five (45) days after the date of the notice. Such notice shall be effective and conclusive as to all **Insureds** hereunder.  Proof of mailing is sufficient proof of notice and the effective cancellation date stated in the notice will become the end date of the **Policy Period**.

In the event the **Company** cancels this **Policy** for any reason, it will compute earned premium on a *pro rata* basis.  The **Company** may make any resultant premium adjustments at the time cancellation is effective, or as soon thereafter as is practicable.  However, the payment or tender of unearned premium is not a condition of or a pre-requisite to cancellation of this **Policy**.

K.   STATEMENTS IN DECLARATIONS AND APPLICATION

By acceptance of this **Policy**, each **Insured** agrees with, represents to and assures the **Company** that the statements, information and representations in the **Declarations**, in the application for this **Policy**, and in the applications for each prior policy issued by the **Company** to the **Insured**, are true and correct, that the **Declarations** and the application form a part of this **Policy**, and that this **Policy** is issued in reliance upon the truth of such statements, information and representations.



L.    ENTIRE CONTRACT

This **Policy**, including any signed endorsements attaching hereto, and including any current or previously submitted application documents which are incorporated herein by reference, embodies all agreements existing between the **Insured** and the **Company** relating to this insurance.

M.    NONASSESSABLE POLICY

This **Policy** is not assessable.

N.    SPECIAL LAWS

Any and all provisions of this **Policy** that are in conflict with applicable laws of the jurisdiction wherein this **Policy** is issued are hereby amended to conform to such laws.

O.    NOTICES

All notices to be delivered to the **Named Insured** under this **Policy** shall be mailed first class postage to the **Named Insured** at the address shown in Item 1 of the **Declarations**, unless the **Company** is notified in writing of a change in the mailing address of the **Named Insured**.  Except for notice of a claim/potential claim, which shall be delivered to the **Company** in accordance with the NOTICE OF CLAIM paragraph set forth on page 1 of this **Policy**, all other notices to be delivered to the **Company** shall be mailed first class postage to the **Company** at the following address:

ALPS
111 N. Higgins, Ste. 600
P.O. Box 9169
Missoula, MT  59807-9169

P.    SINGULAR AND PLURAL FORM OF A WORD OR DEFINED TERM

Whenever the singular form of a word or defined term is used herein, the same shall include the plural form of the word or defined term when required by context.

Q.    NAMED INSURED REPRESENTS ALL INSUREDS

By acceptance of this **Policy**, the **Named Insured** shall be designated to act on behalf of all **Insureds** for all purposes including, but not limited to, the giving and receiving of all notices, consents, communications and correspondence, the cancellation or non-renewal of this **Policy**, the payment of any premiums and **Deductible** due hereunder and the receipt of any return premiums that may be due under this **Policy**.

# Exhibit B

## 2023-2024 Policy



**Lawyers Professional Liability Insurance Policy**

**HOME OFFICE ADDRESS:**
111 N. Higgins, Suite 600
Missoula, MT  59802

**PHONE:**
(800) 367-2577

**MAILING ADDRESS:**
PO Box 9169
Missoula, MT  59807-9169

### POLICY DECLARATIONS

NOTICE: THE POLICY IS A CLAIMS MADE AND REPORTED POLICY. NO COVERAGE EXISTS UNDER THE POLICY FOR A CLAIM WHICH IS FIRST MADE AGAINST THE INSURED OR FIRST REPORTED TO THE COMPANY BEFORE OR AFTER THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD.  PLEASE READ THE ENTIRE POLICY CAREFULLY.

POLICY NUMBER:          ALPS28842- 2

Item 1 – Named Insured:     Law Office of Gregory P. Cavagnaro
            Address:     2135 112th Avenue N.E.
                         Bellevue, WA 98004

Item 2 – Retroactive Coverage Date: 10/25/2021

Item 3 – Name of Each Insured Attorney:

                         Cavagnaro, Gregory P.

Item 4 – Policy Period:

                         Effective Date and Time:   10/25/2023     at 12:01 AM at the address stated in Item 1.
                         Expiration Date and Time: 10/25/2024     at 12:01 AM at the address stated in Item 1.

Item 5 – Limit of Liability:     $ 1,000,000          Each Claim*
                                 $ 2,000,000          Aggregate

Item 6 – Deductible:          $ 5,000          Each Claim*

Item 7 – Annual Premium:      ██████

Item 8 – Endorsements attached at inception of the policy form Preferred (01-21):
Signature Page                          WA Amendatory                          Excluded Entity Endorsement
First Dollar Defense Endorsement

* Important Notice:  All Claims that arise out of or in connection with the same Professional Services or Interrelated Wrongful Acts, whenever made and without regard to the number of Claims, claimants, or implicated Insureds, shall be treated as a single Claim.

All current and previously submitted application forms delivered to the Company are made a part of the Policy. The Named Insured may obtain a copy of all application forms by submitting a written request to the Company.

Countersigned by:   _____          Date:   09/06/2023
                         Authorized Representative



**Lawyers Professional Liability Insurance Policy**

Named Insured:   Law Office of Gregory P. Cavagnaro

Policy No:       ALPS28842- 2
Effective Date:  10/25/2023

**SIGNATURE PAGE**

IN WITNESS WHEREOF, ALPS Property & Casualty Insurance Company has caused this **Policy** to be executed and attested, but this **Policy** shall not be valid unless countersigned by a duly authorized representative of ALPS Property & Casualty Insurance Company.

[_____]          [_____,

[David A. Bell, President]                          [Bradley D. Dantic, Secretary]



**Lawyers Professional Liability Insurance Policy Endorsement**

**EXCLUDED ENTITY ENDORSEMENT**

In consideration of the premium paid, it is understood and agreed that the **Policy** is amended as follows:

SECTION 3 -- EXCLUSIONS

The following EXCLUSIONS are added to SECTION 3 - EXCLUSIONS to read in their entirety as follows:

THIS **POLICY** DOES NOT APPLY TO ANY actual or potential **Claim** arising from a **Wrongful Act** in connection with **Professional Services** rendered or that should have been rendered by the **Insured** in regard to the **Insured's** relationship with or **Professional Services** rendered for and on behalf of, or rendered to, each EXCLUDED ENTITY identified below.

FURTHER, THIS **POLICY** DOES NOT APPLY TO any actual or alleged facts, events, circumstances, transactions or matters relating to the EXCLUDED ENTITY described below, or derived from the same or substantially similar facts, events, circumstances, transactions or matters related to the EXCLUDED ENTITY described below.

EXCLUDED ENTITY:
Century Law Firm

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

 **Lawyers Professional Liability Insurance Policy Endorsement**

### FIRST DOLLAR DEFENSE ENDORSEMENT

In consideration of the premium paid, it is understood and agreed that the **Policy** is amended as follows:

SECTION 4 – DEDUCTIBLE, CLAIM EXPENSE ALLOWANCE, LIMIT OF LIABILITY, AND MULTIPLE CLAIMS

Section 4.A.1. and Section 4.A.2. of the **Policy** are deleted in their entirety and replaced to read in their entirety as follows:

    A.   DEDUCTIBLE

    1.   For each and every **Claim** covered by this **Policy**, the **Named Insured** shall pay all **Damages** up to the **Deductible** for each and every covered **Claim**. The **Named Insured**'s payment of all **Damages** up to the **Deductible** for each and every covered **Claim** is a condition precedent to the **Company**'s obligation to pay any **Damages** for each and every covered **Claim**. Each **Insured** shall be jointly and severally liable for such **Damages** in the event the **Named Insured** fails to make any required payment.

    2.   The **Company** shall not have any obligation to pay **Damages** until after the **Deductible** is exhausted. If the **Company** pays any amount within the **Deductible,** the **Named Insured** and each **Insured** shall be jointly and severally liable to the **Company** for any and all such amounts paid by the **Company** and, on demand, shall promptly reimburse such amounts to the **Company**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



**Lawyers Professional Liability Insurance Policy Endorsement**

## <u>WASHINGTON AMENDATORY ENDORSEMENT</u>

This Endorsement shall apply to and form a part of your **Policy** issued by ALPS Property & Casualty Insurance Company (the "**Company**").  The effective date of this endorsement is the **Effective Date** of your **Policy**.

In consideration of the premium paid, it is understood and agreed that the **Policy** is amended as follows:

SECTION 1 - INSURING AGREEMENTS

The following sentence is added at the end of Section 1.B.2. of the **Policy**:

> The right to reimbursement of **Claims Expenses** will only apply to the costs the **Company** has incurred after the **Company** notifies the **Insured** in writing that coverage might not exist under the Policy and that the **Company** is reserving the **Company's** right to terminate the defense or the payment of **Claims Expenses** and to seek reimbursement for **Claims Expenses**.

Section 1.B.4. of the **Policy** is deleted in its entirety and replaced to read in its entirety as follows:

> 4.   Where an **Insured** has a right or obligation to arbitrate a **Claim**, or receives a demand to arbitrate a **Claim**, neither the **Company** nor the **Insured** may elect arbitration without the mutual consent of both the **Company** and the **Insured.**

SECTION 6 - GENERAL CONDITIONS

The Section entitled "SUBROGATION" set forth in Section 6 of the **Policy** is deleted in its entirety and replaced to read in its entirety as follows:

> 1.   To the extent of any payment under this **Policy**, the **Company** shall be subrogated to the **Insured's** rights of recovery against any person or organization after the **Insured** has been fully compensated under this **Policy**, and the **Insured** shall execute and deliver all instruments and papers and do whatever else may be necessary for the **Company** to secure such rights.
>
> 2.   Any amount recovered after payment under this **Policy** shall be apportioned first to the **Insured** as indicated in the paragraph above and thereafter, in the inverse order of payment to the extent of actual payment. The expenses of all such recovery proceedings shall be apportioned in the same ratio as the recoveries.

The Section entitled "CANCELLATION" set forth in Section 6 of the **Policy** is deleted in its entirety and replaced to read in its entirety as follows:

CANCELLATION

> 1.   This **Policy** may be cancelled by the **Named Insured** stated in the **Declarations** either by mailing or delivering written notice to the **Company** stating when the cancellation is to become effective. In the event the **Named Insured** cancels the **Policy**, the **Company** shall be entitled to retain the customary "short rate" portion of the premium. Except as otherwise provided, the **Named Insured** may cancel this **Policy** by notifying the **Company** or the insurance producer in one of the following ways:
>
>> (a)   Written notice by mail, fax, or e-mail;
>>
>> (b)   Surrender of the **Policy** or binder; or
>>
>> (c)   Verbal notice.

2.  Upon receipt of such notice, the **Company** will cancel this **Policy** or any binder issued as evidence of coverage, effective on the later of the following:

    (a)  The date on which notice is received or the **Policy** or binder is surrendered; or

    (b)  The date of cancellation required by the **Named Insured**.

    If the **Named Insured** provides verbal notice of cancellation to the **Company**, the **Named Insured** must also provide written confirmation of cancellation to the **Company**. The effective date of cancellation shall be the date of cancellation verbally requested by the **Named Insured**.

3.  This **Policy** may be cancelled by the **Company** by delivering or mailing to the **Named Insured**, and any other person shown by the **Policy** to have an interest in any loss which may occur thereunder, at the principal address shown in the **Declarations**, written notice of cancellation, stating the reason for cancellation at least ten (10) days before the effective date of cancellation for nonpayment of premium and forty-five (45) days before the effective date of cancellation for all other reasons.  A copy of the notice shall be provided within five (5) working days to the agent on the account or to the broker of record for the **Named Insured**. The effective date of cancellation shall become the end of the **Policy Period**.  Delivery of such notice shall be equivalent to mailing. Proof of mailing shall be considered sufficient proof of notice.

4.  In the event the **Company** cancels this **Policy** for any reason, it will compute earned premium on a *pro rata* basis.  The **Company** may make any resultant premium adjustments at the time cancellation is effective, or as soon thereafter as is practicable.  However, the payment or tender of unearned premium is not a condition of or a prerequisite to cancellation of the **Policy**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.



**PREFERRED**
Lawyers Professional Liability Insurance Policy

| PLEASE READ THE ENTIRE POLICY CAREFULLY |
| --- |

CLAIMS MADE AND REPORTED POLICY

This is a "*CLAIMS MADE AND REPORTED*" insurance **Policy**.  Therefore, as a condition precedent to the **Company**'s obligation to defend or indemnify the **Insured** under this **Policy**, the **Insured** must immediately report any **Claim** to the **Company** in writing during the **Policy Period** or during any applicable **Extended Reporting Period**.  No coverage exists under this **Policy** for a **Claim** which is first made against the **Insured** or first reported to the **Company** before or after the **Policy Period** or any applicable **Extended Reporting Period**.  If the **Insured** receives notice of a **Claim**, or becomes aware of a **Wrongful Act** that could reasonably be expected to be the basis of a **Claim**, then the **Insured** must, as a condition precedent to the **Company**'s obligation to defend or indemnify any **Insured**, immediately deliver a written notice directly to the **Company** via email, facsimile, or mail at any of the following:

| NOTICE OF CLAIM | |
| --- | --- |
| Email: | Claims@alpsinsurance.com |
| Facsimile: | 406-728-7416 |
| Mail Address: | ALPS |
| | 111 N. Higgins, Ste. 600 |
| | P.O. Box 9169 |
| | Missoula, MT  59807-9169 |

If you deliver written notice of a **Claim** or circumstances which may give rise to a **Claim** to the **Company** via email at Claims@alpsinsurance.com you must then receive an email from the **Company** acknowledging receipt of the notice before the notice is considered to have been received.  If you do not receive an acknowledging email from the **Company** by the end of the next business day after delivering a written notice to the **Company** via email, then please contact the **Company** at 406-728-3113 for further assistance.

CLAIM EXPENSE ALLOWANCE

This **Policy** provides a **Claim Expense Allowance**.  The **Company**'s payment of any **Claim Expenses** will first be applied against and reduce the **Claim Expense Allowance**.  Any **Claim Expenses** paid by the **Company** will not be applied against or reduce the **Limit of Liability** until after the **Claim Expense Allowance** has been exhausted, at which time any additional **Claim Expenses** paid by the **Company** will be applied against and reduce the **Limit of Liability** available to pay **Damages**.

SEPARATE AND DISTINCT POLICY AND LIMIT OF LIABILITY

This **Policy** is a separate insuring agreement and distinct from any other insurance policy the **Company** may issue to you. Each insurance policy the **Company** issues to you should be considered to be a separate and independent insuring agreement with its own separate terms, conditions and definitions.   No coverage is afforded under this **Policy** for any **Claim** that is otherwise covered under any other insurance policy the **Company** issues to you.  The limits of liability provided by each separate insurance policy the **Company** issues to you shall not be added together with the limits of liability of any other insurance policy the **Company** issues to you.

THIS POLICY DOES NOT RENEW

This **Policy** expires on the **Expiration Date** and time specified in the **Policy Declarations**.  There is no right to a renewal of this **Policy**.  If the **Insured** wishes to maintain insurance coverage with the **Company** following the **Expiration Date** of this **Policy**, the **Insured** must timely submit a fully completed application to the **Company** prior to the **Expiration Date** so that the **Company** may review the complete underwriting information and determine whether or not the **Insured** qualifies for continued coverage under a new policy, and if so, on what terms.



**PREFERRED Lawyers Professional Liability Insurance Policy**

ALPS Property & Casualty Insurance Company (herein called "the **Company**"), agrees with the **Named Insured**, in consideration of the payment of the premium, and in reliance upon all applications, documents and information that the **Named Insured** has submitted for this **Policy** and any prior policies, as follows:

---

## SECTION 1 – INSURING AGREEMENTS

A.   COVERAGE

Subject to the **Limit of Liability**, exclusions, conditions and other terms of this **Policy**, the **Company** agrees to pay on behalf of the **Insured** all sums (in excess of the **Deductible** amount) that the **Insured** becomes legally obligated to pay as **Damages**, arising from or in connection with A **CLAIM** FIRST MADE AGAINST THE **INSURED** AND FIRST REPORTED IN WRITING TO THE **COMPANY** DURING THE **POLICY PERIOD**, provided that all of the following conditions are satisfied:

1.   The **Claim** arises from a **Wrongful Act** that occurred on or after the **Retroactive Coverage Date** set forth in Item 2 of the **Declarations**;

2.   At the **Effective Date** of this **Policy**, no **Insured** knew or reasonably should have known or foreseen that the **Wrongful Act** might be the basis of a **Claim**;

3.   Notice of the **Claim** or the **Wrongful Act** was not given nor required to be given to any other insurer prior to the **Effective Date**; and

4.   The **Claim** is not otherwise covered under any other insurance policy that the **Company** has issued to the **Named Insured**.

B.   DEFENSE AND CLAIM EXPENSES

1.   For any **Claim** seeking the recovery of **Damages** from the **Insured** and otherwise covered under this **Policy**, the **Company** shall have the right and the duty to defend such **Claim** even if any or all of the allegations of the **Claim** are groundless, false or fraudulent, but shall have no obligation to appoint legal counsel to defend a **Claim** that is not the subject of a pending civil action, arbitration, or similar proceeding seeking the recovery of **Damages**.  The **Company** shall have the right to appoint legal counsel in the **Company**'s sole discretion after consultation with an **Insured** when practicable; consultation with any one **Insured** being sufficient.  The **Company** shall have no duty to defend any **Claim** that does not seek the recovery of **Damages** from the **Insured**.

2.   The **Company** shall pay **Claim Expenses** in accordance with the terms of this **Policy**.  The **Company** shall not have a duty to defend or to pay such expenses as to any **Claim** not covered under this **Policy**, and shall have the right to seek reimbursement from any **Insured**, who shall promptly provide such reimbursement, for any amount paid by the **Company** in defending any such non-covered **Claim**, including any amount paid in defending a non-covered **Claim** that is asserted together with one or more covered **Claims**.

3.   The **Company** may make such investigations as it deems appropriate.

4.   Where an **Insured** has a right or obligation to arbitrate a **Claim**, or receives a demand for arbitration, the **Company** shall have sole discretion as to whether to seek, agree to or reject arbitration.

5.   In the event a **Claim** covered under this **Policy** is made against an **Insured**, and in the same matter a **Claim** is also made against a non-attorney who referred to the **Insured** the matter from which the **Claim** arises, the **Company** shall provide the same defense to the referring party as to the **Insured**, but only for so long as the **Insured** remains liable to pay **Damages** arising from or in connection with the **Claim** against the **Insured**, and, provided, however, that such referring party shall accept the same legal counsel to defend the **Claim** as the **Company** appoints to represent the **Insured**.  The **Company** shall have no other obligation to the referring party, including any obligation to pay any **Damages** or other **Claim Expenses** on the referring party's behalf.  Any **Claim Expenses** associated with the defense of the referring party shall be subject to the **Deductible**, and shall be included within, and shall not increase, the **Claim Expense Allowance** and the **Limit of Liability**.

C.   SETTLEMENT AND CONSENT TO SETTLE

The **Company** will not admit liability of any **Insured** or settle a **Claim** without the written consent of any **Insured**, which consent shall not be unreasonably withheld.

---



**PREFERRED Lawyers Professional Liability Insurance Policy**

D.    SUPPLEMENTARY PAYMENTS FOR DISCIPLINARY PROCEEDINGS

If an **Attorney** identified in Item 3 of the **Declarations**, at a time when the **Attorney** is an employee of the **Named Insured**, first receives notice during the **Policy Period** of a proceeding brought against the **Attorney** before a state licensing board, peer review committee or disciplinary agency or official to investigate allegations of professional misconduct by the **Attorney** concerning a **Wrongful Act** by the **Attorney** that would otherwise fall within the coverage of this **Policy**, then, except as provided in Section 1.D.6., the **Company** shall reimburse the **Named Insured** for attorneys' fees and expenses incurred by the **Named Insured** in relation to such proceeding, subject to the following conditions:

1.    The **Attorney** must be an employee of the **Named Insured** at the time the **Attorney** first receives notice of the proceeding;

2.    The **Attorney** must immediately deliver written notice of the proceeding to the **Company** during the **Policy Period**;

3.    The **Company** shall have the right to appoint legal counsel in the **Company**'s sole discretion after consultation with the **Attorney** that is the subject of the proceeding;

4.    The maximum reimbursement amount for any one **Attorney** involved in such proceeding shall be $25,000 without regard to the number of such proceedings involving the **Attorney** during the **Policy Period**;

5.    The maximum reimbursement amount shall be $75,000 per **Policy Period** and **Extended Reporting Period**, if applicable, without regard to the number of such proceedings or the number of **Attorneys** listed in Item 3 of the **Declarations**; and

6.    The **Company** will not reimburse the **Named Insured** for any attorney's fees and expenses incurred by the **Named Insured** in relation to such proceedings if the **Attorney** is disbarred in conjunction with such proceedings.

E.    EXHAUSTION OF LIMIT OF LIABILITY AND TENDER OF REMAINING LIMIT OF LIABILITY

The **Company**'s duty to defend shall be fully satisfied, and the **Company** shall not be obligated to continue to defend any **Claim** or pay any **Claim Expenses**, nor be obligated to pay any **Damages**, or interest thereon, after:

1.    The applicable **Limit of Liability** has been exhausted by payments of **Damages** and/or **Claim Expenses**; or

2.    The **Company** has deposited an amount equal to the applicable **Limit of Liability**, minus any **Damages** paid on the **Claim** and any **Claim Expenses** paid on the **Claim** and chargeable against the **Limit of Liability**, with a court of competent jurisdiction, to be disbursed by the court's order.

In either such case, the **Company** shall have the right to withdraw from further defense of the **Claim** by tendering control of the defense to the **Insured**. The **Insured** agrees, as a condition to the issuance of this **Policy**, to accept such tender.

F.    POLICY TERRITORY

This **Policy** applies to any **Wrongful Act** occurring anywhere in the world, provided that a **Claim** otherwise covered by this **Policy** is made within the United States of America, its territories or possessions, or Canada.

## SECTION 2 – DEFINITIONS

As used in this **Policy**, including the **Declarations**:

A.    **Attorney** means an individual attorney who is properly licensed to practice law or a professional business entity of which said individual attorney who is properly licensed to practice law is the sole owner and employee; provided, however, that with respect to the **Professional Services**  which are the subject of a **Claim**, the individual attorney must have been properly licensed at the time the **Professional Services** were or should have been rendered within the jurisdiction in which the **Professional Services** were or should have been rendered.

B.    **Bodily Injury** means any injury to the body, any sickness or disease, or any death.  **Bodily Injury** also includes any mental, psychological, or emotional injury, anguish, tension, distress, pain, suffering, shock or death, regardless of whether or not such condition arises from any injury to the body, from any sickness or disease, or from any death.



C.   **Claim** means a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the **Insured**.

  **Claim** does *not* mean *nor* include any demand, service or proceeding arising from or in connection with any actual or alleged:

  1.   Discrimination by an **Insured** including, but not necessarily limited to, discrimination based on race, color, creed, age, sex, gender, nationality, marital status or sexual orientation;

  2.   Sexual harassment or misconduct by an **Insured**;

  3.   Employment-related matter involving an **Insured** as an employer;

  4.   Security breach, unauthorized access, unauthorized use or misuse of any **Computer Systems**;

  5.   Theft, unauthorized use or misuse of any login information, access information or identification, or personally identifiable information including, but not necessarily limited to, any password, username, social security number or other code or identifier intended for use in accessing any **Computer Systems**, account, website or the internet;

  6.   Infection, damage or loss of use of any **Computer Systems** due to the transmission of or failure to prevent the transmission of any malware, ransomware or malicious code;

  7.   Notice or written demand arising from or in connection with any disciplinary, investigatory or other proceeding before a state licensing board, peer review committee or governmental regulatory body involving an **Insured Attorney**;

  8.   Nuclear reaction, radiation or contamination, or any pollution, contamination or condition of any real or personal property, regardless of cause;

  9.   Advertising or marketing services or activities; or

  10.   **Bodily Injury** of any person.

D.   **Claim Expenses** means:

  1.   Fees charged by any attorney(s) designated by the **Company** to defend a **Claim** or otherwise represent an **Insured**;

  2.   All other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a **Claim** (including a suit or proceeding arising in connection therewith), if incurred by the **Company**, or if incurred by the **Insured** with the prior written consent of the **Company**; and

  3.   Any supplementary payments incurred or reimbursed by the **Company** under Section 1.D.

  **Claim Expenses** does *not* mean *nor* include:

  4.   Salaries or other compensation of regular employees or officials of the **Company** or the **Named Insured**; or

  5.   Premiums for any supersedeas, appeal, attachment or other similar bond and the **Company** shall have no obligation to apply for, furnish or issue such bond.

E.   **Claim Expense Allowance** means, with respect to **Claims** first made and first reported during the **Policy Period**, an amount equal to one half of the "Each **Claim**" Limit of Liability listed in Item 5 of the **Declarations**, or $500,000, whichever is less, and includes the amount of any applicable **Deductible** and any supplementary payments incurred or reimbursed by the **Company** under Section 1.D.  The **Claim Expense Allowance** is described further in Section 4.B.

  **Claim Expense Allowance** means, with respect to **Claims** first made and first reported during any applicable **Extended Reporting Period**, the applicable **Claim Expense Allowance** further described in Section 5.J.

F.   **Computer Systems** means computers, information systems, servers, hardware, software, and associated input and output devices, data storage devices, networking equipment, back up facilities and any other associated or connected electronic devices, including mobile devices.

G.   **Contract Attorney** means a non-employee **Attorney** who is or was rendering services for and on behalf of the **Named Insured**, but solely for a **Claim** arising from or in connection with the provision of **Professional Services** by the **Named**



**Insured** or **Predecessor Law Firm**, solely to the extent no other insurance or extension of insurance applies, and solely to the extent said **Contract Attorney**'s services satisfy the following conditions:

1.  The services must be rendered to a client of the **Named Insured** in conjunction with the **Named Insured's** rendering of **Professional Services** to such client; and

2.  The non-employee **Attorney** must be identified as an **Attorney** in Item 3 of the **Declarations**.

H.  **Damages** means any:

1.  Monetary award by way of judgment or final arbitration, or any settlement; and

2.  Civil liability which may be imposed upon an **Insured** under § 813(a) of the federal Fair Debt Collection Practices Act (codified at 15 U.S.C. § 1692k(a)), as may hereafter be amended from time to time.

**Damages** does _not_ mean _nor_ include any:

3.  Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same were levied or imposed in a separate matter or proceeding;

4.  Awards deemed uninsurable by law;

5.  Injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

6.  Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an **Insured**, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an **Insured**;

7.  Judgment, award, verdict, decision or order that includes, as a measure, element or portion of the damages or award set forth therein, any amount the basis of which was determined by reference to the amount of fees, costs, consideration or expenses paid to, awarded to, charged by, or received by an **Insured**.

8.  Injury or damage to, destruction of, loss of, or loss of use of any funds or property; or

9.  Pollution, contamination, or erosion of any property.

I.  **Declarations** means the Policy Declarations attaching to this **Policy** for the current **Policy Period** listed in Item 4 of the Policy Declarations.

J.  **Deductible** means the **Deductible** amount for "Each **Claim**" stated in Item 6 of the **Declarations**. The **Deductible** is described further in Section 4.A.

K.  **Effective Date** means 12:01 a.m., at the address stated in Item 1 of the **Declarations**, on the **Effective Date** listed in Item 4 of the **Declarations**.

L.  **Exempt Organization** means an **Organization** exempt from taxation within the meaning of the following enumerated sections of 501(c) of the United States Internal Revenue Code: 501(c)(3), 501(c)(4), 501(c)(6), 501(c)(7), 501(c)(8) and 501(c)(10).

M.  **Expiration Date** means 12:01 a.m., at the address stated in Item 1 of the **Declarations**, on the **Expiration Date** listed in Item 4 of the **Declarations**.

N.  **Extended Reporting Period Endorsement** means an endorsement issued by the **Company** providing for an **Extended Reporting Period** as described in Section 5 for reporting of a **Claim** that: (a) would otherwise be covered by this **Policy**; (b) arises from a **Wrongful Act** that occurred after the **Retroactive Coverage Date** and before the end of the **Policy Period**; and (c) is first made, and first reported to the **Company**, after the end of the **Policy Period** and during the **Extended Reporting Period**.

O.  **Extended Reporting Period** means the period of time set forth in an automatic 60-day extended reporting period identified in Section 5.A. or the period of time set forth in an **Extended Reporting Period Endorsement** that the **Company** may issue after expiration or cancellation of the **Policy Period** as described in Section 5.

P.  **Formal Mediation** means a voluntary alternative dispute resolution ("ADR") process agreed to by the **Company** and the **Insured** and engaged in without a court order or judicial rule, by which: (i) a qualified professional mediator is



chosen by the parties to the **Claim** with agreement by the **Company**; (ii) a specific date, time and duration is established for the ADR process; and (iii) the mediator meets with and intercedes between the parties during the ADR process in an attempt to fully and finally resolve the **Claim**.

Q.   **Insured** means the **Named Insured** listed in Item 1 of the **Declarations** and each of the following, but solely for **Claims** arising from **Professional Services** performed for and on behalf of the **Named Insured** or a **Predecessor Law Firm**:

1.   An **Attorney** who is, at the time a **Claim** is first made, or who was, at the **Effective Date** of the **Policy**, a principal, partner, shareholder, member or other owner or employee of the **Named Insured**, and who is or was identified in Item 3 of the **Declarations**, provided that the requirements of this **Policy** concerning amendment of Item 3 of the **Declarations** have been complied with, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim**;

2.   An **Attorney** who was, before the **Effective Date** of the **Policy**, a principal, partner, shareholder, member or other owner or employee of the **Named Insured** or a **Predecessor Law Firm**, provided that information requested on the application concerning such person has been provided to the **Company**, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim**;

3.   An **Attorney** acting as "of counsel" under formal contract with the **Named Insured** or a **Predecessor Law Firm**, and who is identified in Item 3 of the **Declarations**, provided that information requested on the application concerning such person has been provided and that the requirements of this **Policy** concerning amendment of Item 3 have been complied with, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim;**

4.   A non-**Attorney** who is or was an employee of the **Named Insured** or a **Predecessor Law Firm**, solely for **Claims** arising from or in connection with actions within the scope of such person's duties as an employee of the **Named Insured** or a **Predecessor Law Firm**, and arising from or in connection with the rendering of **Professional Services** for and on behalf of the **Named Insured** or a **Predecessor Law Firm**, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim**;

5.   The heirs, executors, administrators, assigns and legal representatives of an **Insured**, in the event of the **Insured's** death, incapacity or bankruptcy;

6.   A **Contract Attorney** who is, at the time a **Claim** is first made, or who was, at the **Effective Date** of this **Policy**, a **Contract Attorney** of the **Named Insured**, and who is or was identified in Item 3 of the **Declarations**;

7.   Any **Predecessor Law Firm** listed as an additional **Insured** on an endorsement issued by the **Company** and identified in Item 8 of the **Declarations**; and

8.   The spouse or legally recognized domestic partner of an **Insured**, but solely with respect to a **Claim** asserted against such **Insured** that is otherwise covered under this **Policy**; provided, however, that such spouse or legally recognized domestic partner shall accept the same legal counsel to defend the **Claim** as the **Company** appoints to represent the **Insured**, and only if no other professional liability insurance or extension of professional liability insurance applies to the **Claim**.

R.   **Interrelated Wrongful Acts** means **Wrongful Act**s that are temporally, logically or causally related, including all **Wrongful Act**s that have as a common nexus any fact, circumstance, situation, transaction, event, advice or decision, and all **Wrongful Act**s that are the same, related or continuous acts, regardless of whether the **Claim** or **Claim**s alleging such **Wrongful Act**s involve the same, different or multiple claimants, **Insured**s, or causes of action.

S.   **Limit of Liability** means, with respect to **Claims** first made and first reported during the **Policy Period**, the "Each **Claim**" **Limit of Liability** and the "Aggregate" **Limit of Liability,** as applicable and as listed in Item 5 of the **Declarations**.  The **Limit of Liability** with respect to **Claims** first made and first reported during the **Policy Period** includes the amount of any applicable **Deductible** and is described in Section 4.C.

**Limit of Liability** means, with respect to **Claims** first made and first reported during any **Extended Reported Period**, the applicable **Limit of Liability** further described in Section 5.J.

T.   **Named Insured** means the law firm or individual **Attorney** listed as the **Named Insured** in Item 1 of the **Declarations**.

U.   **Organization** means any corporation, partnership, limited partnership, limited liability partnership or limited liability company; association; charitable entity, enterprise or organization; health or welfare benefit plan, program, fund or trust; pension, profit-sharing, 401(k) or other retirement benefit plan, program, fund or trust; mutual fund or



investment trust; or any other business entity, enterprise or organization of any kind or nature whatsoever. **Organization** does not include a decedent's estate or a trust (other than an investment trust).

V.   **Personal Injury** means an injury other than a **Bodily Injury** that results from:

1.   False arrest, detention or imprisonment;

2.   Wrongful entry or eviction or other invasion of private occupancy;

3.   Malicious prosecution;

4.   Publication or utterance of libel, slander or other defamatory or disparaging material; and

5.   Invasion of privacy, or publication or utterance in violation of an individual's right of privacy.

W.   **Policy** means this Lawyers Professional Liability Insurance Policy that the **Company** has issued to the **Named Insured**, including all endorsements attaching hereto, and including all current and previous application forms any **Insured** has delivered to the **Company**.

X.   **Policy Period** means the period of time between the **Effective Date** listed in Item 4 of the **Declarations** and the earlier to occur of (a) the **Expiration Date** listed in Item 4 of the **Declarations**, or (b) the date this **Policy** is otherwise terminated or cancelled prior to the **Expiration Date**.  **Policy Period** does not mean nor include any **Extended Reporting Period** provided pursuant to Section 5.

Y.   **Predecessor Law Firm** means any sole proprietorship or legally recognized business entity previously engaged in the private practice of law that: (i) has undergone dissolution; (ii) has been disclosed to the **Company** in the **Named Insured's** application for lawyers professional liability insurance; and (iii) is listed as an additional **Insured** on an endorsement issued by the **Company** and identified in Item 8 of the **Declarations**.

Z.   **Professional Services** means services or activities performed for and on behalf of the **Named Insured** or a **Predecessor Law Firm** and rendered solely to others as:

1.   An **Attorney** in an attorney-client relationship on behalf of one or more clients applying the **Attorney's** specialized education, knowledge, skill, labor, experience and/or training, including pro bono services;

2.   A mediator, arbitrator, or other facilitator in a dispute resolution process;

3.   An administrator, conservator, guardian, executor, personal representative, trustee or other fiduciary, so long as the **Insured**:  (i) is not a beneficiary of such estate, trust or other fiduciary relationship; and (ii) is not receiving compensation other than fees for such services paid directly from such estate or trust or for services in conjunction with such fiduciary capacity;

4.   An **Attorney** in researching or certifying title to real estate, including services as a title insurance agent acting on behalf of a title insurance company;

5.   A director, officer or member of any professional legal association, legal bar association, or paralegal or legal assistant association, including its governing board or any of its committees;

6.   An author or presenter of legal research papers, legal materials and legal seminars, including matters relating to the ethical and professional conduct of an **Attorney**, but only if such services or activities are performed without compensation or royalties, or the amount of compensation or royalties per publication, presentation or seminar does not exceed $30,000;

7.   A court-appointed child and family investigator in a domestic relations matter, or other similar position or role so long as the **Insured** is acting pursuant to a court order;

8.   A government affairs advisor or lobbyist; and

9.   A notary public.

**Professional Services** does *not* <u>nor</u> include any:

10.   Services rendered or activities engaged in prior to the **Retroactive Coverage Date**;

11.   Obligations or services assumed by or performed under any contract other than one to provide **Professional Services**;



12. Rendering of investment advice in any context or in any capacity including, but not limited to, advice concerning securities, real property, commodities, futures contracts or franchises;

13. Holding, possessing, controlling, supervising, disbursing, or otherwise handling or overseeing in any manner or nature whatsoever any funds or property of the **Insured**, or of any  client, trust, estate, person, or any other third party;

14. Advertising or marketing services or activities;

15. Services as a broker, dealer, business manager, accountant, or real estate broker or agent; or

16. Services as an expert witness.

AA. **Retroactive Coverage Date** means the date for the **Named Insured** as listed in Item 2 of the **Declarations** and, if applicable, the date for any **Predecessor Law Firm** as listed in an additional **Insured** endorsement issued by the **Company** and identified in Item 8 of the **Declarations**.  The effect of the **Retroactive Coverage Date** is described in Section 1.A.1. and Section 5.

BB. **Wrongful Act** means an actual or alleged**:**

1. Act, error, or omission by the **Insured** in the performance of **Professional Services**; and

2. A **Personal Injury** resulting from the **Professional Services** of the **Insured**.

**Wrongful Act** does not mean nor include an act, error, or omission resulting in **Bodily Injury**.

---

## SECTION 3 – EXCLUSIONS

THIS **POLICY** DOES NOT APPLY TO ANY **CLAIM** ARISING FROM OR IN CONNECTION WITH:

A. Any dishonest, fraudulent, criminal, malicious, or intentionally harmful **Wrongful Act** committed by, at the direction of, or with the consent of an **Insured**, subject to Section 6.A. ("innocent insured coverage");

B. Any trust or estate of which an **Insured** is an heir, devisee, beneficiary or distributee of such trust or estate;

C. Any **Professional Services** that were rendered or should have been rendered to or in connection with any **Organization** (including the ownership, maintenance or care of any property in connection with any such **Organization**) of which, at the time such **Professional Services** were or should have been rendered:

1. An **Insured** was an officer, director, employee or other fiduciary;

2. An **Insured** was a partner, shareholder, member or other owner; provided, however, that this provision does not apply if, at the time such **Professional Services** were or should have been rendered, no **Insured** (or group of **Insureds** collectively) owned, possessed or controlled a total voting interest or beneficial interest of more than ten percent (10%) of such **Organization**; or

3. An **Insured** served in any capacity to directly or indirectly control, operate or manage such **Organization**.

This exclusion shall not apply to any **Claim** arising from or in connection with (i) an **Insured's** position as an officer or director of an **Exempt Organization**, but only to the extent the **Insured** is not indemnified by the **Exempt Organization**, and only to the extent no other insurance applies, or (ii) any **Professional Services** that were or should have been rendered to an **Organization** listed on an endorsement identified in Item 8 of the **Declarations**;

D. Notary certification or attestation of an instrument without first determining from personal knowledge or satisfactory evidence or proof of the identity of the individual, that the individual signing the instrument has the identity claimed and has executed the instrument knowingly and willingly for the purposes intended;

E. Any **Wrongful Act** that occurred prior to the **Effective Date** of this **Policy**, if:

1. The **Wrongful Act** occurred in the course of services or activities performed for a firm other than the **Named Insured**, and there is another policy of professional liability insurance that provides coverage for the **Claim**, regardless of the amount, if any, of the available limits of liability of the other policy, and regardless of whether or not the deductible provisions or limits of liability of the other policy are different from those of this **Policy**;



**PREFERRED Lawyers Professional Liability Insurance Policy**

2. There is an earlier-incepting policy of professional liability insurance that provides coverage for the **Claim**, or would have provided coverage for the **Claim** if the **Insured's** obligations under that policy had been complied with, regardless of the amount, if any, of the available limits of liability of the prior policy, and regardless of whether or not the deductible provisions or limits of liability of the prior policy are different from those of this **Policy**; or

3. Prior to the **Effective Date** of this **Policy**, any **Insured** gave or should have given to any insurer, notice of a **Claim** or potential **Claim** arising from or in connection with the **Wrongful Act**, or from any **Wrongful Act** that is connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the **Claim** or potential **Claim**.

F. An **Insured's** activities as an elected public official, employee or representative of a governmental body, subdivision, or agency thereof ("public entity"), unless such **Insured** is deemed to be a public official, employee or representative solely by reason of rendering **Professional Services** to such public entity;

G. An **Insured's** activities or capacity as a fiduciary under the Employee Retirement Income Security Act of 1974, as amended, or any regulation or order issued pursuant thereto, or under any other similar state or local law;

H. Any loss, conversion, misappropriation, wrongful disbursement, improper commingling, or negligent supervision by any person of client or trust account funds or property, or funds or property of any other person, held or controlled at any time by an **Insured** in any capacity or under any authority, including any loss or reduction in value of such funds or property;

I. Any dispute over fees or costs, or any **Claim** that seeks, whether directly or indirectly, the return, reimbursement or disgorgement of fees, costs, or other funds or property held or controlled at any time by an **Insured**;

J. Any defect in title to real estate that was not disclosed in public records and that any **Insured** knew about when a title insurance policy was issued;

K. Breach of any underwriting authority granted any **Insured** by a title insurance company or its authorized representative;

L. Any liability agreed to or assumed by an **Insured** under an agreement where the **Insured** has agreed to indemnify for or share or participate in any loss payment or expense due or payable under a title insurance policy;

M. Any **Claim** that is otherwise covered under any other insurance policy that the **Company** has issued to the **Named Insured**; or

N. Any **Wrongful Act** committed by any **Attorney** with whom any **Insured** shares common office space or office facilities, but which said **Attorney** is not identified as an **Insured Attorney** in Item 3 of the Declarations.

THIS **POLICY** DOES NOT APPLY TO ANY **CLAIM** MADE BY:

O. An employer against an **Insured** who is or was an employee of the employer;

P. An **Insured**;

Q. A family member or other relative of an **Insured**; or

R. Anyone who is or was a partner, officer, director, owner, stockholder or employee of any **Insured**.

---

**SECTION 4 – DEDUCTIBLE, CLAIM EXPENSE ALLOWANCE, LIMIT OF LIABILITY, AND MULTIPLE CLAIMS**

---

A. DEDUCTIBLE

1. For each and every **Claim** covered by this **Policy**, the **Named Insured** shall pay all **Claim Expenses** and **Damages** up to the **Deductible** for each and every covered **Claim**. The **Named Insured's** payment of all **Claim Expenses** and **Damages** up to the **Deductible** for each and every covered **Claim** is a condition precedent to the **Company's** obligation to pay any **Claim Expenses** or **Damages** for each and every covered **Claim**. Each **Insured** shall be jointly and severally liable for such **Claim Expenses** and **Damages** in the event the **Named Insured** fails to make any required payment.

2. The **Company** shall not have any obligation to pay **Claim Expenses** or **Damages** until after the **Deductible** is exhausted. If the **Company** pays any amount within the **Deductible**, the **Named Insured** and each **Insured** shall



be jointly and severally liable to the **Company** for any and all such amounts paid by the **Company** and, on demand, shall promptly reimburse such amounts to the **Company**.

3.  The maximum aggregate **Deductible** amount payable by the **Named Insured** for all **Claims** first made and reported during a **Policy Period**, without regard to the number of **Claims** or claimants, or the number of **Insureds**, shall be twice the "Each **Claim**" **Deductible** amount listed in Item 6 of the **Declarations**.

4.  If a **Claim** is resolved through **Formal Mediation**, the **Deductible** payable by the **Named Insured** for that **Claim** will be reduced by an amount equal to the lesser of: (i) fifty percent (50%) of the **Deductible**; or (ii) $25,000.

B.  CLAIM EXPENSE ALLOWANCE

1.  This **Policy** provides a **Claim Expense Allowance**.  The **Company**'s payment of any **Claim Expenses** will first be applied against and reduce the **Claim Expense Allowance**.  Subject to Section 4.B.2., the **Claim Expense Allowance** shall be the maximum aggregate amount the **Company** shall be obligated to pay for **Claim Expenses** for all **Claims** first made and reported during a **Policy Period**, without regard to the number of **Claims** or claimants, or the number of **Insureds**.

2.  In the event payment by the **Named Insured** or the **Company** (or both) of **Claim Expenses** exhausts the remaining available **Claim Expense Allowance** under this **Policy**, any further payment of **Claim Expenses** shall be applied against and reduce the remaining available **Limit of Liability**, described in Section 4.C.  The **Company** shall have no further obligation to pay **Claim Expenses** once any **Limit of Liability** is reached.

3.  The **Claim Expense Allowance** includes the **Deductible**, and to the extent any **Insured** is required during the **Policy Period** to pay **Claim Expenses** as part of a **Deductible**, the remaining available **Claim Expense Allowance** for the **Policy Period** shall be reduced by the amount of such payments by the **Insured**.

4.  If the **Company** issues an **Extended Reporting Period Endorsement**, the **Claim Expense Allowance** applicable during the **Extended Reporting Period** is described in Section 5.J.

C.  LIMIT OF LIABILITY

1.  Subject to Section 4.B.2. and subject always to the remaining available "Aggregate" **Limit of Liability** in the event more than one **Claim** is first made and first reported during the **Policy Period,** the "Each **Claim**" **Limit of Liability** listed in Item 5 of the **Declarations** shall be the maximum amount the **Company** shall pay for each **Claim** first made and first reported during a **Policy Period**, without regard to the number of claimants or number of **Insureds**.  The **Limit of Liability** includes the **Deductible**, and to the extent any **Insured** is required during the **Policy Period** to pay **Damages** as part of a **Deductible**, the remaining available **Limit of Liability** for the **Claim** shall be reduced by the amount of such payments by the **Insured**.

2.  The "Aggregate" **Limit of Liability** listed in Item 5 of the **Declarations** shall be the maximum amount the **Company** shall pay for all **Claims** first made and first reported during a **Policy Period**, without regard to the number of **Claims** or claimants, or the number of **Insureds**.

3.  If the **Company** issues an **Extended Reporting Period Endorsement**, the **Limit of Liability** applicable during the **Extended Reporting Period** is described in Section 5.J.

4.  If the **Company** pays any amount in excess of the applicable **Limit of Liability**, or any other amount for which the **Company** has no obligation under this **Policy**, each **Insured** shall be jointly and severally liable to the **Company** for any and all such amounts and, on demand, shall promptly reimburse such amounts to the **Company**.

D.  MULTIPLE CLAIMS, CLAIMANTS, OR INSUREDS

Neither the making of one or more **Claims** against more than one **Insured**, nor the making of **Claims** by more than one claimant, shall operate to increase the Limit of Liability.  All **Claims** that arise out of or in connection with the same **Professional Services** or **Interrelated Wrongful Acts**, whenever made and without regard to the number of **Claims**, claimants, or implicated **Insureds**, shall be treated as a single **Claim**.  All such **Claims**, whenever made, shall be deemed first made at the time the earliest **Claim** arising out of such **Professional Services** or **Interrelated Wrongful Acts** was first made, and all such **Claims** shall be subject to the same "Each **Claim**" **Limit of Liability,** "Aggregate**" Limit of Liability**, and **Claim Expense Allowance.**



**PREFERRED Lawyers Professional Liability Insurance Policy**

E.   NON-CUMULATION OF LIMITS OF LIABILITY

If two or more policies of lawyers professional liability insurance issued by the **Company** would otherwise provide coverage to an **Insured** or multiple **Insureds** with respect to any **Claim**, the **Claim** shall be subject to, and the maximum amount the **Company** shall be obligated to pay is, the highest available **Limit of Liability** of one of such policies.  The **Limit of Liability** under this **Policy** shall be reduced, and may be exhausted, by payments under this **Policy** or payments under such other policies issued by the **Company**.

## SECTION 5 – EXTENDED REPORTING PERIOD

A.   AUTOMATIC 60-DAY EXTENDED REPORTING PERIOD

1.   If this **Policy** is cancelled or not renewed by the **Company** or **Named Insured** for any reason other than nonpayment of premium or **Deductible**, or for fraud or material misrepresentation in any application for lawyers professional liability insurance delivered to the **Company**, then the **Named Insured** shall have an automatic 60-day period to report a **Claim**, commencing immediately upon expiration or cancellation of the **Policy Period**, subject to the terms and conditions of Section 5.J. and Section 5.K.

2.   The automatic 60-day reporting period under this Section 5.A. shall immediately terminate if: (i) the **Company** issues an **Extended Reporting Period Endorsement** to the **Named Insured** at any time during such 60-day period; or (ii) the **Named Insured** binds coverage or otherwise becomes insured under another policy of lawyers professional liability insurance issued by any insurer.

B.   FREE EXTENDED REPORTING PERIOD FOR RETIRING SOLE PRACTITIONER

This Section 5.B. shall apply to any **Extended Reporting Period Endorsement** issued to an individual **Attorney** who is the only **Attorney** identified in Item 3 of the **Declarations**.

1.   Except as provided in Section 5.B.5., an **Attorney** practicing as a sole practitioner shall have the right, upon written request to the **Company** no later than thirty (30) days after expiration or cancellation of the **Policy Period**, to have the **Company** issue an **Extended Reporting Period Endorsement** of unlimited duration to the **Attorney** if the **Attorney** satisfies the following conditions:

(a)   The **Attorney** has been the only **Attorney** identified in Item 3 of the **Declarations** and the only **Attorney** continuously insured by the **Company** under this **Policy** or a predecessor to this **Policy** during the five-year period immediately preceding expiration or cancellation of the **Policy Period**; and

(b)   The **Attorney** has attained age 55 or older and retires from and permanently and completely ceases the practice of law and the rendering of **Professional Services** during the **Policy Period**.

2.   No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to the sole practitioner **Attorney** pursuant to Section 5.B.1.

3.   If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.B.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

4.   Any **Extended Reporting Period Endorsement** issued under this Section 5.B. shall be subject to the terms and conditions of Section 5.K.

5.   No **Extended Reporting Period Endorsement** shall be available to an **Attorney** under this Section 5.B. if the **Attorney** has been insured by the **Company** under the **Company**'s policy form ALPS-LPL-BASIC at any time during the five-year period immediately preceding expiration or cancellation of the **Policy Period**.

C.   FREE EXTENDED REPORTING PERIOD FOR ATTORNEY RETIRING FROM NAMED INSURED FIRM

This Section 5.C. shall apply to any **Extended Reporting Period Endorsement** issued to an individual **Attorney** if the **Named Insured** has more than one (1) **Attorney** identified in Item 3 of the **Declarations**.

1.   Except as provided in Section 5.C.5. and Section 5.C.6., an **Attorney** identified in Item 3 of the **Declarations** shall have the right, upon written request to the **Company** no later than thirty (30) days after expiration or cancellation of the **Policy Period**, to have the **Company** issue an **Extended Reporting Period Endorsement** of unlimited duration if the **Attorney** satisfies the following conditions:



    (a)    The **Attorney** has been identified in Item 3 of the **Declarations** and continuously insured by the **Company** under this **Policy** and each predecessor policy to this **Policy** during the five-year period immediately preceding expiration or cancellation of the **Policy Period**; and

    (b)    The **Attorney** has attained age 55 or older and retires from and permanently and completely ceases the practice of law and the rendering of **Professional Services** during the **Policy Period**.

2.    No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** pursuant to Section 5.C.1.

3.    If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.C.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

4.    Any **Extended Reporting Period Endorsement** issued pursuant to Section 5.C.1. shall be subject to the terms and conditions of Section 5.K.

5.    No **Extended Reporting Period Endorsement** shall be available to an **Attorney** under this Section 5.C. if the **Attorney** has been insured by the **Company** under the **Company**'s policy form ALPS-LPL-BASIC at any time during the five-year period immediately preceding expiration or cancellation of the **Policy Period**.

6.    No **Extended Reporting Period Endorsement** shall be available to an **Attorney** under this Section 5.C. if fifty percent (50%) or more of the **Attorneys** identified in Item 3 of the **Declarations** retire from and permanently and completely cease the practice of law and the rendering of **Professional Services** during the **Policy Period**.

D.    FREE EXTENDED REPORTING PERIOD UPON DEATH

1.    If an **Attorney** identified in Item 3 of the **Declarations** dies during the **Policy Period**, the executor, personal representative or other duly authorized administrator of the **Attorney**'s estate shall have the right to request that the **Company** issue an **Extended Reporting Period Endorsement** to the **Attorney**'s estate, subject to satisfaction of all of the following terms and conditions:

    (a)    The executor, personal representative or other duly authorized administrator of the **Attorney**'s estate shall deliver to the **Company** no later than thirty (30) days following expiration of the **Policy Period** or any applicable **Extended Reporting Period**: (i) a written request that the **Company** issue an **Extended Reporting Period Endorsement**; and (ii) written proof of the date and cause of death of the **Attorney**;

    (b)    No **Extended Reporting Period Endorsement** shall be available if suicide or abuse or misuse of any substance is the cause of the **Attorney**'s death; and

    (c)    The **Extended Reporting Period Endorsement** issued to the **Attorney**'s estate shall terminate upon the earlier of: (i) the informal or formal closing of the **Attorney**'s estate; or (ii) that date which is three (3) years following the date of death of the **Attorney**.

2.    No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** pursuant to this Section 5.D.1.

3.    If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.D.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

4.    Any **Extended Reporting Period Endorsement** issued pursuant to Section 5.D.1. shall be subject to the terms and conditions of Section 5.K.

E.    FREE EXTENDED REPORTING PERIOD UPON TOTAL AND PERMANENT DISABILITY

1.    If an **Attorney** identified in Item 3 of the **Declarations** becomes totally and permanently disabled during the **Policy Period**, then the **Attorney** or the legal guardian acting on behalf of the **Attorney** shall have the right to request that the **Company** issue an **Extended Reporting Period Endorsement** of unlimited duration, subject to satisfaction of all of the following terms and conditions:

    (a)    The **Attorney** or such legal guardian shall deliver to the **Company** no later than thirty (30) days following expiration of the **Policy Period**: (i) a written request that the **Company** issue an **Extended Reporting Period Endorsement**; and (ii) a written certification from a licensed physician stating that the **Attorney** is totally and permanently disabled;



    (b)    No **Extended Reporting Period Endorsement** shall be available if the **Attorney** is totally and permanently disabled arising from or in connection with abuse or misuse of any substance;

    (c)    If the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** who is totally and permanently disabled, the **Extended Reporting Period** shall immediately terminate if the **Attorney** begins to render any **Professional Services** at any time after the **Company** issues the **Extended Reporting Period Endorsement**; and

    (d)    Upon the **Company**'s request and at the **Company**'s sole expense, the **Attorney** must agree to submit to a medical examination by a licensed physician designated by the **Company**.

2.    Solely for purposes of this Section 5.E., including the written certification from a licensed physician as required under Section 5.E.1.(a), the phrase "totally and permanently disabled" shall mean:

    (a)    Due to **Bodily Injury,** other than death, the **Attorney** is wholly and entirely prevented from rendering any **Professional Services**;

    (b)    Such **Bodily Injury** has existed for no less than six (6) months prior to expiration of the **Policy Period**; and

    (c)    Such **Bodily Injury** is reasonably expected to be continuous and permanent.

3.    No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** pursuant to Section 5.E.1.

4.    If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.E.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

5.    Any **Extended Reporting Period Endorsement** issued pursuant to Section 5.E.1. shall be subject to the terms and conditions of Section 5.K.

F.    FREE EXTENDED REPORTING PERIOD UPON ACTIVE MILITARY SERVICE

1.    If an **Attorney** listed in Item 3 of the **Declarations** is called to active duty as a member of the United States armed forces, then the **Attorney** shall have the right to request that the **Company** issue an **Extended Reporting Period Endorsement** of unlimited duration to the **Attorney**.  The **Attorney** shall deliver to the **Company** no later than thirty (30) days after being called to active duty:  (i) a written request for issuance of an **Extended Reporting Period Endorsement**; and (ii) written proof demonstrating that the **Attorney** has been called to active duty.

2.    No additional premium will be charged if the **Company** issues an **Extended Reporting Period Endorsement** to an **Attorney** pursuant to this Section 5.F.1.

3.    If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.F.1., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

4.    Any **Extended Reporting Period Endorsement** issued pursuant to Section 5.F.1. shall be subject to the terms and conditions of Section 5.K.

G.    OPTIONAL EXTENDED REPORTING PERIOD FOR INDIVIDUAL ATTORNEY

1.    If an **Attorney** identified in Item 3 of the **Declarations** ceases to be a principal, partner, shareholder or other owner or employee of the **Named Insured** during the **Policy Period**, then the **Attorney** shall have the right, upon written request to the **Company** and upon payment of the additional premium specified in Section 5.I.2. no later than thirty (30) days after ceasing to be a principal, partner, shareholder or other owner or employee of the **Named Insured**, to have the **Company** issue an _Unlimited_ **Extended Reporting Period Endorsement**.

2.    If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to this Section 5.G., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

3.    Any **Extended Reporting Period Endorsement** issued pursuant to this Section 5.G. shall be subject to the terms and conditions of Section 5.K.

H.    OPTIONAL EXTENDED REPORTING PERIOD FOR NAMED INSURED

1.    If this **Policy** is cancelled or not renewed by the **Company** or **Named Insured** for any reason other than nonpayment of premium or **Deductible** or fraud or material misrepresentation in any application for lawyers professional liability insurance delivered to the **Company**, and except as otherwise provided herein, the **Named**



**PREFERRED Lawyers Professional Liability Insurance Policy**

**Insured** shall have the right, upon written request to the **Company** and upon payment of the additional premium specified in Section 5.I. no later than thirty (30) days after expiration or cancellation of the **Policy Period**, to have the **Company** issue an **Extended Reporting Period Endorsement** of a duration as set forth in Section 5.I.1.

2.  If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to this Section 5.H., the **Company**'s **Limit of Liability** during the **Extended Reporting Period** shall be as stated in Section 5.J.

3.  Any **Extended Reporting Period Endorsement** issued under this Section 5.H. shall be subject to the terms and conditions of Section 5.K.

I.  PREMIUM FOR EXTENDED REPORTING PERIOD ENDORSEMENT

1.  If the **Company** issues an **Extended Reporting Period Endorsement** to the **Named Insured** pursuant to Section 5.H.1., the premium for any **Extended Reporting Period Endorsement** shall be calculated based upon a percentage of the expiring premium of this **Policy** as applied to the duration of the **Extended Reporting Period** as follows:

| Duration of **Extended Reporting Period** | Percentage of Expiring Premium |
|---|---|
| 1 Year | 125% |
| 2 Years | 175% |
| 3 Years | 200% |
| 5 Years | 265% |
| Unlimited | 300% |

2.  If the **Company** issues an **Extended Reporting Period Endorsement** to an individual **Attorney** pursuant to Section 5.G., the premium for any **Extended Reporting Period Endorsement** shall be calculated based upon the **Attorney**'s portion of the expiring premium of this **Policy** multiplied by the percentage applicable to an *Unlimited* **Extended Reporting Period Endorsement** as set forth in Section 5.I.1.

3.  Except as stated in Section 5.G., the premium for any **Extended Reporting Period Endorsement** must be paid no later than thirty (30) days after expiration or cancellation of the **Policy Period**.  If the **Company** issues an **Extended Reporting Period Endorsement** pursuant to Section 5.G., the premium for the **Extended Reporting Period Endorsement** must be paid no later than thirty (30) days after the individual **Attorney** ceases to be a principal, partner, shareholder or other owner or employee of the **Named Insured**.

J.  LIMIT OF LIABILITY AND CLAIM EXPENSE ALLOWANCE DURING EXTENDED REPORTING PERIOD

1.  If the **Company** issues an **Extended Reporting Period Endorsement** to a sole practitioner **Attorney** pursuant to Section 5.B.1. or to the **Named Insured** pursuant to Section 5.H., the **Extended Reporting Period Endorsement** does *not* create or establish a new or separate **Policy**, **Limit of Liability** or **Claim Expense Allowance** and will not increase or reinstate the **Limit of Liability** or the **Claim Expense Allowance** under this **Policy**.  Instead, the maximum amount the **Company** shall pay as **Claim Expenses** and **Damages** for all **Claims** first made and first reported to the **Company** during the **Extended Reporting Period** shall be the remaining **Limit of Liability** and the remaining **Claim Expense Allowance** under this **Policy** at the time of expiration or cancellation of the **Policy Period**.

2.  Subject to the further limitation set forth in Section 5.J.4, if the **Company** issues an **Extended Reporting Period Endorsement** to an individual **Attorney** pursuant to Section 5.C., Section 5.D., Section 5.E., Section 5.F., or Section 5.G., the maximum amount the **Company** shall pay as **Claim Expenses** for all **Claims** first made against the **Attorney** and first reported to the **Company** during the **Extended Reporting Period** shall be the *lesser* of:

(a)  The remaining **Claim Expense Allowance** under this **Policy** at the time of expiration or cancellation of the **Policy Period**; or

(b)  $125,000.

The amount of such **Claim Expense Allowance** shall be determined without regard to the number of **Claims** or claimants.



**PREFERRED Lawyers Professional Liability Insurance Policy**

3. Subject to the further limitation set forth in Section 5.J.4., if the **Company** issues an **Extended Reporting Period Endorsement** to an individual **Attorney** pursuant to Section 5.C., Section 5.D., Section 5.E., Section 5.F., or Section 5.G., the maximum amount the **Company** shall pay as **Damages** for all **Claims** first made against the **Attorney** and first reported to the **Company** during the **Extended Reporting Period** shall be the *lesser* of:

   (a) The remaining **Limit of Liability** under this **Policy** at the time of expiration or cancellation of the **Policy Period**; or

   (b) $500,000.

   The maximum amount the **Company** shall pay as **Damages** during the **Extended Reporting Period** shall be determined without regard to the number of **Claims** or claimants.

4. If the **Company** has issued an **Extended Reporting Period Endorsement** to more than one former **Attorney** of the **Named Insured**, the "Each **Claim**" **Limit of Liability** listed in Item 5 of the **Declarations** shall be the maximum amount the **Company** shall pay for all **Claims** first made and first reported during any **Extended Reporting Period**, without regard to the number of **Claims** or claimants, or the number of **Attorneys** to whom the Company has issued an **Extended Reporting Period Endorsement**.

K. TERMS AND CONDITIONS OF EXTENDED REPORTING PERIOD ENDORSEMENT

1. If the **Company** issues any **Extended Reporting Period Endorsement** to an individual **Attorney** pursuant to Section 5.C., Section 5.D., Section 5.E., Section 5.F., or Section 5.G., the **Extended Reporting Period** shall become effective and shall commence only upon the latest to occur of the following:

   (a) The date the **Named Insured** no longer has available any other insurance that provides coverage to the **Attorney** for any **Claim** first made and first reported to the **Company** after the **Company** has issued the **Extended Reporting Period Endorsement**;

   (b) Expiration or cancellation of the **Policy Period**;

   (c) Expiration or cancellation of any renewal or successive renewal of this **Policy**; and

   (d) Expiration or cancellation of any **Extended Reporting Period Endorsement** issued to the **Named Insured**.

2. Any **Extended Reporting Period** and **Extended Reporting Period Endorsement** provided under Section 5 simply extends the reporting period to first report a **Claim** to the **Company** under this **Policy** that:

   (a) Is otherwise covered by this **Policy**;

   (b) Arises from a **Wrongful Act** that occurred after the **Retroactive Coverage Date** and before the end of the **Policy Period**; and

   (c) Is first made, and first reported to the **Company**, after the end of the **Policy Period** and during the **Extended Reporting Period**.

3. Any **Claim** reported to the **Company** during the **Extended Reporting Period** shall be treated as if reported during the **Policy Period**.

4. Immediately upon issuance of an **Extended Reporting Period Endorsement**, any premium paid for the **Extended Reporting Period Endorsement** shall be non-refundable and the **Extended Reporting Period Endorsement** shall not be cancellable, except as provided in Section 5.K.5.

5. No **Extended Reporting Period Endorsement** under this Section 5 shall be available to an **Attorney** or the **Named Insured** if:

   (a) The **Company** cancels this **Policy** or any other policy for failure to pay the premiums when due or for failure to pay any **Deductible** or other amount due to the **Company**;

   (b) The **Company** cancels or rescinds this **Policy** or any other policy for fraud or misrepresentation in any application or other submission to the **Company**;

   (c) Any **Insured** fails to comply with the terms and conditions of this **Policy** or any other policy, including any **Extended Reporting Period Endorsement** or any other endorsements; or



**PREFERRED Lawyers Professional Liability Insurance Policy**

(d)    Any **Insured's** license or right to practice law has been revoked, suspended, or surrendered after the commencement of any investigation or disciplinary proceeding by any regulatory authority.

6.    If the **Company** issues any **Extended Reporting Period Endorsement** under Section 5, it is understood that any such **Extended Reporting Period Endorsement** is not a new insurance policy, but instead an endorsement that simply extends the time period during which to report a **Claim** under this **Policy**. All other terms and conditions of this **Policy** shall apply to any **Extended Reporting Period** and any **Extended Reporting Period Endorsement**.

7.    An **Attorney** remains eligible for an **Extended Reporting Period Endorsement** under Sections 5.B. and 5.C. even if, upon permanently and completely ceasing the practice of law, the **Attorney** intends to or does render services solely within the context of a pro bono, volunteer service, access to justice, or access to legal services program sponsored by a national, state, or local agency or bar association; provided, however the **Extended Reporting Period Endorsement** provides no coverage under this **Policy** for such services.

## SECTION 6 – GENERAL CONDITIONS

A.    INNOCENT INSURED COVERAGE

1.    Whenever a **Claim** otherwise covered by this **Policy** would be excluded based solely upon Section 3.A. and no other applicable exclusion under this **Policy**, coverage will be afforded to any individual **Insured** who did not personally commit, or personally participate in committing or causing any such **Wrongful Act**, and who did not remain passive after learning of the **Wrongful Act**, provided that each such individual **Insured** shall have immediately notified the **Company** and complied with all obligations under this **Policy** once said **Insured** obtained knowledge of the **Wrongful Act**. Nothing in this section shall be interpreted to afford any coverage to a **Named Insured** that is an entity rather than an individual.

2.    No coverage will be afforded to any individual **Insured** under Section 6.A.1. if the **Claim** is otherwise excluded from coverage based upon any applicable exclusion from coverage under this **Policy** other than Section 3.A.

3.    The **Company**'s obligation to provide coverage or make any payment of **Damages** or **Claim Expenses** under this Section 6.A. shall be in excess of any and all assets of any **Insured** who is not afforded coverage under this Section 6.A.

B.    INSURED'S OBLIGATIONS UPON NOTICE OF CLAIM OR POTENTIAL CLAIM

1.    When an **Insured** becomes aware of a **Wrongful Act** that could reasonably be expected to be the basis of a **Claim**, but no **Claim** arising therefrom has yet been made, then as a condition precedent to the **Company**'s obligation to defend or indemnify the **Insured** under this **Policy**, the **Insured** shall immediately give written notice to the **Company**. Such notice shall include the fullest information obtainable concerning the potential **Claim**. The **Insured** must deliver written notice to the **Company** in accordance with the CLAIMS MADE AND REPORTED POLICY paragraph set forth on page 1 of this **Policy**.

2.    If, during the **Policy Period** or any **Extended Reporting Period**, the **Company** is given written notice of a potential **Claim** pursuant to Section 6.B.1, and a **Claim** arising from or in connection with the same **Wrongful Act** is subsequently made against an **Insured** no later than six years after the end of the **Insured's** last **Policy Period** or any applicable **Extended Reporting Period**, then any such **Claim** shall be deemed to have been first reported during the **Policy Period** or **Extended Reporting Period** in which the potential **Claim** was reported.

3.    When a **Claim** is made against an **Insured,** the **Insured** shall immediately forward to the **Company** every demand, notice, summons, or other process received by the **Insured** or the **Insured's** representative. The **Company** shall have no obligation hereunder with respect to a **Claim** unless and until so notified.

4.    In the event an **Insured** fails to give written notice to the **Company** of a **Claim**, prior to the end of the **Policy Period** in which the **Claim** is made, or in the event an **Insured** fails to give written notice to the **Company** of a potential **Claim**, as described in Section 6.B.1, prior to the end of the **Policy Period** in which the **Insured** first becomes aware of a **Wrongful Act**, then no coverage for any such **Claim** shall be afforded to the **Insured** under any future policy issued by the **Company**.



C.   ASSISTANCE AND COOPERATION OF THE INSURED

1.   Each **Insured** shall cooperate with the **Company** in its investigation of any **Claim**, including, without limitation, by promptly complying with all requests for any **Insured** to submit to or provide any statements, including any sworn statements or statements under oath of any **Insured**, reports, documents, or other information, and by providing copies of all pertinent files upon request.

2.   Each **Insured** shall cooperate and assist, as requested, in the defense of any **Claim**, in making any settlements, and in enforcing any right of contribution or indemnity against any person.  If requested by the **Company**, such assistance may include, without limitation, attendance at hearings and trials and assistance in securing and giving evidence and in obtaining the attendance of witnesses.  Neither the **Insured** nor the **Insured's** legal representative shall impede the **Company**'s investigation or defense of any **Claim**.  Neither the **Insured** nor the **Insured**'s legal representative shall in any manner impair the right of the **Company** to make any settlement that the **Company** deems, in its discretion, to be reasonably necessary pursuant to any statutory or common law requirements concerning the fair or unfair claim settlement practices of insurers.

3.   Each **Insured** shall notify the **Company** of any demand to arbitrate a **Claim** against an **Insured**, and any right to demand arbitration of a **Claim**, and in the event the **Company** elects to proceed with arbitration, shall cooperate in any such proceeding.

4.   No **Insured** shall, without the **Company**'s prior written consent, engage in or offer to engage in any of the following with respect to any **Claim** or potential **Claim**:  (a) make any payments; (b) admit any liability; (c) stipulate to the entry of a judgment against the **Insured**; (d) settle any **Claim**; (e) assume any obligation; (f) negotiate any tolling agreement; or (g) incur any expense. If an **Insured** engages in or offers to engage in any of the foregoing, the **Insured** shall do so at the **Insured's** own liability and expense, and such engagement, action or offer by the **Insured** shall be deemed to be a breach of the **Insured's** duty to cooperate with the **Company** with respect to such **Claim** or potential **Claim**.

D.   ACTION AGAINST COMPANY

No action shall lie against the **Company** unless and until the **Insured** has fully complied with all terms and conditions of this **Policy**, and unless and until the amount of the **Insured's** obligation to pay has been finally determined either by judgment against the **Insured** or by written agreement of the **Insured,** the claimant and the **Company**.  No person or **Organization** shall have the right under this **Policy** to join the **Company** as a party to any **Claim** against an **Insured**.

E.   OTHER INSURANCE

Except where coverage under this **Policy** is excluded under Section 3.E., the insurance provided under this **Policy** shall be excess over any other valid and collectible insurance, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is specifically written only as excess insurance over this **Policy**.

F.   SUBROGATION

1.   In the event of any payment under this **Policy**, the **Company** shall be subrogated to all the **Insured's** rights of recovery against any person or organization.  The **Insured** shall execute and deliver such instruments and papers as may be required by the **Company**, and shall do whatever else is necessary, to secure such rights.  The **Insured** shall at no time do anything to prejudice such rights.

2.   The **Company** shall not exercise any subrogation rights against another **Insured,** except with respect to any **Claim** arising from, involving, or in connection with any dishonest, fraudulent, criminal, malicious, or intentionally harmful **Wrongful Act** caused by such **Insured**.

3.   Any amounts recovered through subrogation shall be apportioned as follows: First, to the repayment of expenses incurred in enforcing subrogation; Second, to repayment of any loss and expense payments by the **Insured** in excess of any **Deductible**; Third, to any loss and expense payments by an excess carrier on behalf of the **Insured**; Fourth, to any loss and expense payments by any primary carrier, including the **Company**, on behalf of the **Insured**; and Last, to repayment of the **Insured's Deductible**.



**PREFERRED Lawyers Professional Liability Insurance Policy**

G.   CHANGES IN POLICY TERMS

Except where otherwise provided herein, no part of this **Policy** may be waived or changed, except by written endorsement issued to form a part of this **Policy** and signed by an authorized representative of the **Company**.  Neither notice to an agent nor knowledge possessed by an agent or by any other person shall effect any waiver or change in any part of this **Policy** or estop the **Company** from asserting any right under this **Policy**.

H.   FIRM CHANGES

1.   The **Named Insured** shall immediately notify the **Company** if, during the **Policy Period**, the **Named Insured** has: (a) any increase or decrease by more than 25 **Attorneys** or by more than 50% in the total number of **Attorneys** listed in Item 3 of the **Declarations**; or (b) any acquisition, dissolution or merger by or of the **Named Insured**. Upon receipt of such notice, the **Company** reserves the right, in its sole discretion, to re-evaluate the risk insured under this **Policy** and to take appropriate underwriting action.

2.   In all instances other than those described in the immediately preceding section, the **Named Insured** shall notify the **Company** within a commercially reasonable period of time if, during the **Policy Period**, the **Named Insured** seeks to add or delete an **Attorney** to or from the list of insured **Attorneys** in Item 3 of the **Declarations**.  Upon receipt of such notice, the **Company** reserves the right, in its sole discretion, to re-evaluate the risk insured under this **Policy** and to take appropriate underwriting action.

I.   ASSIGNMENT

No rights or interests hereunder of any **Insured** may be assigned.

J.   CANCELLATION

1.   The **Named Insured** may cancel this **Policy** at any time by surrendering this **Policy** to the **Company** (or an authorized representative of the **Company**), or by written notice to the **Company** stating the date on which the **Named Insured** proposes that the cancellation will be effective.  In the event the **Named Insured** cancels this **Policy**, the **Company** shall be entitled to retain the customary "short rate" portion of the premium.

2.   In the event the **Named Insured** has failed to pay when due a premium or **Deductible** under this **Policy**, or any other money owed to the **Company**, the **Company** may cancel this or any other policy by written notice of cancellation to the **Named Insured**.  The notice shall state the date on which the cancellation will be effective, which shall be no fewer than ten (10) days following the date of the notice.  Such notice shall be effective and conclusive as to all **Insureds** hereunder.  Proof of mailing shall be sufficient proof of notice and the effective date of cancellation stated in the notice shall become the end date of the **Policy Period**.

3.   For any reason other than nonpayment of premium or **Deductible** as set forth in Section 6.J.2, including but not limited to: (a) material misrepresentation; (b) substantial change in the risk assumed; or (c) substantial breach of contractual duties, conditions, statements or assurances, the **Company** may cancel this **Policy** by written notice of cancellation to the **Named Insured**.  The notice shall state the date on which the cancellation will be effective, which shall be no fewer than forty-five (45) days after the date of the notice. Such notice shall be effective and conclusive as to all **Insureds** hereunder.  Proof of mailing is sufficient proof of notice and the effective cancellation date stated in the notice will become the end date of the **Policy Period**.

In the event the **Company** cancels this **Policy** for any reason, it will compute earned premium on a *pro rata* basis.  The **Company** may make any resultant premium adjustments at the time cancellation is effective, or as soon thereafter as is practicable.  However, the payment or tender of unearned premium is not a condition of or a pre-requisite to cancellation of this **Policy**.

K.   STATEMENTS IN DECLARATIONS AND APPLICATION

By acceptance of this **Policy**, each **Insured** agrees with, represents to and assures the **Company** that the statements, information and representations in the **Declarations**, in the application for this **Policy**, and in the applications for each prior policy issued by the **Company** to the **Insured**, are true and correct, that the **Declarations** and the application form a part of this **Policy**, and that this **Policy** is issued in reliance upon the truth of such statements, information and representations.



L.    ENTIRE CONTRACT

This **Policy**, including any signed endorsements attaching hereto, and including any current or previously submitted application documents which are incorporated herein by reference, embodies all agreements existing between the **Insured** and the **Company** relating to this insurance.

M.    NONASSESSABLE POLICY

This **Policy** is not assessable.

N.    SPECIAL LAWS

Any and all provisions of this **Policy** that are in conflict with applicable laws of the jurisdiction wherein this **Policy** is issued are hereby amended to conform to such laws.

O.    NOTICES

All notices to be delivered to the **Named Insured** under this **Policy** shall be mailed first class postage to the **Named Insured** at the address shown in Item 1 of the **Declarations**, unless the **Company** is notified in writing of a change in the mailing address of the **Named Insured**.  Except for notice of a claim/potential claim, which shall be delivered to the **Company** in accordance with the NOTICE OF CLAIM paragraph set forth on page 1 of this **Policy**, all other notices to be delivered to the **Company** shall be mailed first class postage to the **Company** at the following address:

ALPS
111 N. Higgins, Ste. 600
P.O. Box 9169
Missoula, MT  59807-9169

P.    SINGULAR AND PLURAL FORM OF A WORD OR DEFINED TERM

Whenever the singular form of a word or defined term is used herein, the same shall include the plural form of the word or defined term when required by context.

Q.    NAMED INSURED REPRESENTS ALL INSUREDS

By acceptance of this **Policy**, the **Named Insured** shall be designated to act on behalf of all **Insureds** for all purposes including, but not limited to, the giving and receiving of all notices, consents, communications and correspondence, the cancellation or non-renewal of this **Policy**, the payment of any premiums and **Deductible** due hereunder and the receipt of any return premiums that may be due under this **Policy**.

# Exhibit C

## July 23, 2023 Request

**From:**       Raymond Alan Hopkins <reply-to+26007e93d30b@crm.wix.com>
**Sent:**       Sunday, July 23, 2023 11:14 PM
**To:**         kristin@gcavlaw.com; greg@gcavlaw.com
**Subject:**    [Law Office Of GPC] Contact Form - new submission

**Raymond Alan Hopkins** just submitted your form: Contact Form
on Law Office Of GPC

> **Message Details:**
> Name: Raymond Alan Hopkins
> Email: emailraymondalanhopkins@gmail.com
> Phone: 623 226 4745
> Address: emailraymondalanhopkins@gmail.com
> Subject: -
> Message: How can I take legal action against a former business
> partner/friend who I granted a personal loan and he has defaulted to
> make payment as at when due? Please let me know if you can be of
> assistance to me.

If you think this submission is spam, report it as spam.

To edit your email settings, go to your inbox on desktop.

# Exhibit D

## July 25, 2023 Correspondence

**From:** Raymond Alan Hopkins <emailraymondalanhopkins@gmail.com>
**Sent:** Wednesday, July 26, 2023 3:23 PM
**To:** Gregory Cavagnaro <greg@gcavlaw.com>
**Subject:** Re: Business Loan

Hello Gregory ,
Thank you for your response, the debtor's name is William A Johnson, and he resides in Seattle, he also just inherited money and property in Canada, which is what has prompted my renewed enthusiasm to get my money which I gave to him back as soon as possible. In 2021 William came to me seeking financial assistance, he said he needed some money to inject into a new real estate flipping business venture he was embarking on. Attached is a copy of the loan agreement we had which should explain the terms we agreed on while facilitating the loan. At present William owes me $950,000 plus interest. I would be extremely glad if you can assist me with this problem as I suffered a stroke early in the year that has impaired my vision partially,and affected my speech and hearing and this has made telephone conversations difficult. I will be able to pay for legal services on a traditional hourly rate basis or contingency, but should he decide to avoid a suit he will be responsible for all legal fees as stated in the loan agreement. How long have you been in practice? How many cases like mine have you handled? How often do you settle cases out of court? What are the firm fees and costs? What are the next steps?
Regards,
Ray

On Tue, 25 Jul 2023 at 10:05, Gregory Cavagnaro <greg@gcavlaw.com> wrote:

Raymond,

Let me know if I can be of assistance to you in connection with the collection of sums due under a loan you made to a friend/business associate.

I am available today to discuss.

Greg Cavagnaro

Gregory P. Cavagnaro

Law Office of Gregory P. Cavagnaro

2135 112th Ave. N.E.

**LOAN AGREEMENT**

**THIS LOAN AGREEMENT (this Agreement) dated this 7th day of September 2021 BETWEEN:**

**Raymond Alan Hopkins** of 2333 E Prescott Pl, Chandler, AZ 85249

**("Lender")**

**OF THE FIRST PART**

**AND**

**William A Johnson** of 2008 Westlake Ave #324, Seattle, WA 98121

**("Borrower")**

**OF THE SECOND PART**

**IN CONSIDERATION OF** the Lender loaning certain monies (the "Loan") to the Borrower, and the borrower repaying the loan to the lender, both parties agree to keep, perform and fulfill the promise and condition set out in this agreement:

**Loan Amount & Interest**

- The lender promises to loan Nine hundred and fifty thousand United States dollars ($950,000) to the borrower and the borrower promises to repay this principle amount to the lender, with interest payable on the unpaid principal at the rate of 5.00 percent per annum, calculated monthly not in advance.

The borrower is severally liable to the lender for the full principal amount, plus the applicable interest.

**Payment** This loan will be repaid in the consecutive yearly installment of the principle and interest on the anniversary date of the execution of this agreement commencing next year and continuing until September 7th 2022

with the balance then owing under this agreement being paid at that time. At any time while not in default under this agreement, the borrower may pay the outstanding balance then owing under this Agreement to the Lender without further bonus or penalty.

- **Default**

Notwithstanding anything to the contrary in this agreement, if the borrower defaults in the performance of any obligation under this agreement, the Lender may declare the principal amount owing and interest due under this agreement at that time to be immediately due and payable.

- further, if the Lender declares the principle amount owing under this agreement to be immediately due and payable, and the borrower fails to provide full payment, interest in the amount of 10.00 percent per annum, calculate yearly not in advance, will be charged on the outstanding amount, commencing the day principal amount is declared due and payable, until full payment is received by the lender.

**Governing Law :**This agreement shall be governed by and construed in accordance with Laws of the state of Washington.

**Cost** All cost, expenses and expenditure including, without limitation, the complete legal cost incurred by enforcing this Agreement as a result of any default by the Borrower, will be added to the principal then outstanding and will immediately be paid by the Borrower.

**Binding Effect** This agreement will pass to the benefit of and be binding upon the respective heirs, executors, administrators, successors and permitted

assigns of the Borrower and Lender.  The Borrower waives payment, notice of non-payment, protest, and notice of protest.

## Amendments

- This agreement may only be amended or modified by a written instrument executed by both the borrower and the lender

## Severability

- The clauses and paragraph contained in this Agreement are intended to be read and construed independently of each other. if any term, covenant, condition or provision of the Agreement is held by court of competent jurisdiction to be invalid, void or unenforceable, it is the parties intent that such provision be reduced in scope by the court only to the extent deemed necessary by that court to render the provision reasonable and enforceable and the remainder of the provisions of this agreement will in no way be affected, impaired or invalidated as a result.

**General Provision**  Headings are inserted for the convenience of the parties only and are not to be considered when interpreting this agreement. Words in the singular mean and include the plural and vice versa. Words in the masculine mean and include the feminine and vice versa.

**Entire Agreement :**This agreement constitutes the entire agreement between the parties and there are no further items or provisions, either oral or otherwise.

This 7th day of September 2020 in front of the person below
Who is over 18 years of age and not involved with the contents

of this document or related to any of the parties in this
document.

**John w Baxter**

(Name of witness)

**IN WITNESS WHEREOF,** the parties have duly affixed their signature under hand
and seal on this 7th day of September 2021.

**SIGNED, SEALED, AND DELIVERED**

**Raymond Hopkins**                              **William A Johnson**

# Exhibit E

## July 29, 2023 Correspondence

**From:** William Johnson <suppliesconsultbill@gmail.com>
**Sent:** Saturday, July 29, 2023 11:31 PM
**To:** greg@gcavlaw.com
**Subject:** Request for out of court settlement

Dear attorney Gregory P. Cavagnaro,
I was informed by Mr.Raymond Hopkins that you intend to file a lawsuit against me concerning a debt I owed to him and it is my belief that we can settle this amicably without going to court as I intend to pay every cent back. I am writing to inform and assure you that I have no intention of going to court. I know I am in default. I am already making arrangements to get some money for payment. I experienced some financial setback which caused my inefficiency to completely settle the debt at the appropriate time but I am glad everything is getting back as it should be. I would be truly grateful if we can settle this matter without ever going to court. I informed Mr. Hopkins that I had just concluded the sale of a family estate in Canada and he should give me some time to get the money to him, but he insisted that all settlement had to be done through your firm and he wanted nothing to do with me. As proof that I am serious about paying back the loan I will send out a payment shortly. I would also like to have a complete breakdown of any balance remaining, including interest incurred. I would appreciate it if we can keep this problem between us because I don't want to get my wife or any other family member involved. Thank you for your consideration in advance. Please let me know what you think. I hope you will be able to help me protect my dignity and reputation and keep this away from the court.I am away now and will come over to the office to meet with you immediately i get back from travel.

Sincerely,
William Johnson

# Exhibit F

## August 3, 2023 Correspondence

| | |
|---|---|
| **From:** | Gregory Cavagnaro <greg@gcavlaw.com> |
| **Sent:** | Thursday, August 3, 2023 11:18 AM |
| **To:** | William Johnson |
| **Cc:** | kristin@gcavlaw.com |
| **Subject:** | RE: Request for out of court settlement |

ER 408 Communication – For Settlement Purposes Only and Not Admissible

Mr. Johnson,

I received your letter and payment of $258,500.00 today. Thank you.

I will review your payment proposal and our receipt of payment with Mr. Hopkins. Although prepared, I have not filed a lawsuit in this matter.

I will forward the interest and fee calculations shortly.

Regards,

Greg Cavagnaro

Gregory P. Cavagnaro
Law Office of Gregory P. Cavagnaro
2135 112th Ave. N.E.
Bellevue, WA 98004
425 818-9441

**From:** William Johnson <suppliesconsultbill@gmail.com>
**Sent:** Thursday, August 3, 2023 7:44 AM
**To:** Gregory Cavagnaro <greg@gcavlaw.com>
**Subject:** Re: Request for out of court settlement

Thank you for the opportunity and consideration. I have made out a part payment in good faith and as promised,please let me know that you have received it.I await the breakdown and total amount owed and i am willing to comply 100%.I however will plead/appeal to you that i am allowed settle this debt with a spread out payment plan.I can raise and have another part payment(upwards $300,000)made within Twenty One(21) business days,and subsequently on or before the 15th of September 2023 I will make another $350,000 payment.I can also assure the final payment will be completed on or before October 30th,2023.Please confer with your client asap so we can resolve this pending issue, and please let me know what you think. I hope you will be able to help me protect my dignity and reputation and keep this away from the court.
Sincerely,
William Johnson

On Mon, 31 Jul 2023 at 16:16, Gregory Cavagnaro <greg@gcavlaw.com> wrote:

ER 408 Communication – For Settlement Purposes Only and Not Admissible

# Exhibit G

## Counterfeit Check and Cover Letter

# Scotiabank

**CUSTOMER'S COPY**

DRAFT NO. **645990**

| DATE | INVOICE NUMBER | | NET AMOUNT |
|------|----------------|---|-----------|
| 2023-07-31 | SCOTIA18-1351B | LAW OFFICE OF GREGORY P. CAVAGNARO | 258,500.00 |
| WILLIAM JOHNSON | | TOTALS | $258,500.00 |

Please detach and retain for your records

---

THIS CHEQUE IS VOID WITHOUT A COLORED BORDER AND BACKGROUND PLUS A KNIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

# Scotiabank

**U.S. DOLLAR DRAFT**

SAHALI
500 NOTRE DAME DR, COLUMBIA SQ SC
KAMLOOPS, BRITISH COLUMBIA V2C 6T6

**645990**

DATE  2 0 2 3  0 7  3 1
Y Y Y Y   M M   D D

PAY TO THE ORDER OF   LAW OFFICE OF GREGORY P. CAVAGNARO

$ 258,500.00

SUM OF   EXACTLY 258,500 DOLLARS xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx 00/100   **U.S. FUNDS**

TO
ANY BRANCH OF
THE BANK OF NOVA SCOTIA

AUTH NO.  A01C11
AUTH NO.  K1585

THE BANK OF NOVA SCOTIA
AUTHORIZED OFFICER

AUTHORIZED OFFICER

Purchaser's Name:  *WILLIAM JOHNSON

Law Office of Gregory P. Cavagnaro

2135 112th Ave. N.E.

Bellevue, WA 98004


Dear Attorney Gregory P. Cavagnaro,

<u>PAYMENT NOTIFICATION</u>

I am sending this letter in regards to the money owed to your client Raymond Hopkins.

Find enclosed with this letter a check for part payment of the loan.

I know I am also responsible for all legal fees according to the agreement we had and I am ready to satisfy that also. Please deduct your legal fees from the funds with you and use the balance as part payment of the loan.

I am presently away but I will make sure I come see you as soon as I return so we can formally close this loan.

I would appreciate it if we can keep this problem between us because I don't want to get my wifeor any other family members involved.

You can reach me at any time by email while I am away.

Thanks for your understanding,I truly hope we can settle this matter amicably.

Yours sincerely

William Johnson

# Exhibit H

## Complaint

1    Jason M. Ayres, WSBA #39141
     jason.ayres@foster.com
2    FOSTER GARVEY PC
     Eleventh Floor
3    121 SW Morrison Street
     Portland, Oregon 97204-3141
4    Telephone: (503) 228-3939
     Facsimile: (503) 226-0259

**FILED**
2024 JAN 10 11:38 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 24-2-00682-6 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

IN AND FOR COUNTY OF KING

| | |
|---|---|
| UMPQUA BANK, an Oregon state chartered bank, | Case No. |
|         Plaintiff, | **COMPLAINT** |
|   v. | |
| GREGORY P. CAVAGNARO d/b/a The Law Offices of Gregory P. Cavagnaro, | |
|         Defendant. | |

     Plaintiff, Umpqua Bank, an Oregon state-chartered bank, by and through its undersigned counsel, alleges as follows:

### PARTIES

     1.     Plaintiff Umpqua Bank ("**Plaintiff**" or "**Umpqua Bank**") is an Oregon state-chartered bank. Umpqua Bank is the successor in interest to Columbia State Bank ("**Columbia State Bank**"), a Washington state-chartered bank.

     2.     Defendant Gregory P. Cavagnaro ("**Cavagnaro**") is an attorney licensed to practice law in Washington. Cavagnaro conducts business as the Law Offices of Gregory P. Cavagnaro

Page 1 –COMPLAINT

FOSTER GARVEY PC
*ELEVENTH FLOOR*
*121 SW MORRISON STREET, PORTLAND,*
*OREGON 97204-3141*
*(503) 228-3939*

FG: 102321803.3

(the "**Law Office**"), a sole proprietorship with its principal place of business located at 2135 112th Avenue NE, Bellevue, Washington 98004-2923.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the parties and the subject matter of this action pursuant to RCW 4.28.185.

4.      Venue is appropriate in this Court pursuant to RCW Ch. 4.12 because Cavagnaro resides and conducts business in King County, Washington.

## FACTS AND DEMAND

5.      On February 20, 2002, Cavagnaro opened an Interest on Lawyers' Trust Account ("**IOLTA**"), account number ending 7087 (the "**IOLTA Account**"), with Columbia State Bank on behalf of the Law Office.

6.      In connection with the IOLTA Account, Cavagnaro executed and delivered to Columbia State Bank an Agreement for IOLTA Account Type II Pooled Funds acknowledging receipt of the Deposit Account Agreement and the bank's Funds Availability Policy. Cavagnaro executed and delivered to Columbia State Bank additional documents evidencing his authority to operate under the trade name of the Law Office, for which the account was to be used. The various documents executed and agreed to by Cavagnaro in connection with the IOLTA Account are collectively referred to herein as the "**Agreement.**"

7.      The Agreement provides that "[t]he Bank may change this Deposit Account Agreement or any other agreements, or change the terms of our deposit accounts at any time without notice." The accountholder's continued use of the account constitutes agreement to any such changes.

8.      On or around March 1, 2023, Columbia State Bank merged with Umpqua Bank to form what is currently known as Umpqua Bank.

9.      In connection with the merger, Umpqua Bank amended the terms and conditions of the Agreement and provided notice to Cavagnaro.

/ / /

Page 2 –COMPLAINT

FOSTER GARVEY PC
ELEVENTH FLOOR
121 SW MORRISON STREET, PORTLAND,
OREGON 97204-3141
(503) 228-3939

FG: 102321803.3

10.     For deposits, the terms of the Agreement provide that,

We will give only provisional credit until collection is final for any Items other than cash we accept for deposit (including Items drawn "on us"). Before settlement of any Item becomes final, we act only as your agent, regardless of the form of endorsement or lack of endorsement on the Item and even though we provide you provisional credit for the Item. We may reverse any provisional credit for Items that are lost, stolen, or returned. **Unless prohibited by law, we also reserve the right to charge back to your Account the amount of any Item deposited to your Account or cashed for you that was initially paid by the payor bank and that is later returned to us due to an allegedly forged, unauthorized or missing endorsement, claim of alteration, encoding error or other problem that in our judgment justifies reversal of credit.** You authorize us to attempt to collect previously returned Items without giving you notice, and in attempting to collect we may permit the payor bank to hold an Item beyond the daily cutoff time described in the Funds Availability Policy in this agreement.

11.     With respect to returned deposit items, the Agreement provides,

RETURNED DEPOSIT ITEMS - **If a Check or other Item you deposit or cash is returned to us for any reason, at any time, we may debit your Account for the amount of the Item.** We may also debit your Account for any interest you may have provisionally earned on the Item. We also charge you a Returned Deposited Item fee for each returned item. . . . We may debit your Account for a returned Item at any time on or after the day it is returned to us by electronic or other means, or the day we receive notice that the Item is being returned to us - whichever is earlier. Furthermore, **if an Item deposited in your Account has been paid by the financial institution on which it is drawn and that institution later returns or makes a claim on the Item to us claiming that it was altered, forged or unauthorized or should not have been paid for any other reason, we may debit your Account for the amount of the Item. If you have insufficient funds to cover a returned Item, we may overdraw your Account** (see the Overdraft section of this agreement to learn more). **You agree to** <u>**repay us immediately.**</u>

12.     Pursuant to the terms of the Agreement, there is a fee of $25.00 per item for each item deposited int a Business or Consumer Account in foreign funds that is returned unpaid.

13.     The Agreement defines "overdraft" to mean that a customer does not have enough money in their account to cover a transaction. The Agreement further provides,

Overdraft coverage and fees - An Overdraft occurs when you do not have enough money in your Account to cover a transaction, but we pay it anyway. We are not obligated to pay any Item presented for payment if your Account does not contain sufficient funds. However, if you maintain your Account in good standing (defined generally as your

Page 3 –COMPLAINT

FOSTER GARVEY PC
*ELEVENTH FLOOR
121 SW MORRISON STREET, PORTLAND,
OREGON 97204-3141
(503) 228-3939*

FG: 102321803.3

Account having a positive balance) and there are no legal orders outstanding (including notice of bankruptcy filing), we may approve reasonable Overdrafts as a non-contractual courtesy.

14.     The Agreement also provides, "[i]f a Check, Item or transaction is presented without sufficient funds in your Account to pay it, we may, at our discretion, pay the Item (creating an Overdraft) or return the Item for insufficient funds (non-sufficient funds - NSF)." Further,

> NSF Returned Item - Each time an Item is presented for payment and your Account does not contain sufficient funds to pay the Item, that item will be returned. We reserve the right to honor, pay, return, reject or decline the Item when you have a non-sufficient Account balance. We have no obligation to notify you if we honor, pay, return or decline an Item for a non-sufficient Account balance.

15.     Overdraft fees may be imposed for transactions by check, in-person withdrawals, ATM withdrawals, or other electronic transfers.

16.     As of July 31, 2023, the IOLTA Account had a balance of $1,443.12.

17.     On August 3, 2023, Cavagnaro deposited a check (the "**Check**") purporting to be from an account held by "Sahali" at Scotiabank, with an address in Kamloops, British Columbia, Canada, totaling $258,500.00 into the IOLTA Account.

18.     On August 11, 2023, Cavagnaro instructed Umpqua Bank to send a wire transfer in the amount of $254,750.00 (the "**Funds**") using the following information:

> Acc name : FariyaL R ALI
> Bank name : Third Federal
> Bank Address : 929 E Hallandale Beach Blvd, FL 33009
> Acct Number : ******20811
> Wire Routing : ******0530

19.     Umpqua Bank initiated the wire to Third Federal Bank in accordance with Cavagnaro's instructions.

20.     On or around August 14, 2023, Umpqua Bank received from Canadian Imperial Bank of Commerce ("**Canadian Imperial**") a notification of chargeback (incoming return) explaining that the Check had been returned as a counterfeit item. Accordingly, Umpqua Bank issued a wire recall and sought to recover any remaining Funds transferred to Third Federal Bank.

Page 4 –COMPLAINT

FOSTER GARVEY PC
ELEVENTH FLOOR
121 SW MORRISON STREET, PORTLAND,
OREGON 97204-3141
(503) 228-3939

FG: 102321803.3

21.     Based on the returned Check, Umpqua Bank charged the IOLTA Account a Deposit Return Item Chargeback of $258,515.00 on August 14, 2023. Because there were insufficient funds in the IOLTA Account to cover the returned Check, the account was overdrawn.

22.     As of August 31, 2023, the balance of the IOLTA Account was $(-)253,321.88.

23.     Third Federal Bank agreed to return $104,988.85 of the Funds to Umpqua Bank and issued a check to dated August 25, 2023 in that amount.

24.     On September 14, 2023, Umpqua Bank credited the $104,988.95 payment from Third Federal Bank to the IOLTA Account.

25.     As of September 30, 2023, the balance of the IOLTA Account was $(-)148,333.18.

26.     Under the terms of the Agreement, Umpqua Bank is entitled to recover from Cavagnaro the overdrawn balance of the IOLTA Account.

27.     As a result of the overdrawn balance, Umpqua Bank issued a letter to Cavagnaro dated October 4, 2023, demanding that Cavagnaro immediately address the overdrawn balance and return the IOLTA Account balance to zero. Cavagnaro failed to respond to the letter.

28.     On October 30, 2023, Umpqua Bank issued letter to Cavagnaro demanding that he cure the total overdrawn balance on the IOLTA Account within ten (10) days. Cavagnaro failed to cure or otherwise pay the total overdrawn balance on the IOLTA Account.

29.     Umpqua Bank closed the IOLTA Account on November 14, 2023 in accordance with the terms of the Agreement.

30.     As of November 14, 2023, the IOLTA Account has a balance of $(-)148,333.18.

31.     Pursuant to the terms of the Agreement, Umpqua Bank is entitled to recover its attorneys' fees and costs from Cavagnaro.

/ / /

/ / /

/ / /

/ / /

Page 5 –COMPLAINT

FOSTER GARVEY PC
ELEVENTH FLOOR
121 SW MORRISON STREET, PORTLAND,
OREGON 97204-3141
(503) 228-3939

FG: 102321803.3

## CAUSE OF ACTION

### (Breach of Contract)

32.     Plaintiff realleges the allegations contained in paragraphs 5 through 31, above, and incorporates them by reference.

33.     As set forth above, the IOLTA Account had insufficient funds to cover the returned Check, resulting in an overdraft on the IOLTA Account.

34.     As of November 14, 2023, the IOLTA Account has an overdrawn balance of $(-) 148,333.18.

35.     Cavagnaro has failed to repay the overdrawn balance on the IOLTA Account.

36.     Under the terms of the Agreement, Umpqua Bank is entitled to a monetary judgement against Cavagnaro in the principal amount of $148,333.18.

37.     Pursuant to the terms of the Agreement, Umpqua Bank is entitled to recover its attorneys' fees and costs from Cavagnaro.

38.     All conditions precedent have been performed by Umpqua Bank.

### **REQUEST FOR RELIEF**

WHEREFORE, Umpqua Bank respectfully requests the Court to enter judgment against Cavagnaro as follows:

1.     For judgment in favor of Umpqua Bank and against Cavagnaro in the total amount of $148,333.18;

2.     For an award of attorneys' fees and costs and fees as allowed by the Agreement and as allowed by law;

/ / /

/ / /

/ / /

/ / /

/ / /

Page 6 –COMPLAINT

FOSTER GARVEY PC
ELEVENTH FLOOR
121 SW MORRISON STREET, PORTLAND,
OREGON 97204-3141
(503) 228-3939

FG: 102321803.3

3.      That said judgment(s) bear interest at the highest legal rate; and

4.      For such other relief as the court deems just and equitable.

DATED this 10th day of January, 2024.

FOSTER GARVEY PC

By  */s/ Jason M. Ayres*
    Jason M. Ayres, WSBA #39141
    121 SW Morrison St, Suite 1100
    Portland, OR 97204
    (503) 228-3939
    jason.ayres@foster.com

Page 7 –COMPLAINT

FOSTER GARVEY PC
*ELEVENTH FLOOR*
*121 SW MORRISON STREET, PORTLAND,*
*OREGON 97204-3141*
*(503) 228-3939*

FG: 102321803.3

# Exhibit I

## August 10, 2023 Wire
## Instruction Correspondence

| | |
|---|---|
| **From:** | Raymond Alan Hopkins <emailraymondalanhopkins@gmail.com> |
| **Sent:** | Thursday, August 10, 2023 3:50 PM |
| **To:** | Gregory Cavagnaro |
| **Cc:** | Kristin Jacobs |
| **Subject:** | Re: Hello |

Thank you for the update. Please send me a copy of the wire transfer receipt for my confirmation and record purpose.
Regards,
Ray

☒  Virus-free.www.avast.com

On Thu, 10 Aug 2023 at 15:36, Gregory Cavagnaro <greg@gcavlaw.com> wrote:

Hi Ray,

I set up the wire transfer at my bank this afternoon. It was beyond the wire cut-off deadline, so the wire funds will be to deposited into Mr. Ali's account tomorrow.

Regards,

Greg Cavagnaro

Gregory P. Cavagnaro

Law Office of Gregory P. Cavagnaro

2135 112th Ave. N.E.

Bellevue, WA 98004

425 818-9441

---

**From:** Raymond Alan Hopkins <emailraymondalanhopkins@gmail.com>
**Sent:** Thursday, August 10, 2023 1:19 PM

**To:** Gregory Cavagnaro <greg@gcavlaw.com>
**Subject:** Re: Hello

Greg,

I am in the hospital and it is imperative the funds are made available for mr  to meet a ton of commitments with regards to my health and life.If you are uncomfortable with sending the funds to Bonpat i will be providing details of my assistant for a wire to be made to as  it is important i receive the  funds today.I can not receive any funds in my account till i get out of the hospital.I insist that you make the wire out to:

Acc name : FariyaL R ALI

Bank name : Third Federal

Bank Address : 929 E Hallandale Beach Blvd, FL 33009

Acct Number : █████0811

Wire Routing : █████0530

Please send me a copy of the wire receipt as soon as it has been initiated.

Regards,

Ray

# Exhibit J

## August 14, 2023 Correspondence

| From: | Gregory Cavagnaro <greg@gcavlaw.com> |
|---|---|
| Sent: | Monday, August 14, 2023 10:46 AM |
| To: | William Johnson |
| Cc: | Kristin Jacobs |
| Subject: | RE: Request for out of court settlement |

I appreciate your response.

Thank you,

Greg Cavagnaro

Gregory P. Cavagnaro
Law Office of Gregory P. Cavagnaro
2135 112th Ave. N.E.
Bellevue, WA 98004
425 818-9441

**From:** William Johnson <suppliesconsultbill@gmail.com>
**Sent:** Monday, August 14, 2023 8:03 AM
**To:** Gregory Cavagnaro <greg@gcavlaw.com>
**Subject:** Re: Request for out of court settlement

Dear attorney Gregory P. Cavagnaro,
Thank you for this valuable information.I hear Raymond just had surgery and wish him all the best in his recovery as he has still not responded to my messages which is understandable.Now that i have the breakdown i will work towards making a second payment this week.I will keep you informed.Thank you for your help.
Sincerely,
William Johnson

On Fri, 11 Aug 2023 at 11:21, Gregory Cavagnaro <greg@gcavlaw.com> wrote:

**ER 408 Communication – For Settlement Purposes Only**

Mr. Johnson,

We have applied your payment in the sum of $258,500 to the balance of the loan, including accrued interest. As of August 3rd 2023 the remaining balance due under the loan is $781,947.30 plus a per diam amount of $107.12 per day. Although you are in default, my client will allow you to pay interest at the 5% per annum rate, instead of the default rate of 10% provided you follow the terms of your proposed payment plan including paying off the balance in full on or before October 30th 2023. Therefore we expect payment(s) as follows:

1. $300,000 payment by September 1, 2023.

1

2. $350,000 payment on or before September 15, 2023
3. Remaining loan balance including attorney fees on or before October 30th 2023.


We will provide updated payoff figures after you make a payment(s) and will provide you with an itemization of our legal fees at the time you are prepared to pay the balance in full. We reserve the right to charge the default interest rate of 10% on the outstanding balance in the event you do not make payments as outlined above. Please continue to send payments to our office. Let me know if you have any questions.

Regards,

Greg Cavagnaro


Gregory P. Cavagnaro

Law Office of Gregory P. Cavagnaro

2135 112th Ave. N.E.

Bellevue, WA 98004

425 818-9441

2

# Exhibit K

## August 14, 2023 Notice

# UMPQUA BANK

Date: 08-14-2023
Branch:   50427

GREGORY P CAVAGNARO
WA LAWYER TRUST ACCOUNT
DBA LAW OFFICES OF GREGORY P CAVAGNARO
2135 112TH AVE NE SUITE 200
BELLEVUE WA 98004-2926

Advice for unpaid deposited item
for account no.    ████████7087

**REASON**
**ALTERED/FICTITIOUS ITEM  $     258515.00**

THE BELOW ATTACHED ITEM HAS BEEN RETURNED UNPAID.
YOUR ACCOUNT HAS BEEN CHARGED FOR THE DEPOSITED
ITEM THAT WAS RETURNED. A RETURN DEPOSITED ITEM
FEE HAS BEEN ASSESSED. FOR ADDITIONAL INFORMATION
REGARDING THIS ITEM PLEASE SEE THE REVERSE SIDE OF
THIS NOTICE.



**NOTIFICATION OF CHARGEBACK (INCOMING RETURN)/NOTIFICATION DE REVENU IMPAYÉ**

Cheque debited to / Revenu Impayé imputé au:

Transit:                                    9612
Account/Compte: ▆▆▆▆▆▆9816
Amount/Montant:    258,500.00

Reason for Notification/Raison de Notification:

Return Reason(s)/Raison(s) de Retour:
1   COUNTERFEIT ITEM                              CONTREFAIT
2
3

Posting Date(YYYY-MM-DD)    2023-08-10   Sequence/Séquence: 75705899
Date de Passation(AAAA-MM-JJ)

---

THIS CHEQUE IS VOID WITHOUT A COLORED BORDER AND BACKGROUND PLUS A BRIGHT & FINGERPRINT WATERMARK ON THE BACK - HOLD AT ANGLE TO VIEW

**Scotiabank.**                    **U.S. DOLLAR DRAFT**                          645990

SAHAJ
500 NOTRE DAME DR, COLUMBIA SQ &C
KAMLOOPS, BRITISH COLUMBIA V2C 6T8                     DATÉ   2 0 2 3  0 7  3 1
                                                            Y Y Y Y  M M  D D

PAY TO THE ORDER OF   LAW OFFICE OF GREGORY P. CAVAGNARO            $   258,500.00

SUM OF   EXACTLY 258,500 DOLLARS xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx 00/100   **U.S. FUNDS**

TO:                                                          THE BANK OF NOVA SCOTIA
ANY BRANCH OF            AUTH NO
THE BANK OF NOVA SCOTIA   AUTH NO    AUTHORIZED OFFICER

Purchaser's Name:  *WILLIAM JOHNSON           AUTHORIZED OFFICER

---

                                                     Endorsement - Signature or Stamp
                                                     Endossement - Signature ou Timbre

                              BACK/ENDOS

---

™ Trademark of CIBC /  ᴹᶜ Marque de commerce de la Banque CIBC       5326070    May / Mai  2022
              ® Registered trademark of CIBC /  ᴹᴰ Marque déposée de la Banque CIBC

US POSTAGE
ZIP 99224 $ 000.63⁰
02 1M
0001398200 AUG 18 2023

Received
8/22/23



**UMPQUA BANK**

PO Box 1820
Roseburg, OR 97470

RETURN SERVICE REQUESTED



9800432926 C095

# Exhibit L

## September 14, 2023

## Umpqua Bank Correspondence



9/14/2023

GREGORY P CAVAGNARO        SHD
WA LAWYER TRUST ACCOUNT
DBA LAW OFFICES OF GREGORY P CAVAGNARO
2135 112TH AVE NE SUITE 200
BELLEVUE, WA   98004-2926

RE: Your account ending in XXXXXX7087
Days Overdrawn: 30

Dear Client,

The account referenced above has been overdrawn for 30 or more consecutive days as of the date of this letter. The account is overdrawn by ($253,321.88).

If the balance remains overdrawn for 55 days, this letter will serve as "the final demand for payment" of the overdraft amount and any fees. If your account is overdrawn for 55 consecutive days, it will be closed. The total balance owing, including fees, will be charged off. This action may be reported to ChexSystems and collection proceedings pursued.

We want to work with you to resolve this matter, but we must hear from you immediately. It is critical that you bring your account balance back to a positive amount. Please visit the nearest Umpqua Bank branch or call our Customer Care Support Center at 1-866-4UMPQUA (1-866-486-7782) with any questions.


Sincerely,

Umpqua Bank

50,427 - 2784